# 22-3137-cv

## United States Court of Appeals

### *for the*

### Second Circuit

UNITED STATES SECURITIES AND EXCHANGE COMMISSION,

*Plaintiff-Appellee,*

SILLS CUMMIS & GROSS, P.C.,

*Petitioner,*

– v. –

RICHARD XIA, AKA Yi Xia, FLEET NEW YORK METROPOLITAN
REGIONAL CENTER LLC, FKA Federal New York Metropolitan Regional
Center, LLC, JULIA YUE, AKA Jiqing Yue,

*Defendants-Appellants.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF AND SPECIAL APPENDIX FOR
## DEFENDANTS-APPELLANTS

MARK C. RIFKIN
BENJAMIN Y. KAUFMAN
WOLF HALDENSTEIN ADLER FREEMAN
& HERZ LLP
*Attorneys for Defendants-Appellants*
270 Madison Avenue, 10th Floor
New York, New York 10016
(212) 545-4600

**CORPORATE DISCLOSURE STATEMENT**
**PURSUANT TO RULE 26.1 OF THE**
**FEDERAL RULES OF APPELLATE PROCEDURE**

Pursuant to Federal Rule of Appellate Procedure Rule 26.1, Defendant-Appellant Fleet New York Metropolitan Regional Center, LLC, states that it does not have a corporate parent, and there is no publicly held corporation that owns 10 percent or more of its stock.

# **TABLE OF CONTENTS**

**Page(s)**

TABLE OF CITATIONS .................................................................... iii

JURISDICTIONAL STATEMENT ..................................................... 1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ..................... 1

STANDARDS OF REVIEW ................................................................ 2

STATEMENT OF THE CASE ............................................................. 2

SUMMARY OF THE ARGUMENT ..................................................... 12

ARGUMENT ..................................................................................... 15

I.    THE ASSET FREEZE IS GROSSLY EXCESSIVE AND UNNECESSARY
      TO PROTECT THE SEC'S DISGORGEMENT AND CIVIL MONEY
      JUDGMENT CLAIMS ................................................................. 15

      A.   Any Asset Freeze Must be in Proportion to the Amount of .....................
           Defendants' Potential Liability to the SEC ............................................. 15

      B.   The Preliminary Injunction is Grossly Excessive ................................ 23

           1.   Defendants Showed They Have Spent More Than
                They Received From All the EB-5 Visa Investors ...................... 25

           2.   The Amount of Assets Frozen Dwarfs the SEC's Potential
                Recovery ................................................................................. 31

II.   THE PRELIMINARY INJUNCTION MUST BE VACATED OR
      MODIFIED BECAUSE NEARLY ALL OF THE SEC'S CLAIMS ARE
      TIME-BARRED ......................................................................... 34

      A.   Retroactive Application of NDAA § 6501 to Revive Expired
           Claims is Constitutionally Impermissible ............................................. 34

      B.   Nearly All of the SEC's Claims Are Barred by the Five-Year Statute of
           Limitations ........................................................................................... 41

III.    THE EB-5 VISA INVESTMENTS ARE NOT "SECURITIES" UNDER
        THE FEDERAL SECURITIES LAWS .........................................................45

CONCLUSION .......................................................................................................48

# TABLE OF CITATIONS

**CASES**                                                                **Page(s)**

*421-A Tenants Ass'n v. 125 Court St. LLC*,
   760 F. App'x 44 (2d Cir. 2019) .........................................................34

*Bank Markazi v. Peterson*,
   578 U.S. 212 (2016) ...................................................................37, 38

*Bowen v. Georgetown University Hospital*,
   488 U.S. 204 (1988) .......................................................................36

*Charas v. Sand Technology Systems International, Inc.*,
   90 Civ. 5638 (JFK),
   1992 U.S. Dist. LEXIS 15227 (S.D.N.Y. Oct. 7, 1992).......................48

*Chemical Bank v. Arthur Andersen & Co.*,
   726 F.2d 930 (2d Cir.),
   *cert. denied*, 469 U.S. 884 (1984).......................................................47

*Diaz v. Johnson & Johnson*,
   No. 19-CV-6929 (LJV) (MWP),
   2021 U.S. Dist. LEXIS 137083 (W.D.N.Y. July 22, 2021) .................42

*In re Enterprise Mortgage Acceptance Co. Securities Litigation*,
   391 F.3d 401 (2d Cir. 2004)......................................................*passim*

*Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*,
   38 F.3d 1279 (2d Cir. 1994).............................................................23

*J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*,
   37 N.Y.3d 552 (2021) .....................................................................40

*Kokesh v. SEC*,
   137 S. Ct. 1635 (2017)................................................................35, 40

*Landgraf v. Usi Film Products*,
   511 U.S. 244 (1994).................................................................*passim*

*Liu v. SEC,*
  140 S. Ct. 1936 (2020) ...................................................................*passim*

*Marine Bank v. Weaver,*
  455 U.S. 551 (1982). .........................................................................47

*SEC v. American Board of Trade,*
  830 F.2d 431 (2d Cir. 1987).............................................................12

*SEC v. Byers,*
  No. 08 Civ. 7104 (DC), 2009 U.S. Dist.
  LEXIS 59689 (S.D.N.Y. Jan. 7, 2009) ............................................22

*SEC v. Callahan*,
  No. 12-CV-1065 (ADS) (AYS),
  2015 U.S. Dist. LEXIS 178114 (E.D.N.Y. Dec. 24, 2015) ......................17, 19, 45

*SEC v. ETS Payphones, Inc.*,
  408 F.3d 727 (11th Cir. 2005) .......................................................*passim*

*SEC v. First Jersey Sec., Inc.*,
  101 F.3d 1450 (2d Cir. 1996)...........................................................19

*SEC v. I-Cubed Domains, LLC*,
  664 F. App'x 53 (2d Cir. 2016) .................................................... 15-16

*SEC v. Manor Nursing Centers, Inc.*,
  458 F.2d 1082 (2d Cir. 1972)...........................................17, 18, 20

*SEC v. Microtune, Inc.*,
  783 F. Supp. 2d 867 (N.D. Tex. 2011) ............................................34

*SEC v. Sason*,
  433 F. Supp. 3d 496 (S.D.N.Y. 2020) .............................................35

*SEC v. Unifund Sal*,
  910 F.2d 1028 (2d Cir. 1990)......................................................*passim*

*SEC v. Unifund SAL*,
  917 F.2d 98 (11th Cir. 1990) ...........................................................21

iv

*SEC v. W.J. Howey, Co.*,
  328 U.S. 293 (1946).......................................................................46

*SEC v. Xia*,
  No. 21-CV-5350 (PKC) (RER),
  2022 U.S. Dist. LEXIS 221555 (E.D.N.Y. Dec. 8, 2022)....................2

*SEC v. Zandford*,
  535 U.S. 813 (2002).......................................................................47

*Set Capital LLC v. Credit Suisse Grp. AG*,
  996 F.3d 64 (2d Cir. 2021)...............................................................2

*Smith v. SEC*,
  653 F.3d 121 (2d Cir. 2011)..............................................................2

*Stogner v. California*,
  539 U.S. 607 (2003)...................................................................14, 38

*Superintendent of Insurance v. Bankers Life & Casualty Co.*,
  404 U.S. 6 (1971).........................................................................47

*United Housing Foundation, Inc. v. Forman*,
  421 U.S. 837 (1975).......................................................................46

*United States v. O'Hagan*,
  521 U.S. 642 (1997).......................................................................47

*United States v. Zaslavskiy*,
  No. 17-CR-647(RJD),
  2018 U.S. Dist. LEXIS 156574 (E.D.N.Y. Sep. 11, 2018) ..................45

*United States SEC v. Ahmed*,
  No. 3:15cv675 (JBA),
  2018 U.S. Dist. LEXIS 242717 (D. Conn. Mar. 26, 2018) .............17, 44

*Weingarten v. United States*,
  865 F.3d 48 (2d Cir. 2017)...........................................................36, 37

# STATUTES & RULES

Fed. R. App. P. 4(a)(1)(B)(ii) ....................................................................24
Fed. R. App. P. 4(a)(3) ..............................................................................24

National Defense Authorization Act for Fiscal Year 2021,
Pub. L. No. 116-283, codified in part at 15 U.S.C. § 78u(d)(8)(A) ("NDAA")
.......................................................................................................... *passim*
  Section 6501 ........................................................................................ *passim*

National Defense Authorization Act for Fiscal Year 2008, § 1083,
122 Stat. 341, 28 U.S.C.S. § 1610(g) .......................................................38

Securities Act of 1933, 15 U.S.C. § 77a, *et seq.* ("Securities Act") ...........1
  15 U.S.C. § 77q(a) ("Section 17(a)") .................................4, 35, 46, 47
  15 U.S.C. § 77v(a) ("Section 22(a)") ....................................................1

Securities Exchange Act of 1934, 15 U.S.C. § 78a, *et seq.* .................1, 36
  15 U.S.C. § 77aa ("Section 27(a)") .......................................................1
  15 U.S.C. § 78j(b) ("Section 10(b)") ............................................ *passim*

28 U.S.C. § 1292(a)(1) ................................................................................1
28 U.S.C. § 1331 .........................................................................................1
28 U.S.C. § 2462 ..................................................................................34, 35

17 C.F.R ¶ 240.10b-5 ("Rule 10b-5") ........................................................4

U.S. Const., Art. I, § 9, cl. 3 .................................................................38, 39

## JURISDICTIONAL STATEMENT

The District Court had subject-matter jurisdiction over this action pursuant to Section 22(a) of the Securities Act of 1933, 15 U.S.C. § 77v(a), Section 27 of the Securities and Exchange Act of 1934, 15 U.S.C. § 78aa, and pursuant to 28 U.S.C. § 1331. This Court has appellate jurisdiction over this appeal from an interlocutory order of the District Court granting, continuing, modifying, or refusing to dissolve or modify an injunction pursuant to 28 U.S.C. § 1292(a)(1).

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Whether the District Court improperly declined to vacate or modify the temporary restraining order despite the Supreme Court's holding in *Liu v. SEC*, 140 S. Ct. 1936 (2020), and this Court's decision in *SEC v. Unifund Sal*, 910 F.2d 1028, 1042 (2d Cir. 1990), after Defendants and Relief Defendant Yue showed that the asset freeze was grossly disproportionate to the potential amounts recoverable by the SEC in this civil enforcement action?

2.      Whether the SEC's claims were barred by the expiration of the five-year statute of limitations before this action was commenced, in contravention of this Court's decision in *In re Enterprise Mort. Acceptance Co. Sec. Litig.*, 391 F.3d 401 (2d Cir. 2004)?

3.     Whether the District Court improperly expanded the scope of the temporary restraining order and imposed a far harsher asset freeze than the SEC sought?

4.     Whether any of Defendants' alleged misrepresentations were made "in connection with" the offer or sale of any securities to foreign investors through the EB-5 Immigrant Investor Program?

## STANDARDS OF REVIEW

The Second Circuit reviews *de novo* a District Court's determination whether the alleged misconduct satisfies the "in connection with" the purchase or sale of any securities.  *See Set Capital LLC v. Credit Suisse Grp. AG*, 996 F.3d 64, 75 (2d Cir. 2021).

The Second Circuit reviews a District Court order granting or modifying an asset freeze for abuse of discretion. *Smith v. SEC*, 653 F.3d 121, 127 (2d Cir. 2011).

## STATEMENT OF THE CASE

This is an appeal from a decision by Hon. Pamela K. Chen of the United States District Court for the Eastern District of New York, granting a preliminary injunction freezing more than $774 million in assets in this civil enforcement action by Plaintiff-Appellee Securities and Exchange Commission ("SEC"). The decision is reported at *SEC v. Xia*, No. 21-CV-5350 (PKC) (RER), 2022 U.S. Dist. LEXIS 221555 (E.D.N.Y. Dec. 8, 2022).  Special Appendix ("SPA") at SPA-1.

Defendants-Appellants, Richard Xia ("Xia") and Fleet New York Metropolitan Regional Center, LLC ("Fleet"),[1] are successful real estate developers who undertook two large commercial construction projects in Queens, New York. The first construction project is a nearly completed 20-story mixed-use commercial building at 42-31 Union Street (the "Eastern Mirage Project"), on which Defendants already have spent $108 million in land acquisition and hard construction costs. The second construction project is a planned mixed use commercial office building and convention center to be built at 112-21 Northern Boulevard (the "Eastern Emerald Project"), on which Defendants already have spent $121 million in land acquisition and massive site decontamination and excavation costs.

At the suggestion of the City of New York, Defendants raised $56 million for the Eastern Mirage Project by selling limited partnership interests in three partnerships, EMMCO, L.P., EMMCO Tower, L.P., and EMMCO NQMC, L.P. to 112 Chinese investors seeking permanent residence in the United States through the EB-5 Immigrant Investor Program. They similarly raised $172.5 million for the Eastern Emerald Project by selling limited partnership interests in two partnerships, EEGH, L.P., and EEGH II, L.P., to 345 additional Chinese investors also seeking permanent residence in the United States through the EB-5 Immigrant Investor

---

[1] Petitioner Sills Cummis & Gross, P.C., which appears in the caption, represented the Defendants for a time in the District Court. Its petition for attorneys' fees was denied by the District Court. It is not a party to this appeal.

Program. Each investor contributed $500,000 for his or her limited partnership interest. The investments were sold pursuant to a Confidential Private Offering Memorandum for each of the five partnerships.

Following a three-year investigation of Defendants' business activities, the SEC commenced this civil enforcement action on September 27, 2021, accusing Defendants of violating Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder, 17 C.F.R. ¶ 240.10b-5. ECF No. 1. The alleged securities law violations relate to the way Defendants have financed and operated both construction projects.

On September 27, 2021, the SEC also filed an emergency *ex parte* application seeking an order appointing a monitor and a temporary restraining order freezing Defendants' assets "up to the amount of $229 million." ECF Nos. 2, 2-1, and 8 ¶ 2(a) at 2. The SEC presented a heavily skewed, one-sided version of the facts and argued that an order freezing Defendants' assets "up to the amount of $229 million" was "necessary . . . to protect this Court's ability to award equitable relief in the form of disgorgement of illegal profits from securities law violations and civil penalties." ECF No. 8 at 4 (proposed TRO).

The Court granted the SEC's emergency *ex parte* application and entered its order (the "Asset Freezing Order") at 6:30 p.m. that same day, freezing Defendants'

assets "up to the amount of $229 million," capping the asset freeze at "up to the amount of $229 million" exactly as the SEC requested. ECF No. 95-1, ¶ 2(a) at 2. In doing so, the District Court implicitly accepted the SEC's *ex parte* argument that freezing up to $229 million of Defendants' assets would protect the SEC's ability to award any disgorgement of alleged "illegal profits" earned by Defendants and impose any civil penalties it might be able to achieve if it prevails on the merits. ECF No. 95-1 at 4 (emphasis added).

Before the Asset Freezing Order was entered, Defendants already had contributed more than $31.6 million of their own cash to both Projects.[2] Amideo Decl., ¶ 9 and Ex. A § 1 (Appendix ("A") at A-1901 and A-1906). In addition to

---

[2] The SEC has made much of the fact that Mr. Xia allegedly withdrew $14 million from the Projects to purchase a family home on Long Island – hardly the best way for an alleged fraudster to abscond with allegedly ill-gotten gains. In fact, Defendants contributed ***three times more in cash*** to the Projects than what Mr. Xia allegedly withdrew to buy the home. The SEC concedes that no funds were withdrawn from either Project; rather, certain assets – principally Brownfield tax credits that belong to Mr. Xia - were used to secure credit used to buy the home. ECF No. 98 at ¶ 96. But in any event, Mr. Xia was entitled to payment for the years of service he already had provided to both Projects. It also is noteworthy that Mr. Xia had been negotiating the purchase of the home ***for years*** before buying it in 2021 and that he signed the sales contract a month ***before*** receiving the SEC's Wells notice advising him that the SEC's staff had "made a preliminary determination to recommend that the Commission file an enforcement action against" him. *See* Declaration of Mark C. Rifkin in Support of Defendants' Motion to Vacate or Modify Asset Freeze ("Rifkin Decl.") filed herewith, ¶¶ 5-6 (A-1264) & Ex. C (A-1871) thereto. The notion that the home was purchased to surreptitiously siphon investor funds from the projects, as insinuated by the SEC, strains credulity, especially given the timing, the publicly-filed mortgage, and the location of the home.

contributing cash to both Projects, they also paid $16.7 million in cash to acquire the

land at 42-31 Union Street for the Eastern Mirage Project[3] and $17 million in cash

to purchase the land at 112-21 Northern Boulevard. *Id*. at ¶¶ 10-14 (A-1901-02) and

Ex. A § 1 (A-1906). Defendants' $65.3 million in total cash and land contributions

were in addition to the $228.5 million received from the EB-5 visa investors. *Id*. at

¶¶ 9-14 (A-1901-02) and Ex. A § 1 (A-1906).

Defendants also incurred significant reasonable business expenses for the

Eastern Mirage and for Eastern Emerald Projects in addition to their cash

contributions. Before the Asset Freezing Order was entered, Defendants spent $91.3

million for construction costs[4] and $16.7 million in deferred developer costs for the

Eastern Mirage Project.[5] Amideo Decl., ¶¶ 18-19 (A-1903) and Ex. A § 2 (A-1907).

Leaving apart the ground lease rent they have deferred, Defendants' actual hard

---

[3] The land on Union Street on which the Eastern Mirage Project is built is owned by E&Y Development Group ("E&Y") and is leased to Fleet for 99 years. To date, Defendants have not received any rent for the land; they have deferred $53.9 million in land lease payments to which E&Y is contractually entitled. *See* Amideo Decl., ¶ 12 (A-1902) and Ex. A § 2 (A-1907).

[4] Defendants have nearly completed construction of the 348,000 square foot, 20-story building at a cost of just $262.36 per square foot, just one-half of the average direct cost of approximately $500 per square foot for construction in New York City. *See* Rifkin Decl., Ex. A at 250 (A-1524).

[5] Defendants have deferred a total of $70.6 million in rent ($53 million) and developer fees ($16.7 million) on the Eastern Mirage Project to which they are entitled. *See* Amideo Decl., ¶¶ 12, 16 & 17 (A-1902-03). The $70.6 million in deferred rent and developer fees on the Eastern Mirage Project is **five times more** than the $14 million Mr. Xia withdrew to purchase the Long Island home.

business expenses incurred to date, including $16.7 million in cash paid for the land and $91.3 million for construction, are $108.1 million for the Eastern Mirage Project. *Id*. ¶¶ 18-19 (A-1903) and Ex. A § 2 (A-1907). Defendants received only $56 million from the EB-5 visa investors for the Eastern Mirage Project. Thus, their hard business expenses *exceeded* the amount contributed by the Eastern Mirage investors by *$52.1 million*. *Id*. at ¶ 21 (A-1903-04) and Ex. A § 3 (A-1908).[6] The SEC has given no credit to Defendants for these costs and expenses and have not even attempted to quantify them. Nor have they given any credit to Defendants for the lease payments and fees they are contractually entitled to. Instead, the SEC has treated Defendants as mere scammers, who simply absconded with investor money and undertook no work on the Projects.

Likewise, in addition to paying $17 million in cash for the land on Northern Boulevard,[7] Defendants have incurred $104.5 million in site improvement costs[8] and

---

[6] Adding the additional deferred developer fees of $17.5 which Defendants claim for the Eastern Mirage Project, their total reasonable business expenses for Eastern Mirage are $124.8 million. *See* Amideo Decl., ¶¶ 16 & 18 (A-1903). These total expenses exceed the amount contributed by the EB-5 visa investors by $68.8 million.

[7] Defendants paid $17 million in cash to acquire the property on Northern Boulevard for the Eastern Emerald Project. Amideo Decl., ¶ 11 (A-1902) and Ex. A § 1 (A-1906).

[8] Defendants have spent $104.5 million for clean-up of the site contamination, for which they earned $84 million in Brownfield tax credits. Amideo Decl., ¶ 18 (A-1903) and Ex. A § 2 (A-1907). The Brownfield tax credits belong to Defendants, who have contributed them to EEGH and EEGH II. *Id.,* Ex. A § 5 (A-1910).

$17.5 million in deferred developer costs for the Eastern Emerald Project.[9] Amideo Decl., ¶¶ 18-19 (A-1903) and Ex. A § 2 (A-1907). Thus, Defendants' hard business expenses incurred to date are $139.0 million for the Eastern Emerald Project. *Id*. at ¶¶ 18-19 (A-1903) and Ex. A § 2 (A-1907). They received $172.5 million from EB-5 visa investors for the Eastern Emerald Project. Of that sum, $75.8 million remains on deposit at CTBC. *Id*. at ¶ 10 (A-1901-02). After excluding the cash on hand, Defendants' hard business expenses ***exceeded*** the amount contributed by the Eastern Emerald EB-5 visa investors and used for project-related expenses[10] by $42.3 million. *Id*. at ¶ 21 (A-1903-04) and Ex. A § 3 (A-1908).[11] As with Eastern Mirage Project, the SEC has given Defendants no credit for these costs as well as the lease payments and fees they are contractually entitled to. Instead, they treat Defendants as simply having absconded with investor funds.

The real estate for both Projects was appraised in mid-2022 by Colliers

---

[9] Pursuant to the Private Offering Memorandum for EEGH, Defendants are entitled to management fees of $11.7 million to date. Pursuant to the Private Offering Memorandum for EEGH II, they are entitled to management fees of $5.6 million to date. Amideo Decl., ¶ 15 (A-1902); ECF No. 46-10 at 7.

[10] Excluding the $74.9 million still on deposit at CTBC from the $172.5 million paid by the EB-5 visa investors leaves the sum of $97.6 million capital contributed and used by the EB-5 visa investors.

[11] Adding the additional deferred developer fees of $9.5 million which Defendants claim for the Eastern Emerald Project, their total reasonable business expenses for Eastern Emerald are $148.3 million. *See* Amideo Decl., ¶¶ 17-18 (A-1903). Net of the cash still on hand, these total expenses exceed the amount contributed by the EB-5 visa investors by $51.8 million.

International Valuation & Advisory Services, a division of Colliers, a publicly traded and highly respected international commercial real estate and investment advisor, for a potential lender for both Projects. Copies of the two Colliers appraisal reports are attached as Exhibits A and B to the accompanying Rifkin Decl. A-1265 & A-1587. Colliers has determined three different appraised market values for each property: the "as-is" value, the "as completed" value, and the "stabilized" value. Reflecting the enormous amount of work Defendants have performed on both projects, the appraised values are as follows:

| | Eastern Mirage | Eastern Emerald | Combined Value |
|---|---|---|---|
| As-Is Value | $314,600,000 | $270,200,200 | $584,800,000 |
| As Completed Value | $318,000,000 | $632,600,000 | $950,600,000 |
| Stabilized Value | $345,950,000 | $680,900,000 | $1,026,850,000 |

The appraisals were prepared by one of the nation's most highly respected independent consultants acting for a sophisticated commercial lender prepared to invest hundreds of millions of dollars in both Projects. They were not prepared by or for Defendants; nor were they prepared in connection with any litigation. The SEC disputes these valuations; in fact, the SEC disputes *any* valuation of the real property. After three years of investigating Defendants before commencing suit and after a year of litigation, the SEC has not – or more likely, it *will not* – place any value on the real estate.

On September 23, 2022, Defendants and Relief Defendant-Appellant Julia

Yue moved to vacate or modify the Asset Freezing Order. ECF No. 178 (A-1261). They argued that the asset freeze was excessive and unwarranted because Defendants already spent more in land acquisition costs on the two Projects than they received from the EB-5 visa investors. Under the Supreme Court's decision in *Liu*, 140 S. Ct. at 1940, the SEC may only recover Defendants' "net profits" as disgorgement in this civil enforcement action and must credit Defendants for all their reasonable business expenses incurred on both projects. Because Defendants incurred reasonable expenses ***greater than*** the total amount contributed by all the EB-5 visa investors in both projects, the SEC is not entitled to ***any*** disgorgement. And because they are not entitled to any disgorgement, they are not entitled to an asset freeze.

On December 8, 2022, the District Court entered its Preliminary Injunction rejecting Defendants' arguments and freezing all of Defendants' assets, whenever and however acquired, without any limitation on the value of the assets frozen. The District Court refused to consider *Liu* in setting the amount of the asset freeze in the Preliminary Injunction. Consequently, the Preliminary Injunction currently freezes more than $774 million in assets, ***tripling*** the amount of assets frozen by the original Asset Freezing Order. The Court did so despite uncontroverted evidence that Defendants already had spent more in land acquisition and hard construction costs on both projects than they received from the EB-5 visa investors. The SEC has never

offered **any** contrary evidence of the cost to build the 20-story building on Union Street or to complete the massive decontamination and excavation on Northern Boulevard.

Following three years of investigation, the SEC never has attempted to estimate the reasonable expenses or net profits earned when it sought its extraordinary *ex parte* relief which froze **all** of Defendants' assets and put a halt to two major construction projects directly harming the "investors" the SEC claims to protect. If the SEC had properly accounted to the Court for Defendants' ***$308 million in costs for both Projects*** as it must under *Liu*, the Asset Freezing Order and the Preliminary Injunction never would have been entered. By now, the Eastern Mirage Project – which was at least 80% complete when the Asset Freezing Order was entered – would have been finished, the 20-story mixed-use building would be leased and producing revenue, and all those EB-5 visa investors would have been repaid. And work on the Eastern Emerald Project would be well underway. Instead, the SEC's ill-considered and ill-timed asset freeze has halted both Projects, has delayed repayment to the investors, and may prevent them from ever being made whole.[12]

---

[12] The SEC recently moved the District Court to appoint a receiver to completely liquidate all of the Defendants' and the Relief Defendants business and personal assets. ECF No. 235. The SEC proposes to have the receiver lump the investors' claims together with all other claims against the Defendants, whether related to the SEC enforcement action or not, and oversee a *pro rata* distribution to all the

Nearly all of the SEC's claims against Defendants were **time-barred and extinguished** under the then-applicable five-year statute of limitations long **before** the SEC commenced this action and long **before** Congress extended the statute of limitations in 2021. At most, as shown below, the SEC has timely claims for only 84 investors in one of the five partnerships at issue. If it is not vacated entirely, the Asset Freezing Order should be modified to reflect the fact that most of the SEC's claims are untimely.

## SUMMARY OF THE ARGUMENT

In *Liu*, 140 S. Ct. 1936, the Supreme Court held that the SEC may only recover a defendant's "net profits" as disgorgement in any civil enforcement action and must credit the defendant for all its reasonable business expenses. An asset freeze, which exists to protect the SEC's ability to collect disgorgement and civil money penalties, may be no larger than a defendant's potential disgorgement liability. *See Unifund Sal*, 910 F.2d at 1042 (freeze order must be proportional to "relief 'of the same character as that which may be granted finally'") (quoting *De Beers Consolidated Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945)); *SEC v. ETS Payphones, Inc.*, 408 F.3d 727, 735 (11th Cir. 2005) (amount of assets to be frozen must be

---

claimants that will not favor the investors, despite clear Second Circuit authority against such liquidating receiverships outside of the Bankruptcy Code. *SEC v. American Board of Trade*, 830 F.2d 431, 436-8 (2d Cir. 1987) (criticizing use of liquidating receiverships).

related to the amount of disgorgement).

Here, Defendants' potential liability for disgorgement is extremely small. They have paid tens of millions of dollars *more* in legitimate business expenses on both Projects than the amount of $228.5 million they collected from all the EB-5 visa investors. To date, they have incurred *net losses*, not any "net profit," on the Projects. In addition, the District Court already has determined that Defendants' maximum potential liability for civil money penalties is only $18,646,380. ECF No. 216 at 65 (SPA-65).

The District Court refused to apply *Liu* or the limit on the SEC's claim for civil money penalties in setting the amount of the asset freeze. ECF No. 216 at 25 (SPA-25). Instead, the District Court eliminated the $229 million cap in the Asset Freezing Order and *tripled* the amount of assets frozen. Under the Preliminary Injunction, the asset freeze now covers *more than $774 million in frozen assets*, including approximately $76 million in cash, $585 million in "as-is" real property on Union Street and Northern Boulevard in Queens, $84 million in earned tax credits, approximately $11 million in Defendants' two pre-EB-5 income-producing properties, and more than $18 million in Mr. Xia's and Ms. Yue's personal real estate. Under *Liu*, the Asset Freezing Order and the Preliminary Injunction are grossly excessive.

The asset freeze is also excessive because nearly all of the SEC's claims were

time-barred **before** the SEC commenced the civil enforcement action on September 27, 2021. Under the *ex post facto clauses* of the Constitution, a statute of limitations cannot be extended retroactively to revive time-barred claims for disgorgement and civil money penalties. *Stogner v. California*, 539 U.S. 607, 618 (2003). Once extinguished by a vested statute of limitations defense, those time-barred claim cannot be revived. *Enterprise Mort. Acceptance Co. Sec. Litig.*, 391 F.3d at 410 ("resurrection of previously time-barred claims has an impermissible retroactive effect"). Nonetheless, the District Court impermissibly applied the National Defense Authorization Act for Fiscal Year 2021, Pub. L. No. 116-283 ("NDAA"), retroactively to revive all of the SEC's time-barred claims, voiding Defendants' vested statute of limitations defense. ECF No. 216 at 30 (SPA-30).

For the reasons explained in detail below, this Court should reverse the District Court's decision refusing to apply settled precedent in *Liu*, *Unifund*, *Stogner*, and *Enterprise*. The Court should vacate the Preliminary Injunction and the Asset Freezing Order.

## ARGUMENT

I.  **THE ASSET FREEZE IS GROSSLY EXCESSIVE AND UNNECESSARY TO PROTECT THE SEC'S DISGORGEMENT AND CIVIL MONEY JUDGMENT CLAIMS**

A.  **Any Asset Freeze Must be in Proportion to the Amount of Defendants' Potential Liability to the SEC**

The Asset Freezing Order capped the amount of assets that were frozen at "up to the amount of $229 million," exactly the amount proposed by the SEC when it sought the Asset Freezing Order. ECF No. 95-1, ¶ 2(a) at 2; ECF No. 8 at 4 (proposed TRO). Nonetheless, the SEC claimed it was entitled to freeze *all* of Defendants' assets, as if there were no cap in the Asset Freezing Order. The Preliminary Injunction has no cap in it. It freezes *all* of Defendants' business and personal assets, whenever and however acquired. The Preliminary Injunction currently freezes *more than $774 million in assets*, tripling the amount of assets frozen.

The District Court erroneously concluded it was not required to consider the potential amount of the SEC's recovery when it set the cap in the Asset Freezing Order or when it entered the Preliminary Injunction. ECF No. 216 at 25 (SPA-25).[13] This Court reviews the District Court's "preliminary injunction freezing assets – 'an asset freeze' – for abuse of discretion." *SEC v. I-Cubed Domains, LLC*, 664 F.

---

[13] The Asset Freezing Order is superseded by the Preliminary Injunction. If the Court agrees that the Preliminary Injunction was entered improperly, it should likewise conclude that the Asset Freezing Order was also entered improperly.

App'x 53, 55 (2d Cir. 2016) (citing *CFTC v. Walsh*, 618 F.3d 218, 225 (2d Cir. 2010)). A district court abuses its discretion if it applies the incorrect legal standard or relies upon clearly erroneous findings of fact. *Id*. The District Court applied the incorrect legal standard and its Preliminary Injunction decision – like the Asset Freezing Order – was wrong as a matter of law.

In *Liu*, 140 S. Ct. at 1940, the Supreme Court held that the SEC may only recover Defendants' "***net profits***" as disgorgement in a civil enforcement action such as this. Thus, "courts ***must*** deduct legitimate expenses before ordering disgorgement." *Id*. at 1950 (emphasis added). In *Liu*, the defendants solicited nearly $27 million from foreign investors, promising that the bulk of the proceeds would be used to build a cancer-treatment center. *Id*. at 1941. They spent nearly $20 million on marketing expenses and salaries, not to build the medical center, and "[o]nly a fraction of the funds were put toward" construction. *Id*. at 1941-42. The district court ordered disgorgement of the ***full amount*** the defendants raised from the investors and imposed civil penalties, which the Ninth Circuit affirmed. *Id*. at 1942. The Supreme Court vacated the decision, holding that "Congress prohibited the SEC from seeking an equitable remedy in ***excess of a defendant's net profits from wrongdoing***." *Id*. at 1946 (emphasis added).

The Preliminary Injunction (like the Asset Freezing Order before it) should have been no larger than Defendants' potential liability to the SEC. When it seeks

an asset freeze, the SEC "is requesting ancillary relief to facilitate enforcement of any disgorgement remedy that might be ordered in the event a violation is established at trial." *Unifund*, 910 F.2d at 1041. An asset freeze "assures that any funds that may become due can be collected." *Id*. In *Unifund*, the Court modified the asset freeze to be equal to the defendant's potential liability in that case. *Id*. at 1042 (setting amount of asset freeze to match defendant's potential liability on SEC's insider trading claim).[14]

In *SEC v. Manor Nursing Centers, Inc*., 458 F.2d 1082 (2d Cir 1972), the Court held that an asset freeze could be imposed only if it provides "remedial relief and is not a penalty assessment." *Id*. at 1104 (quoting *SEC v. Texas Gulf Sulphur Co.*, 446 F.2d 1301, 1308 (2d Cir.), *cert. denied*, 404 U.S. 1005 (1971)).  The Court cautioned that an asset freeze should not be so onerous as to "financially destroy" the defendant's ongoing business, which "might thwart the goal of compensating investors." *Manor Nursing*, 458 F.2d at 1105-06. If an asset freeze impairs far more assets than necessary to satisfy the defendant's potential liability, it ceases to be

---

[14] *See also SEC v. Callahan*, No. 12-CV-1065 (ADS)(AYS), 2015 U.S. Dist. LEXIS 178114, at *6-7 (E.D.N.Y. Dec. 24, 2015) (quoting *SEC v. Banner Fund Int'l*, 211 F.3d 602 (D.C. Cir. 2000)) (amount that may be frozen must take into account the amount defendant may be required to disgorge); *United States SEC v. Ahmed,* No. 15-675 (JBA), 2018 U.S. Dist. LEXIS 242717, at *6 n.3 (D. Conn. Mar. 26, 2018).

ancillary relief to facilitate enforcement of a potential disgorgement remedy and becomes an improper penalty.[15]

In *ETS Payphones,* 408 F.3d at 735, the Eleventh Circuit discussed the SEC's burden to prove the amount of its potential disgorgement recovery to obtain an asset freeze: "The SEC's burden for showing the amount of assets subject to disgorgement (and, ***therefore available for freeze***) is light: 'a reasonable approximation of a defendant's ill-gotten gains [is required].'" (Emphasis added; citation omitted). The word "therefore" in the Court's holding means that the amount of assets to be frozen ***must*** relate to the amount of disgorgement. The logical meaning of the holding in *ETS Payphones* is that if the amount assets are not subject to disgorgement, then they are not available to be frozen.

The decision in *ETS Payphones* is fully consistent with this Court's decision in *Unifund*. Both decisions rest on the nature and purpose of asset freezes in SEC civil enforcement actions: they exist to maintain the *status quo* while the case is

_____

[15] Limiting an asset freeze to the amount of the defendant's potential liability to the SEC is well grounded in sound public policy considerations. As this Court noted, "[f]reezing assets under certain circumstances, however, might thwart the goal of compensating investors if the freeze were to cause such disruption of defendants' business affairs that they would be financially destroyed. Thus, the disadvantages and possible deleterious effect of a freeze must be weighed against the considerations indicating the need for such relief." 458 F.2d at 1105-06. Balancing the need to protect the SEC's ability to recover unlawful profits in a disgorgement proceeding such as this against the need to avoid destroying a defendant's business highlights the importance of restricting the amount of any asset freeze to the amount of the SEC's potential recovery.

litigated and to protect the SEC's ability to collect any disgorgement and civil money penalties for which the defendant may be liable after trial.

The SEC implicitly conceded that an asset freeze should be set based upon its ability to obtain disgorgement and civil money penalties, and thus limited by *Liu*. When it sought the Asset Freezing Order, the SEC said the asset freeze was "necessary . . . to protect this Court's ability to award equitable relief in the form of disgorgement of illegal profits from securities law violations and civil penalties." ECF No. 8 at 4 (proposed TRO). The District Court ignored the SEC's implicit concession and declined to follow *Liu*, reasoning that *Liu* applies only trial. ECF No. 216 at 63-64 (SPA-63-64).[16]

---

[16] The District Court's citation to *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996), ECF No. 216 at 62 (SPA-62), was misplaced. That case, which predated *Liu*, was an appeal from a judgment ordering disgorgement following a bench trial. *Id*. at 1456. Regarding the amount of disgorgement ordered, the Court held only that "any risk of uncertainty [in calculating disgorgement] should fall on the wrongdoer whose illegal conduct created that uncertainty." *Id*. at 1475 (citing *SEC v. Patel*, 61 F.3d 137, 140 (2d Cir. 1995) (internal quotation marks omitted)). The Court said nothing about whether the amount of an asset freeze must bear any relationship to the amount of the SEC's potential disgorgement recovery.

Likewise, the District Court's comment that an "asset freeze may encompass assets not derived from the fraud," ECF No. 216 at 62 (SPA-62), does not address whether the ***amount*** of assets to be frozen should take into consideration the amount of the SEC's potential disgorgement recovery. While the frozen assets need not be traceable to the alleged wrongdoing, the ***amount*** of assets frozen must relate to the amount of the defendant's potential liability. *Unifund*, 910 F.2d at 1041-42; *see also Callahan*, 2015 U.S. Dist. LEXIS 178114, at *6-7 (noting "causal connection . . . between the amount by which the defendant was unjustly enriched and the amount he can be required to disgorge") (citation omitted).

Thus, following *Liu*, and consistent with *Unifund* and *Manor Nursing*, the amount of any asset freeze should be no greater than necessary to protect the SEC's ability to recover the defendant's unlawful net profits. Defendants and Ms. Yue cited *Liu* and argued below that the District Court was required to consider the potential amount recoverable on the SEC's disgorgement claim in freezing Defendants' assets and should have vacated or reduced the amount of the asset freeze because the SEC's disgorgement claim is nearly worthless (or certainly worth much less than the amount of $229 million originally frozen and only a small fraction of the amount of $774 million now frozen) under that binding precedent. The District Court misconstrued their argument: "Defendants and Yue argue that notwithstanding the fact that the Second Circuit has repeatedly affirmed the Court's power to issue such asset freezes under the relevant statutes, the Supreme Court effectively ***prohibited*** courts from doing so in *Liu*[]." ECF No. 216 at 24 (SPA-24) (emphasis added). Defendants made no such argument; rather, they argued that *Liu* limits their potential disgorgement liability, and thus ***limited the amount of assets*** that should have been frozen, not that it ***prohibited*** the District Court from entering any asset freeze.

Having misconstrued their argument, the District Court declined to follow *Unifund* or *ETS Payphones* and refused to consider the effect of the Supreme Court's decision in *Liu* when it ***tripled*** the amount of the asset freeze. ECF No. 216 at 24-25 (SPA-24-25). The District Court froze all of Defendants' and Mrs. Yue's business

and personal assets – together worth in excess of $774 million – far more than their potential liability to the SEC. Instead, the District Court cited the Second Circuit's *en banc* decision in *SEC v. Unifund SAL*, 917 F.2d 98, 99 (2d Cir. 1990), concluding it was not required to consider the amount of Defendants' potential liability ***at all*** because the SEC is not required "to prove the extent of the defendants' potential liabilities with exactitude." ECF No. 216 at 62 (SPA-62).

The District Court's reliance on the *en banc* decision in *Unifund* was misplaced. There, the Court simply clarified that it did not "intend to establish any particular time period as the duration for freeze orders in subsequent insider trading cases" in the underlying decision. 917 F.2d at 99. The Court noted in the *en banc* decision that "district courts retain ample discretion . . . to determine the coverage, terms, and duration of [an asset freeze] order." *Id*. However, the Court did ***not*** reconsider its underlying decision that a freeze order must be proportional to "relief 'of the same character as that which may be granted finally.'" *Unifund*, 910 F.3d at 1042.

Moreover, the Eleventh Circuit's more recent decision in *ETS Payphones* makes it abundantly clear that the SEC must provide at least "a reasonable approximation of a defendant's ill-gotten gains" to demonstrate the amount of assets that should be frozen. 408 F.3d at 735 (citation omitted). Though the Court characterized the SEC's burden as "light," it is ***not*** non-existent. The District Court

cited the Court's decision in *ETS Payphones*, but ignored the plain meaning of that holding. In originally setting the amount of the asset freeze in the Asset Freezing Order of "up to $229 million" and later **tripling** that amount in the Preliminary Injunction, the District Court imposed **no burden** on the SEC to approximate Defendants' alleged "ill-gotten gains" in this case. The District Court's decision was clearly erroneous and inconsistent with this Court's decision in *Unifund* and the Eleventh Circuit's persuasive decision in *ETS Payphones*.

Nothing in the Supreme Court's holding in *Liu* supports a conclusion that it applies only at the end of the case, not at the beginning. This Court should reverse the District Court's decision and make it abundantly clear that the limit on the disgorgement remedy must be considered now. Otherwise, the SEC is given unfettered authority to freeze all the assets of any defendant at the commencement of a case, on only a modest showing of the probability of success,[17] regardless of the amount of the defendant's potential liability. No court has held that the SEC should have such overwhelming power, effectively crippling a defendant's ability to defend himself.

---

[17] To obtain an asset freeze, the SEC need only show that the "probability of [it] prevailing is better than fifty percent." *SEC v. Byers*, No. 08 Civ. 7104 (DC), U.S. Dist. LEXIS 59689, at *9 n.5 (S.D.N.Y. Jan. 7, 2009) (citing *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *overruled on other grounds*, *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987)). Assets may be frozen even though there "may remain **considerable room for doubt**" about the SEC's chance of success. *Id.* (emphasis added).

## B.    <u>The Preliminary Injunction is Grossly Excessive</u>

Under *Liu*, even if the SEC is successful on the merits and even if this Court affirms the District Court's decision that the SEC's untimely claims barred by Defendants' vested statute of limitations defense were subsequently revived by the NDAA (*see* Point III below), the amount of the asset freeze dwarfs Defendants' potential liability to the SEC.

The SEC asserts two claims against Defendants in the Amended Complaint in this civil enforcement action: one claim for disgorgement and another claim for civil money penalties. ECF No. 98 at 48 and 49. Under *Liu*, the SEC's disgorgement claim has little or no value because Defendants have spent more on the two Projects than they received from all the EB-5 visa investors; they have no "net profits," illegal or otherwise. In addition, the District Court has determined that the maximum amount of civil money penalties the SEC may seek is $18,646,380. SPA-65 (ECF No. 216 at 65).[18]

---

[18] The District Court corrected the SEC's miscalculation of the maximum amount of civil money penalties it may seek. The SEC sought $34,519,932, but the District Court found that it could seek no more than $18,646,380 in civil money penalties. SPA-65 (ECF No. 216 at 65). If the SEC wanted to contest the District Court's finding that limited its claim for civil money penalties, it had to file a cross-appeal. A party that does not timely cross-appeal may not "attack the decree with a view either to ***enlarging his own rights*** thereunder or of lessening the rights of his adversary." *Int'l Ore & Fertilizer Corp. v. SGS Control Servs., Inc.*, 38 F.3d 1279, 1285 (2d Cir. 1994) (quoting *Morley Constr. Co. v. Maryland Casualty Co.*, 300 U.S. 185, 191 (1937)). The SEC has not cross-appealed the District Court's computation of the maximum amount of civil money penalties it may seek. The time

In *ETS Payphones*, 408 F.3d at 735, the Eleventh Circuit held that the SEC must provide at least "a reasonable approximation of a defendant's ill-gotten gains" to demonstrate the amount of assets that should be frozen. However "light" its burden may be, the SEC never tried to meet it.

When the SEC sought the Asset Freezing Order at the commencement of the action, it offered ***no evidence*** for the District Court to estimate Defendants' "net profits" from the alleged securities law violations in order to set the amount of the asset freeze consistent with *Liu*. It simply requested an asset freeze "up to the amount of $229 million" because that was the total amount invested by all the EB-5 visa investors in both projects. The District Court granted the SEC's *ex parte* application and froze Defendants' assets "up to the amount of $229 million," exactly as the SEC requested, without requiring the SEC to provide ***any*** approximation of Defendants' allegedly "ill-gotten gains."

Likewise, when the SEC opposed Defendants' and Mrs. Yue's motion to vacate or modify the Asset Freezing Order and sought the preliminary injunction, it again offered ***no evidence*** for the District Court to estimate Defendants' "net profits" from the alleged securities law violations to properly set the amount of the asset freeze. The SEC simply requested an asset freeze of ***all*** of Defendants' and the Relief

---

for it to do so expired on February 6, 2023, 60 days after the entry of the Preliminary Injunction. *See* Fed. R. App. P. 4(a)(1)(B)(ii) and 4(a)(3).

Defendants' personal and business assets. When the District Court entered the Preliminary Injunction, it froze more than $774 million of Defendants' and the Relief Defendants' personal and business assets without considering Defendants' potential liability for disgorgement, its limited liability for civil money penalties, or the amount of assets frozen.

### 1. Defendants Showed They Have Spent More Than They Received From All the EB-5 Visa Investors

When Defendants and Ms. Yue moved to vacate or modify the Asset Freezing Order, they submitted substantial evidence from two independent experts showing that the SEC's disgorgement claim is virtually worthless. Defendants demonstrated and substantiated that they have incurred reasonable business expenses *far more* than the total amount of $228.5 million contributed by all the EB-5 visa investors in both projects. For example, Defendants itemized $33.7 million in land acquisition costs and $195 million in site improvement and hard construction costs – all unquestionably legitimate business expenses – in detailed declarations and affidavits from independent expert witnesses filed with the District Court. *See* ECF Nos. 180-1 through 15, 181, and 184 (A-1265-1870, A-1900-2170, A-2231-49). The SEC did not seriously dispute any of those expenses, which are all documented by the record evidence in any event. Certainly, it offered no contrary evidence of different expenses. Counting only the documented land acquisition, site improvement, and hard construction costs incurred before this action was commenced, and leaving

apart all their other development and construction costs, ***Defendants have spent more than they took in. And they have put in more than they may have taken out***.

The EB-5 visa investors contributed a total of $228.5 million to both Projects. Before investor funds were received, Defendants paid $16.7 million in 2007 to acquire the land on Union Street for the Eastern Mirage Project and $17 million in 2013 to acquire the land on Northern Boulevard for the Eastern Emerald Project. The SEC has never challenged those land acquisition costs.

In addition to the $33.7 million in land acquisition costs spent before any investor funds were raised, Defendants also spent $195 million in hard construction costs alone on both Projects before this action was commenced and work on both Projects was halted. They spent ***more than $91 million in hard construction costs*** to build the nearly-complete 20-story building on Union Street, which the SEC decried as an "empty glass tower," currently languishing under the asset freeze. ECF No. 98 at ¶ 3. And they spent ***nearly $104 million in hard construction costs*** for the massive site decontamination and excavation work on Northern Boulevard, which the SEC mocked as a mere "vacant dirt hole," in preparation for construction there. *Id.*[19]

---

[19] Defendants also submitted evidence of tens of millions of dollars of additional construction costs on both Projects. *See* ECF Nos. 161 at ¶ 9; 181-1 at 2 (A-1906-07).

After deducting the hard construction costs of $195 million for both Projects from the amount of $228.5 million invested by all the EB-5 visa investors, ignoring all the other expenses of running both Projects for the past decade, there should have been $33.5 million in the bank when the SEC filed suit and froze Defendants' assets. However, there was actually $80.9 million on hand (*see* ECF No. 53 at 14), which is at least ***$47.2 million more than should have been in the bank***. If this were the giant swindle the SEC says it is, then at least ***some*** investor money would be missing. If the SEC's claims had any merit, there would be ***less*** money in the bank, not more of it. Contrary to what the SEC says, Defendants actually spent investor funds to pay for the enormous amount of work already performed on both Projects, exactly as they were supposed to. In fact, Defendants spent more money than they took in: they contributed tens of millions of dollars ***of their own money*** to the Projects. ECF Nos. 181-1 at 2 (A-1906-07) and 187 at ¶¶ 56-57 & 61-67 (A-5592-93 & A-5594-95). That is why there was $47.4 million ***more*** in the bank when the SEC swooped in than the simple math says should have been there.

The total of $228.7 million in land acquisition, site improvement, and construction costs alone is ***more than the total amount contributed*** by all the EB-5 visa investors, and the recoverable disgorgement is ***zero***. Even if the acquisition cost for the land on Union Street (which is not owned by the Eastern Mirage Project), is excluded, the total of $212 million in costs is only $16.5 million less than the full

amount contributed by the investors. Thus, under *Liu*, the maximum potential amount of the SEC's disgorgement claim was and is only $16,500,000, and is more likely to be zero.

The SEC never refuted those costs or offered any contrary evidence of Defendants' legitimate business expenses. At most, the SEC alleged "***in effect*** . . . that some of the business expenses Defendants seek to exempt from the asset freeze are not legitimate, but merely incidental means to fuel the ongoing fraudulent scheme." *See* ECF No. 216 at 63 (SPA-63) (emphasis added). It is indisputable that land acquisition costs, site remediation and excavation costs, and other hard construction costs are "***legitimate*** business expenses" for a real estate development project: they are the ***core expenses*** of the business. There is no rational explanation for all the money Defendants spent to buy the land for both Projects, remediate the Brownfield site at Northern Boulevard, and build the 20-story building at Union Street other than that they were ***legitimately*** incurred for both Projects. Indeed, those legitimate business expenses have made the projects currently worth, as is, $585 million (not including the $84 million in earned tax credits).

For example, Defendants have spent $99.1 million for the massive site decontamination effort on the Brownfield site at Northern Boulevard, which costs have been audited by the State of New York and for which Defendants earned $84 million in Brownfield tax credits. ECF No. 184 at 5 (A-2235). It would strain

credibility past the breaking point if the SEC were to dispute that those **_audited_** costs were "legitimate business expenses." Without them, the Eastern Emerald Project could not be built. The cost of the massive Brownfield site decontamination alone accounts for almost two-thirds of the funds received from the Eastern Emerald investors and nearly one-half of the total amount received from all the EB-5 visa investors. And, of course, the SEC has frozen the Brownfield tax credits earned by that expenditure.

Defendants documented the legitimate construction costs with affidavits and declarations from two respected professionals. Michael Amideo, an independent accountant and financial advisor, verified and computed the land acquisition costs, site improvement costs, hard construction costs, and other legitimate construction costs for both projects. Joseph Endres, Esquire, a well-respected attorney who has represented Defendants in their application for Brownfield tax credits, summarized and documented the detailed audit process in which $67 million in site decontamination costs already have been approved by the New York State Department of Taxation. The District Court simply ignored those expenses without requiring the SEC to provide any contrary evidence to refute them.

Following its three-year investigation of both projects and after nearly a year of litigation, the SEC offered **_no evidence_** for the District Court to estimate

Defendants' "net profits" from the alleged securities law violations. It failed to meet (or even attempt to meet) its burden under *Liu*, *Unifund*, and *ETS Payphones*.

After citing *Unifund* and *ETS Payphones*, the District Court failed to require the SEC to provide any reasonable approximation of Defendants' allegedly "ill-gotten gains" to set the amount of assets that should be frozen. It imposed no burden on the SEC, and **tripled** the amount of the asset freeze without a scintilla of evidence from the SEC. The District Court summarily rejected the only evidence of Defendants' legitimate business expenses or their "net profits" ***without any contrary evidence from the SEC*** as to the land acquisition costs, the hard construction costs, or the ***audited*** site decontamination and excavation costs. *See* ECF No. 216 at 67-68 (SPA-67-68) (calling the value of the expert evidence "almost nil").

The District Court also declined to take the limited amount of civil money penalties into consideration in setting the amount of the asset freeze. Correcting a mistake in the SEC's computation, the District Court reduced the amount of its claim from $34,519,932, finding that the SEC may only seek penalties up to $15,538,635 from Fleet and up to $3,107,745 from Mr. Xia, or $18,646,380 in total. ECF No. 216 at 65 (SPA-65).[20]

---

[20] The amount of civil money penalties need not be considered in setting the amount of any asset freeze. The SEC argued below that it was necessary to freeze Defendants' assets **only** "***up to the sum of $229 million***" to protect the Court's ability to award disgorgement of illegal profits and civil penalties. *See* ECF No. 8 at 4 (proposed TRO). It never sought to protect its ability to collect civil money

The District Court's jaundiced view of the one-sided record is particularly troublesome given its own citations to this Court's holdings in *Unifund* and the decision in *ETS Payphones*, which required the SEC to put forth at least some evidence to substantiate Defendants' alleged unlawful "net profits" and required the District Court to consider Defendants' maximum potential liability in setting the amount of the asset freeze.

### 2. The Amount of Assets Frozen Dwarfs the SEC's Potential Recovery

As shown above, the SEC's disgorgement claim is likely nearly worthless after Defendants are given credit for their reasonable business expenses incurred on both massive commercial construction projects. Counting only their documented (and undisputed) land acquisition, hard construction, and site remediation costs, Defendants have no "net profits" from either Project, a fact the SEC has never actually refuted. In addition, as the District Court held, the SEC's claim for civil money penalties is capped at $18,646,380, which the SEC has not appealed. ECF No. 216 at 65 (SPA-65).

The amount of assets frozen by the Preliminary Injunction dwarfs Defendants' maximum potential liability by an order of magnitude. The asset freeze now covers ***nearly $774 million in frozen assets***:

---

penalties. The SEC should not be permitted to backtrack from its own explicit representation simply because it must comply with *Liu*.

- approximately $75.8 million in cash on hand (as to which there is no dispute);
- $84 million in Brownfield Tax Credits (which are already earned);
- $314.6 million for the "as-is" value of the Union Street property (including the nearly complete 20-story mixed-use building);
- $270.2 million for the "as-is" value of the Northern Boulevard property (including the substantial site preparation work);
- $11 million in pre-EB-5 rental properties; and
- $18 million in personal real estate

Rifkin Decl., Exs. A & B (A-1265 & A-1587); Amideo Decl., ¶ 10 (A-1901-02).

When they moved to vacate the Asset Freezing Order, Defendants and Mrs. Yue offered detailed, independent appraisals of both properties from Colliers, a highly respected international commercial real estate and investment advisor. Colliers determined the value of the properties in their current condition, once completed, and after the projects are fully leased. The lowest of those appraised values, the "as-is" market value, for Eastern Mirage was $314,600,000 and for Eastern Emerald was $270,200,000, for a combined "as-is" appraised value of $584,800,000.

The appraisals were prepared by one of the nation's most highly respected independent consultants acting for a sophisticated commercial lender prepared to invest hundreds of millions of dollars in both Projects. They were not prepared by or for Defendants; nor were they prepared in connection with any litigation. Without conducting its own appraisal, the SEC disputed the appraised values from Colliers

and declined to accept even the conservative values from the Monitor.[21] The SEC refuses to place **any** value on the real estate. After three years of investigating Defendants and after a year of litigation, the SEC has ***not placed any value on either Project***. However, the Monitor's conservative estimates and Colliers's appraised values were the ***only*** valuations of the real estate before the Court. The ***SEC has not put any value of its own on the properties***.

Colliers's appraised values and the Monitor's outdated, conservative estimates were the ***only*** valuations of the real estate before the Court. As it did with the only evidence of Defendants' legitimate business expenses, the District Court rejected out of hand the only evidence of the value of the two commercial properties before it. ECF No. 216 at 67-68 (SPA-67-68) (calling the value of the appraisals to be "almost nil").

Under any measure – whether the professional appraisals prepared by a highly respected independent appraiser for a potential commercial lender or the Monitor's ultra-conservative and state estimates – the SEC is ***grossly over-secured*** for its potential disgorgement and civil money penalty claims. The Court should limit the

---

[21] In his Report to the District Court on January 28, 2022, the Monitor reported upon three appraisals for the Eastern Mirage Project prepared in 2019 and 2021 and two appraisals for the Eastern Emerald Project prepared in 2019 that placed values of between $204.3 and $356.8 million for both Projects. ECF No. 53 at 17-19.

amount of frozen assets to be no more than the amount of the SEC's potential recovery on those claims.

## II. THE PRELIMINARY INJUNCTION MUST BE VACATED OR MODIFIED BECAUSE NEARLY ALL OF THE SEC'S CLAIMS ARE TIME-BARRED

### A. Retroactive Application of NDAA § 6501 to Revive Expired Claims is Constitutionally Impermissible

Even if the SEC could show it is entitled to recover any disgorgement from Defendants under the demanding "net profit" standard of *Liu*, the District Court should have reduced the amount of the asset freeze because nearly all of the SEC's claims are time-barred. The District Court's decision rejecting Defendants' statute of limitations defense is reviewed *de novo*. *421-A Tenants Ass'n v. 125 Court St. LLC*, 760 F. App'x 44, 48 (2d Cir. 2019) (citing *Deutsche Bank Nat. Trust Co. v. Quicken Loans Inc.*, 810 F.3d 861, 865 (2d Cir. 2015)).

Like every other litigant, the SEC is subject to statutes of limitation that extinguish stale claims. For the entire time it investigated Defendants, the SEC was subject to a strict five-year statute of limitations under which it cannot maintain any "action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise . . . unless commenced within five years from the date ***when the claim first accrued***." 28 U.S.C. § 2462 (emphasis added).[22]

---

[22] The Section 10(b) claim "accrue[d] when the allegedly false or misleading statement was made." *SEC v. Microtune, Inc.*, 783 F. Supp. 2d 867, 888-89 (N.D.

"Disgorgement in the securities-enforcement context is a 'penalty' within the meaning of [28 U.S.C.] § 2462." *Kokesh v. SEC*, 137 S. Ct. 1635, 1639 (2017). As such, "disgorgement actions must be commenced within five years of the date the claim accrues" because a "[five]-year statute of limitations applies to any 'action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise.'" *Id.* (quoting 28 U.S.C. § 2462).

After the Supreme Court decided *Kokesh*, Congress renewed the annual National Defense Authorization Act for 2021 over the President's veto on January 1, 2021. The NDAA of 2021 provides that the SEC "may bring a claim for disgorgement under paragraph (7) . . . not later than 10 years after the latest date of the violation that gives rise to the action or proceeding in which the Commission seeks the claim if the violation involves conduct that violates" either Section 17(a) of the Securities Act or Section 10(b) of the Exchange Act. Pub. L. No. 116-283, § 6501, 134 Stat. 3388, 4626 (2021) (codified in part at 15 U.S.C. § 78u(d)(8)(A)) ("NDAA § 6501").

The SEC's stale claims are not saved by NDAA § 6501, which does *not* revive claims which were previously extinguished. In *Landgraf v. Usi Film Prods.*, 511 U.S. 244, 266 (1994), the Supreme Court held that the Constitution "flatly prohibits

---

Tex. 2011) (citations omitted). The Section 17(a) claim likewise accrued when the "defendant's allegedly fraudulent conduct occurs." *SEC v. Sason*, 433 F. Supp. 3d 496, 507-08 (S.D.N.Y. 2020) (citing *Gabelli v. SEC*, 568 U.S. 442, 448 (2013)).

retroactive application of penal legislation," and that "[r]etroactivity is not favored in the [civil] law." Applying *Landgraf*, this Court held that the NDAA cannot be given retroactive effect to resurrect already extinguished claims. "[T]he resurrection of **previously time-barred claims** has an **impermissible** retroactive effect." *Enterprise,* 391 F.3d at 410 (emphasis added). Citing *Landgraf* and *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988), the Second Circuit held:

> Extending the statute of limitations retroactively "increase[s] [a defendant's] liability for past conduct" . . . by increasing the period of time during which a defendant can be sued. This effect is particularly prevalent in the context of **claims that have already expired**. Resurrection of such claims puts defendants back at risk at a point when defendants reasonably believe they are immune from litigation, **stripping them of a complete affirmative defense they previously possessed** and may have reasonably relied upon.

*Enterprise,* 391 F.3d at 410 (emphasis added and citations omitted). That reasoning applies exactly to this case, where the SEC seeks to invoke the NDAA to resurrect claims that were expired.[23]

In *Enterprise*, the Court was asked to decide whether an amendment to the statute of limitations for claims under the Securities and Exchange Act of 1934 that extended the filing period for private actions applies retroactively to revive claims that had expired under the old limitations statute. 391 F.3d at 406. The Court held

---

[23] Courts routinely recognize a difference between merely extending a filing period for live claims and revoking an already-vested statute of limitations defense. *Weingarten v. United States*, 865 F.3d 48, 57-58 (2d Cir. 2017) (collecting cases). This case falls in the latter category.

that it did not do so, absent clear congressional intent. *Id*. at 410. The Court reasoned that "'extending the statute of limitations' for antecedent conduct would upset settled expectations and fail to protect reasonable reliance interests because it would "'increase[] a defendant's liability for past conduct'" by increasing the period of time during which a defendant can be sued." *Weingarten,* 865 F.3d at 57 (quoting *Enterprise*, 391 F.3d at 410 (quoting *Landgraf*, 511 U.S. at 280)). The Court found "that observation to be 'particularly prevalent' where the extended statute of limitations revived claims that were fully extinguished under the prior statute." *Weingarten*, 865 F.3d at 57 (quoting *Enterprise*, 391 F.3d at 410, and citing *Stogner*, 539 U.S. at 618.

The District Court agreed with the SEC that *Enterprise* does not apply to the NDAA. ECF No. 216 at 30-31 (SPA-30-31). The District Court concluded that the Supreme Court overruled *Enterprise* in *Bank Markazi v. Peterson*, 578 U.S. 212 (2016), which the District Court said, "in effect, held that the NDAA applies retroactively to claims commenced after its passage and rendered them timely." *Id*. at 31.

The District Court's reliance on *Bank Markazi* was misplaced. That case had nothing to do with the NDAA § 6501 or with **any** statute of limitations; it concerned whether assets held in a New York bank for the Central Bank of Iran were subject

to post-judgment execution.[24] And most importantly, *Bank Markazi* was utterly silent on whether the NDAA applies retroactively to revive untimely claims previously extinguished by the statute of limitations prior to its enactment – the issue for which the District Court cited the decision.[25]

Importantly, in *Stogner*, the Supreme Court held that "[t]he Constitution's two *Ex Post Facto* Clauses prohibit the Federal Government and the States from enacting laws with certain retroactive effects." 539 U.S. at 610 (citing Art. I, § 9, cl. 3 (Federal Government); Art. I, § 10, cl. 1 (States)). The law at issue in *Stogner* "created a new criminal limitations period that . . . authorized criminal prosecutions that the passage of time **had previously barred**. Moreover, it was enacted **after** prior limitations periods for [the defendant's] alleged offenses had expired." *Id*. The Supreme Court held that the Constitution "***forbids***" such a retroactive effect. *Id*. (emphasis added).

---

[24] The Supreme Court construed Section 1610(g) of the National Defense Authorization Act for Fiscal Year 2008 § 1083, 122 Stat. 341, 28 U.S.C.S. § 1610(g), a different section of a different version of the NDAA. *Bank Markazi*, 578 U.S. at 212. Section 1610(g) made the property of a foreign state sponsor of terrorism available for execution to satisfy a judgment against that state.

[25] After recognizing that "the Ex Post Facto Clause **flatly prohibits retroactive application of penal legislation**," the Supreme Court discussed circumstances in which Congress may make statutes apply retroactively to pending cases. *Bank Markazi*, 578 U.S. at 228-29 (quoting *Landgraf*, 511 U.S. at 267) (emphasis added).

The *ex post facto* clauses of the Constitution apply to certain civil claims as well as criminal claims. Indeed, the Supreme Court explained in *Landgraf* that the *ex post facto* clauses prohibit retroactive application of statutes of limitations for civil claims that "share key characteristics of criminal sanctions." 511 U.S. at 281 (discussing *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 17 (1976) (Court would "hesitate to approve the retrospective imposition of liability on any theory of deterrence . . . or blameworthiness"); *De Veau* v. *Braisted*, 363 U.S. 144, 160 (1960) ("The mark of an *ex post facto* law is the imposition of what can fairly be designated punishment for past acts."); *Louis Vuitton S. A. v. Spencer Handbags Corp.*, 765 F.2d 966, 972 (2d Cir. 1985) (retroactive application of punitive treble damages provisions of Trademark Counterfeiting Act of 1984 "would present a potential *ex post facto* problem")).

This is a civil enforcement proceeding, not a criminal prosecution. However, the SEC's claim for disgorgement – which seeks to compel Defendants to return their "ill-gotten gains" – and especially its claim for civil money penalties undoubtedly "share key characteristics of criminal sanctions." *See Landgraf*, 511 U.S. at 281. As such, a congressional statute extending the period in which the SEC may assert claims for disgorgement and civil money penalties under the federal securities laws is subject to the constitutional limitation of the *ex post facto* clause in Art. I, § 9, cl. 3. of the Constitution.

As discussed above, the Supreme Court held in *Kokesh*, 137 S. Ct. at 1643, that SEC disgorgement is a "penalty." The Supreme Court reached that conclusion for three main reasons. *First*, disgorgement is imposed for a violation of public laws, and therefore is designed to protect the public at large rather than any one individual injured party. *Id.* at 1643. *Second*, as disgorgement is imposed for punitive purposes and has a deterrent effect, and since "deterrence" has no legitimate "nonpunitive governmental objective," disgorgement must be punitive. *Id.* (citation omitted). *Third*, and perhaps most importantly, disgorgement is **not** compensatory because courts are **not** required to distribute the funds to the victims. *Id.* at 1644. The Supreme Court confirmed that decision in *Liu*. 140 S. Ct. at 1941 (disgorgement "is assessed in part for punitive purposes, and in many cases, the award is not compensatory").[26] Thus, disgorgement shares key characteristics of criminal sanctions, making disgorgement subject to the *ex post facto* clause of the Constitution.

As its very label implies, civil money penalties are unquestionably penalties and thus plainly share key characteristics with criminal statutes. *See Landgraf*, 511 U.S. at 281 (discussing the "very labels given 'punitive' or 'exemplary' damages").

---

[26] *See also J.P. Morgan Sec. Inc. v. Vigilant Ins. Co.*, 37 N.Y.3d 552, 586 (2021 (SEC disgorgement is a penalty under insurance policy "because it deters violations of public law – federal securities statutes and regulations – rather than compensating violations against a particular aggrieved individual").

Even more so than disgorgement, civil money penalties are assessed ***primarily*** for punitive purposes, and they are not at all compensatory in nature. *Cf. Liu*, 140 S. Ct. at 1941. Like many criminal penalties, civil money penalties are calculated by statute on the basis of the number of violations rather than the harm suffered by any (or indeed, all) of the alleged victims. Thus, civil money penalties also share key characteristics of criminal sanctions, making them subject to the *ex post facto* clause of the Constitution as well.

Applying 15 U.S.C. § 78u(d)(8)(A) retroactively after the original five-year statute of limitations already had expired would create presumptively impermissible retroactive effects.

### B.      Nearly All of the SEC's Claims Are Barred by the Five-Year Statute of Limitations

All of the EB-5 visa investors in the EMMCO, EMMCO NQMC, and EMMCO Tower offerings invested in 2011 and 2012, more than five years ***before*** NDAA § 6501 was enacted. Likewise, all the investors in the EEGH offering invested in 2014 and 2015, more than five years ***before*** passage of NDAA § 6501. In addition, 35 of the investors in the EEGH II offering invested their money ***before*** December 31, 2015.[27] ***All of those claims were time-barred before NDAA § 6501***

---

[27] Though not relevant, Defendants note that one of those 35 early investors withdrew his $500,000 investment in April, 2019, leaving only a total of 125 investors in EEGH II.

*was passed*. Only 84 investors in EEGH II invested on after March 27, 2016, and whose claims were still timely when the NDAA § 6501 was enacted on January 1, 2021. ECF No. 181-1 at 8 (A-1912).

The SEC is not saved by two tolling agreements with Defendants Xia and Fleet, which suspended the running of all applicable tolling for six months, beginning on September 10, 2019, through March 9, 2020.[28] Those tolling agreements did not *revive* the SEC's already-expired claims. A tolling agreement does not revive an already extinguished claim. *Diaz v. Johnson & Johnson*, No. 19-CV-6929-LJV-MWP, 2021 U.S. Dist. LEXIS 137083, at *9 (W.D.N.Y. July 22, 2021) (tolling agreement did not revive already untimely claim).

Indeed, the tolling agreements here expressly confirmed that result:

> nothing in this agreement shall affect any applicable statute of limitations defense or any other time-related defense that may be available to [the tolling parties] before the commencement of the tolling period or be construed to revive any proceeding that may be barred by any applicable statute of limitations or any other time-related before the commencement of the tolling period.

*See* Declaration of Mark C. Rifkin in Support of Defendants' Post-Trial Memorandum (ECF No. 125), ¶¶ 2-3 (A-1077) and Exhibits A and B (ECF Nos. 125-1 & 125-2; A-1078 & A-1080). The tolling agreements expressly preserved

---

[28] The tolling agreements literally refer to a tolling period "beginning on September 10, 2019, through March 19, *2019*," (ECF Nos. 125-1 and 125-2 (A-1078 & A-1080)) (emphasis added), but obviously meant ending on March 19, *2020*. Defendants do not rely upon the SEC's immaterial clerical mistake.

Defendants' *vested* statute of limitations defense to the SEC's claims as to four of the five loans at issue here, which were extinguished long before the tolling period commenced.

The SEC commenced this action on September 27, 2021. After adding the six-month tolling period to its claims, any claims that accrued before March 27, 2016, were time-barred and extinguished under the tolling agreements. The tolling agreements did not preserve the SEC's claims for all the EB-5 visa investors in the EMMCO, EMMCO NQMC, EMMCO Tower, and EEGH offerings, who invested ***prior to January 1, 2016***. The six-month tolling did not extend the five-year statute of limitations for any investments made before January 1, 2016 (and therefore before March 27, 2016). Thus, the SEC's claims for ***all*** the investors in EMMCO, EMMCO NQMC, EMMCO Tower, and EEGH are unaffected by the tolling agreement.

Likewise, the tolling agreement did not preserve the SEC's claims for the 35 investors in the EEGH II offering who invested their money ***before January 1, 2016***. Because the six-month tolling did not extend the five-year statute of limitations for any investments made before March 27, 2016, the SEC's claims for the 35 investors who invested in EEGH II before January 1, 2016 (and therefore before March 27, 2016) are unaffected by the tolling agreement. All of those claims are also time-barred.

Even after accounting for the six-month tolling period, those time-barred claims were extinguished and could not be revived who purchased their partnership interests prior to March 27, 2016, the SEC's claims for all the investors in EMMCO, EMMCO NQMC, EMMCO Tower, and EEGH, and for all but 84 investors in EEGH II, were subject to ***vested statute of limitations defenses before NDAA § 6501 was enacted***. Defendants' statute of limitations defense as to those investors had ***vested*** and could not constitutionally be set aside by the passage of NDAA § 6501. All those time-barred claims were extinguished and could not be revived.

In *Ahmed*, 2018 U.S. Dist. LEXIS 242717, at *6, the district court modified an asset freeze based upon the five-year statute of limitations "to remove disgorgement associated with fraud executed more than five years prior to the filing of the related claims." The SEC should have excluded all the untimely claims from its claim for disgorgement and civil money penalties, and hence from its request for an asset freeze. *See id.* at *6 & n.3. The District Court should have considered the vested statute of limitations defense in setting the amount of the asset freeze, both in the Asset Freezing Order and in the Preliminary Injunction.

The amount of any asset freeze should have been no greater than necessary to cover Defendants' potential liability to the 84 EEGH II investors after January 1, 2016 – the only timely claims in the SEC's civil enforcement action against them.

As discussed above, at $500,000 each, those 84 EB-5 visa investors together "invested" $45.5 million in the Eastern Emerald project.

The asset freeze in the Preliminary Injunction is **seventeen times greater** than Defendants' potential disgorgement liability to the 84 EB-5 visa investors who invested in EEGH II – the SEC's only timely claims – after January 1, 2016, and thus is grossly excessive. *See Unifund*, 910 F.2d at 1042 (freeze order must be proportional to "relief of the same character as that which may be granted finally") (internal quotation omitted); *Callahan*, 2015 U.S. Dist. LEXIS 178114, at *7 (amount that may be frozen must take into account the amount defendant may be required to disgorge). At most, it should have been set at no more than necessary to protect the SEC's ability to recover that potential amount of disgorgement.

## III.   THE EB-5 VISA INVESTMENTS ARE NOT "SECURITIES" UNDER THE FEDERAL SECURITIES LAWS

Finally, the SEC has not alleged any actionable violation of the federal securities laws for two independent reasons. *First*, the EB-5 visa investments were not "securities" subject to the securities laws. *Second*, most of the alleged misconduct was not "in connection with" the sale of any security.

In all civil enforcement actions, the SEC must demonstrate that the federal securities laws are applicable. That means the alleged wrongdoing "must involve a 'security.'" *See United States v. Zaslavskiy*, No. 17-CR-647(RJD), 2018 U.S. Dist. LEXIS 156574, at *12 (E.D.N.Y. Sept. 11, 2018). Under the Supreme Court's

seminal decision in *SEC v. W.J. Howey, Co.*, 328 U.S. 293, 298-99 (1946), a "security" requires a person to invest his or her money in a common enterprise with an expectation of earning profits solely from the efforts of a third party.

In *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837 (1975), the Supreme Court clarified that a "security" must involve "the presence of an investment in a common venture ***premised on a reasonable expectation of profits*** to be derived from the entrepreneurial or managerial efforts of others." *Id*. at 852 (emphasis added). Like the shareholder-tenants in *Forman*, who sought decent housing at an affordable price, the EB-5 visa applicants in this case invested primarily to qualify for permanent residence through the EB-5 program, not to earn a profit. Therefore, they are ***not*** investors in "securities" subject to liability under either Section 17 of the 1933 Act or Section 10(b) of the 1934 Act. They had no reasonable expectation of profit from their "investments," and they are not securities.

The limited partnership interests sold to these EB-5 visa investors do not meet the *Howey* and *Forman* test for a "security" because the investors had no reasonable expectation of profits on their investments. To meet the *Howey* test, the investor must be "attracted solely by the prospects of a return" on his or her investment. *Forman*, 421 U.S. at 852 (investment not a security because investors were attracted by acquiring a place to live). Indeed, the investors in this case were attracted primarily (if not entirely) by the chance to invest in programs qualifying them for

permanent U.S. residence under the EB-5 Immigrant Investor Program, and the partnerships offered ***no reasonable expectation of profit***.

Because these "investments" are not securities, the SEC has no claim against Defendants. *See* 15 U.S.C. § 77q(a) ("unlawful for any person in the offer or sale of any ***securities*** . . .") (emphasis added); 15 U.S.C. § 78j(b) ("unlawful for any person . . . [t]o use or employ, in connection with the purchase or sale of any ***security*** . . .") (emphasis added).

In addition, when Congress enacted the federal securities laws, it "did not intend to provide a broad federal remedy for all fraud." *Marine Bank v. Weaver*, 455 U.S. 551, 556 (1982). Those statutes apply only to misrepresentations that are made "in connection with" a securities transaction. *See SEC v. Zandford*, 535 U.S. 813, 819 (2002) (misappropriation of cash); *United States v. O'Hagan*, 521 U.S. 642, 656 (1997); *Superintendent of Ins. v. Bankers Life & Cas. Co.*, 404 U.S. 6, 8 (1971) (misappropriation of cash). To satisfy the "in connection with" requirement, the alleged misrepresentation or omission must pertain to the purchase or sale of the securities themselves. Allegations of fraud merely involving the securities do not satisfy the requirement. *See Chemical Bank v. Arthur Andersen & Co.*, 726 F.2d 930, 943 (2d Cir.), *cert. denied*, 469 U.S. 884 (1984).

In *Charas v. Sand Tech. Sys. Int'l, Inc.*, 90 Civ. 5638 (JFK), 1992 U.S. Dist. LEXIS 15227, at *22-23 (S.D.N.Y. Oct. 7, 1992), the Southern District dismissed a 10b-5 claim, holding:

> The misdeeds allegedly committed by Defendants generally bear no connection to the sale of Sand's securities. . . . The Amended Complaint alleges that Shattner and Ritchie deprived Sand of corporate opportunities and ***misused corporate funds***, but does not allege that securities were sold based upon a representation that Sand would be investing in these (stolen) opportunities. Further, while Plaintiffs allege that Ritchie took funds from Sand beginning in 1985 for "***unsupported personal expenses***," they fail to link that alleged activity to the sale of Sand securities that occurred two years later. . . . That is insufficient to satisfy the "in connection with" requirement of Rule 10b-5.

*Id*. (emphasis added).

Here, most of the SEC's claims concern allegations that Defendants misused or misappropriated funds invested by the EB-5 visa investors ***after*** they invested their money in the five partnerships. Like the alleged wrongdoing in *Sand Tech.*, the allegations of misappropriation and misuse of funds here do not meet the "in connection with" test. Such alleged misuse or misappropriation of funds, if they occurred at all, occurred ***after*** the limited partnerships were sold to the EB-5 visa investors. The alleged subsequent misuse or misappropriation of funds does not meet the "in connection with" requirement for alleged securities law violations.

## <u>CONCLUSION</u>

For all the foregoing reasons, this Court should reverse the District Court's decision and vacate or modify the Preliminary Injunction after giving Defendants

proper credit for their reasonable business expenses as required under *Liu*. If it does not do so, the Court should reverse the District Court's decision and modify the Preliminary Injunction to be no greater than the amount necessary to secure SEC's timely disgorgement claims.

Dated:  March 23, 2023

**WOLF HALDENSTEIN ADLER FREEMAN & HERZ LLP**

By:  /s/ Mark C. Rifkin
Mark C. Rifkin
Benjamin Y. Kaufman
270 Madison Avenue
9th Floor
New York, NY  10016
(212) 545-4600
rifkin@whafh.com
kaufman@whafh.com

*Attorneys for Defendants and Relief Defendant Yue*

## CERTIFICATE OF COMPLIANCE

Pursuant to Federal Rule of Appellate Procedure 32(a)(5), the foregoing brief is in 14-Point Times New Roman proportional font and contains 13,378 words, and thus is in compliance with the type-volume limitation set forth in Federal Rule of Appellate Procedure 32(a)(7)(B).

Dated: March 23, 2023
        New York, New York


 /s/ Mark C. Rifkin
 MARK C. RIFKIN

# Special Appendix

**i**

**SPECIAL APPENDIX**
**TABLE OF CONTENTS**

**Page**

Memorandum and Order, dated December 8, 2022... SPA-1

Order Freezing Assets, dated December 8, 2022....... SPA-71

SPA-1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------------x
SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

        - against -

RICHARD XIA, a/k/a YI XIA; and FLEET
NEW YORK METROPOLITAN REGIONAL
CENTER, LLC, f/k/a FEDERAL NEW YORK
METROPOLITAN REGIONAL CENTER,
LLC,

                    Defendants,

        - and -

JULIA YUE, a/k/a JIQING YUE; XI
VERFENSTEIN; and XINMING YU

                    Relief Defendants.
--------------------------------------------------------x

**MEMORANDUM & ORDER**
21-CV-5350 (PKC) (RER)

PAMELA K. CHEN, United States District Judge:

      In this action, the Securities and Exchange Commission ("SEC") charges Defendants

Richard Xia and Fleet New York Metropolitan Regional Center, LLC (collectively, "Defendants")

with violating 15 U.S.C. §§ 77q(a), 78j(b) and 17 C.F.R. § 240.10b-5, and unjustly enriching Relief

Defendants Julia Yue, Xi Verfenstein, and Xinming Yu (collectively, "Relief Defendants"). The

parties have cross-moved for and against a preliminary injunction that freezes Defendants' assets

and Relief Defendants' residential properties. For the reasons stated herein, the Court grants the

SEC's motion in part and issues an asset-freezing preliminary injunction, for the duration of two

years (subject to continuation as discussed herein), that covers all of Defendants' assets and Relief

Defendants' residential properties.

## BACKGROUND[1]

On September 27, 2021, the SEC brought this action against Defendant Richard Xia ("Xia"), Defendant Fleet New York Metropolitan Regional Center, LLC ("Fleet"), and Relief Defendant Julia Yue ("Yue") (Dkt. 1), and on April 6, 2022, amended its Complaint to add Relief Defendants Xi Verfenstein ("Verfenstein") and Xinming Yu ("X. Yu"). (Am. Compl., Dkt. 98, at 1.) In substance, the SEC alleges that, since 2010, Defendants have defrauded the immigration authorities and over 450 prospective immigrants to raise more than $229 million in investor funds, and then diverted or misused these funds for their personal needs. (*See generally* Dkt. 98.) The SEC alleges that Defendants' actions amounted to investor fraud that violated 15 U.S.C. §§ 77q(a), 78j(b) and 17 C.F.R. § 240.10b-5 ("Rule 10b-5"), and unjustly enriched Relief Defendants. (*Id.* ¶¶ 191–99.)

Together with its Complaint, the SEC moved for an emergency temporary restraining order ("TRO") freezing Defendants' assets and a preliminary injunction freezing the same assets and lasting throughout the pendency of this suit. (*See* Dkts. 2, 2-2.) The Court granted the TRO. (Dkt. 11.) Between February 14 and 16, 2022, the Court held a Hearing at which Defendant Xia, court-appointed monitor M. Scott Peeler,[2] and expert witnesses provided sworn testimony. (Dkt. 101-

---

[1] While at this stage of the proceedings the SEC need not meet the exacting preponderance of the evidence standard as it would on the merits, *see, e.g.*, *S.E.C. v. Moran*, 922 F. Supp. 867, 891 (S.D.N.Y. 1996) ("To establish [liability under] Section 10(b) of the Exchange Act and Rule 10b–5 thereunder, the SEC must [prove its case] by a preponderance of the evidence[.]"), the Court finds the facts set forth in the Background section were proved by the applicable standards discussed herein, based on the parties' written submissions and the evidence presented at the show-cause hearing (the "Hearing").

[2] Upon issuing the TRO freezing, among others, Defendant Xia's assets, the Court appointed Mr. Peeler, in part, to manage and preserve those assets. (Dkt. 11-1.)

2

37.)  The SEC subsequently moved to expand the scope of its requested preliminary injunction to cover the three mansions that Relief Defendants now own.  (Dkt. 99.)  Relief Defendants and Defendants cross-moved to dissolve the asset freeze, or in the alternative, exclude from its scope assets obtained by Xia prior to the alleged scheme.  (Dkt. 178; *see also* Dkts. 120, 127.)

The evidence in this case is voluminous and complex.  First, the Court surveys Defendants' transactions with their investors.  Second, the Court turns to a series of transactions that occurred after Defendant Xia and Relief Defendant Verfenstein learned of the pending investigation against them, including the purchase of three mansions in short succession and their transfer to Relief Defendants.

# I.     The Eastern Emerald and Eastern Mirage Projects

## A.     Inception of the Emerald and Mirage Projects

Defendant Xia, an engineer who resides in Queens, married Relief Defendant Yue in 1994 and moved to the United States from China in 1996.  (*See* Test. Richard Xia, Dkt. 6-24, at 14:6–19.)  In 2002, Xia developed his first—and, before soliciting the EB-5 investments,[3] only—independent construction project, a 65-unit building in Queens named the "Shangri-La Tower." (Tr. 49:3–19.)[4]  Xia then met Relief Defendant Verfenstein, who became Shangri-La Tower's manager and designer.  (Tr. 228:18–23, 290:1–25.)  In or about 2008, Xia finished the Shangri-La Tower and later became the registered owner of fifteen rental properties across New York,

---

[3] *See infra* footnote [6] regarding the EB-5 investor visa program.

[4] Unless otherwise stated, Tr. refers to the consecutively numbered Hearing transcript, filed as Docket Number 101-37.

including several units in the Shangri-La Tower.  (Tr. 291:14–20; *see also* Dkt. 183, at ¶ 6; Dkt. 183-2.)

Seemingly emboldened by the Shangri-La Tower's success, in 2010, Xia, Verfenstein, and Yue sought to construct two new buildings in Queens—the Eastern Mirage and Eastern Emerald (the "Projects"), which far exceeded the Shangri-La Tower in magnitude and complexity. Together, the Projects promised to include nearly 900 five-star hotel rooms, dozens of residential apartments, a spa and fitness center, a multimedia conference center, multiple restaurants, retail stores, a convention center, a performing arts building, and about 650 parking spots.  (*See* Dkts. 6-1, at ECF[5] 12; 6-2, at ECF 11; 6-3, at ECF 12; 6-4, at ECF 10; and 6-6, at ECF 11.)  Xia sought to finance the Projects with investments from foreign nationals who wished to immigrate to the United States through the EB-5 visa program.[6]  To that end, in 2010, Xia incorporated Defendant Fleet, a New York entity that Xia controls (*see* Dkt. 6-17, at ECF 19), and sought to designate it as a USCIS-approved regional center.

---

[5] Citations to "ECF" refer to the pagination generated by the Court's CM/ECF docketing system and not the document's internal pagination.

[6] The EB-5 program allocates permanent resident visas to foreign investors who "invest[] capital" in a new commercial enterprise ("NCE") and can prove that the NCE "creat[ed] full-time employment for not fewer than 10 United States citizens" or foreign nationals authorized to work in the United States, other than the investor's immediate family.  8 U.S.C. § 1153(b)(5).  Investors can choose to obtain EB-5 visas through participation in the "Immigrant Investor Regional Center Program," where they invest in a regional center that has been approved by the United States Customs and Immigration Services ("USCIS"), and show that the center "create[d] jobs indirectly through revenues generated from increased exports resulting from the new commercial enterprise." 8 C.F.R. § 204.6(j)(4)(iii), (m)(7).  Congress renewed the program in March 2022.  *See generally USCIS Behring Reg'l Ctr. LLC v. Mayorkas*, No. 22-CV-02487 (VC), 2022 WL 2290594, at *1 (N.D. Cal. June 24, 2022) (discussing, and preliminarily enjoining USCIS's decision to de-authorize, previously approved regional centers under the new regime).

4

From 2010 until 2017, together with Walter Verfenstein—Verfenstein's ex-husband—Xia contacted, mostly, Chinese nationals and attempted to solicit contributions of $550,000 per investor.  (Tr. 168:1–13; *see also* Dkt. 6-48.)  After submitting requests to USCIS to designate Fleet as an approved regional center for the EB-5 visa program, Xia created five limited partnerships to finance distinct components of the Projects, and issued offering memoranda marketing ownership interests in each limited partnership to foreign investors in return for a $500,000 capital contribution and a $50,000 fee.  The respective Partnership Agreements earmarked investors' funds for specific purposes.  The EB-5 investors wired funds to their respective limited partnerships, and the partnerships then loaned most of these funds to one of three Xia-controlled entities called "developers."  The developers then transferred funds to twelve Xia-controlled entities, called "contractors" and "subcontractors," allegedly to pay for services rendered in connection with the Projects.

**B.       Designating Fleet as a Regional Center**

On October 7, 2010, USCIS approved Fleet as an EB-5 regional center.  (Dkt. 6-14.)[7]  At least twice, Xia sought to amend Fleet's approval.  (Dkts. 6-15, 6-16.)  The first time was on December 24, 2013, when Xia filed a request to add the Emerald Project to Fleet's approval.  (Dkt. 6-15, at 1; Tr. 62:20–23.)  USCIS requested that Xia produce additional evidence to substantiate representations as to his business plan.  (Dkts. 6-69, at 1.)  In 2014, Xia approved a letter from his attorney responding to USCIS and stating that "$110 million [of] funds will come from" three non-EB-5 sources.  (Dkt. 6-69, at 5; Tr. 78:13–19.)  First, the letter stated that $18 million will come

---

[7] Fleet was originally known as Federal New York Metropolitan Regional Center, LLC. (Tr. 7:18–22.)

from a tax-credit named the "New Market Tax Credit Financing" ("NMTCF"). (Dkt. 6-69, at 5.) Xia never received such credit. (Tr. 69:9–14.) Second, the letter stated that $72 million will come from a loan from Hapoalim Securities. (Dkt. 6-69, at 5.) Xia never received such a loan and could not even remember requesting it. (Tr. 60:16–18, 61:12–18.) Third, the letter stated that $20 million will come from a tax credit named Brownfield. (Dkt. 6-69, at 5.) Seven years after his attorney submitted the letter to USCIS, Xia obtained about $11 million in Brownfield Tax Credits, and collateralized it to buy Yue a mansion. (Tr. 87:20–23, 88:1–89:20, 202:11–21.)

Xia filed his second request to add the Emerald Project to Fleet's approval on November 12, 2015. (Dkt. 6-16, at 1–2.) Again, USCIS requested that Xia provide his business plan for the Eastern Emerald. In 2017, Xia's attorney submitted a letter stating that a Xia-controlled entity, LaGuardia Performance Center, LLC ("LaGuardia"), had obtained a "loan commitment letter in the amount of approximately $85 million from R. Seelaus & Co." ("Seelaus"), to develop the Emerald Project. (Dkt. 6-70, at 3; Tr. 80:20–25, 231:19–22.) The letter included as an exhibit a letter from a Seelaus employee named Edward Chan ("Chan letter")[8] purportedly representing that it was Seelaus's "pleasure" to advise LaGuardia and Xia that it had "approved [their] construction financing [loan]" in principle. (Dkt. 6-70, at ECF 6.) In a sworn declaration submitted by the SEC, Annie Seelaus, the CEO of Seelaus since 2015, stated that she was completely "unaware of the [Chan] [l]etter[.]" (Dkt. 4, ¶¶ 3–5.) Ms. Seelaus further stated that she could not find in her company's records a copy of the Chan letter or any correspondence with Xia. (*Id.* ¶ 5.) Ms. Seelaus also explained under oath during a deposition that Edward Chan lacked the authority to

---

[8] The Chan letter was printed on stationery bearing Seelaus's logo and address. (*See* Dkt. 6-70, at ECF 6.)

commit Seelaus to any loan and that Seelaus "doesn't make loans" and has never made one. (Dkt. 52-3, at 71:6–9, 101:2–7.) Ms. Seelaus concluded that Seelaus "never made—or even considered making—any loan to Richard Xia or his company," and was of the view that the letter was "not authentic or legitimate." (Dkt. 4, ¶¶ 9–10.) At the Hearing, Xia denied knowing that the Chan letter, which was described as fraudulent, was not authorized when he received it, and by extension, when his attorney, acting under his direction, sent it. (Tr. 78:13–19, 84:11–25.)

### C.    The Offering Memoranda

Having obtained Fleet's designation as a USCIS-approved regional center, Xia produced offering memoranda marketing the Projects to investors who wished to participate in the EB-5 program. (*See* Tr. 19:19–25.)

#### 1.    The Eastern Mirage Memoranda

The Eastern Mirage is a building located at 42-31 Union Street, Flushing, New York. (*See* Dkt. 3 ¶ 5; Tr: 630:1–8.) From 2010 to 2014, Xia and his affiliates sold ownership stakes in three limited partnerships—EMMCO, L.P., EMMCO NQMC, L.P., and EMMCO TOWER, L.P.—each allegedly financing distinct components of the Mirage Project through separate offering memoranda. (*See generally* Dkts. 6-1, 6-2, 6-3; *see also* 6-48, at ECF 9, 12–13, 16; Dkt. 2-1, at ECF 11.) Following the issuance of the Mirage memoranda, 112 prospective immigrants invested $500,000 each, and $56,000,000 in total, along with $1,694,272 in fees, as part of the EB-5 visa program. (*See* Dkt. 6-48, at ECF 9, ECF 12–13, ECF 16.; *see also* Dkt. 2-1, ECF 11.) Fleet acted as the general partner for each of the limited partnerships, and Fleet Financial Group, Inc. ("FFG")—which, like Fleet, is controlled by Xia—acted as the developer for each of the partnerships. (*See* Dkts. 6-1, 6-2, 6-3, all at ECF 6; *see also* Tr. 50:1–11; *see generally* Dkts. 6-58, 6-59, 6-60, 6-61 (similar loan agreements showing that FFG borrowed funds from the

partnerships for the development of the Mirage.).)  Each of the offering memoranda for the three

limited partnerships described the Mirage Project as follows:

> The Eastern Mirage Project is expected to consist of the North Queens Medical Center, a medical office building; the Eastern Mirage Tower, including approximately 61 condominium apartments and approximately 101 hotel suites (each with its own kitchen); and the Eastern Mirage Center, including a spa and fitness center (4,500 square feet), a multimedia conference center (5,500 square feet), a restaurant (3,500 square feet), and below-grade public garage with 256 parking spaces covering 62,400 square feet.

(Dkt. 6-1, at ECF 12; Dkt. 6-2, at ECF 12; Dkt. 6-3, at ECF 12.)  The memoranda stated that the

partnerships anticipated that Phase One of the Mirage Project "will be completed" by the fourth

quarter of 2012 (Dkt. 6-1, at ECF 12), and that Phases Two and Three "will be completed" by the

fourth quarter of 2013.  (Dkt. 6-2, at ECF 12; Dkt. 6-3, at ECF 12.)  The memoranda provided

descriptions of Xia and the general contractor, and their development experience.   Each

memorandum described Xia as follows:

> Mr. Xia is a New York City real estate developer and President of the General Partner.  Mr. Xia has been active for ten years in land acquisition, commercial and residential development, marketing research, value-added strategies, financing, property management and leasing, and other related activities.  His company Fleet Financial Group, Inc. specializes in "green" projects, and its [sic] recently completed "Shangri-La Towers[.]"

(Dkt. 6-1, at ECF 14; Dkt. 6-2, at ECF 15; Dkt. 6-3, at ECF 14.)  The memoranda did not disclose

to investors that the Shangri-La Tower, a small-scale 65-unit building, was Xia's only independent

project before starting to work on the Eastern Mirage, and that Xia previously had only worked on

other projects in his capacity as an engineer.  (Tr. 49:8–24.)  The memoranda also contained the

following text about a company named the "Racanelli Construction Group":

> Based in Hamilton NJ, Racanelli Construction Group is recognized as one of the region's leading providers of preconstruction planning, project management, design/build, and general contracting services.  Since its founding, Racanelli has been responsible for building and renovation across a broad range and variety of

> market segments, completing projects that include corporate headquarters, industrial complexes, hospitals, assisted living facilities, university and college facilities, retail stores, hotels, restaurants, houses of worship, self storage complexes, condominiums and townhouses.

(Dkt. 6-1, at ECF 14; Dkt. 6-2, at ECF 15; Dkt. 6-3, at ECF 14.) In fact, a business named Racanelli Construction has been active in Hamilton, New Jersey, since the 1950s ("Racanelli-1"), but Xia had little to do with it. (Tr. 28:3–16, 31:6–25 ("I didn't have any relationship with [Racanelli-1] at all.").)[9] At the Hearing, Xia claimed that he had been negotiating with Racanelli-1 before the Mirage Project started, but that those negotiations fell through in 2011. (Tr. 29:10–16.) Thus, unable to work with Racanelli-1, Xia and his affiliates seemingly formed a New York entity and named it "Racanelli Construction Group, Inc." ("Racanelli-2") in 2011. (Dkt. 6-17, at ECF 27–28; Tr. 25:12–14, 29:10–17, 30:21–23.)[10] Xia identified himself as the acting president of Racanelli-2 in numerous court filings. (Tr. 32:3–5.) Xia admitted that he copied business descriptions that appeared on Racanelli-1's website and then provided them to his agents, who inserted them to the Eastern Mirage and Eastern Emerald offering memoranda. (Tr. 27:2–8, 28:22–29:20.) In April 2015, Racanelli-1 sued Xia and Racanelli-2 for tradename and trademark infringement in the New York Supreme Court in Suffolk County. (*See* Tr. 35:10–19; *see also* Dkt. 6-36; *see generally* Tr. 25–37.)

---

[9] Courts filings state that the full name of Racanelli-1 is Racanelli Construction Co., Inc. (*See* Dkt. 6-36, at ECF 6.) The filings further state that Racanelli Construction Co., Inc. has been active in the construction industry since the 1950s and incorporated itself in 1992. (*Id.* at ECF 6–7.)

[10] At the Hearing, Xia stated that Relief Defendant Verfenstein controlled Racanelli-2 and denied having any control over Racanelli-2. (Tr. 34:2–5, 113:1–4.) The Court concludes that, at a minimum, Xia controlled Racanelli-2's bank accounts, as further explained in footnote [16], *infra*.

The Eastern Mirage offering memoranda—which were issued in December 2010 and January 2011—also contained various statements about financing, and each contained the following information:

> The Eastern Mirage Project is intended to be funded from a variety of sources including . . . a $17,000,000 triple tax-exempt bond financing authorized under the American Recovery and Reinvestment Act of 2009.  The program is administered by the NYCCRC [New York City Capital Resource Corporation] and the NYC Industrial Development Agency, both of which are staffed by [the] New York City Economic Development Corporation.

(Dkt. 6-1 at ECF 12; *see also* Dkt. 6-2 at ECF 12 (similar); Dkt. 6-3, at 12 (similar).)  The 2011 memoranda added that the Mirage Project was to be financed by "up to $12,000,000 of double tax-exempt bond financing" from the NYCCRC.  (Dkt. 6-2 at ECF 12; Dkt. 6-3, at ECF 12.)  However, in 2010, FFG decided to forgo the "allocation of $17,000,000" that the NYCCRC had previously made available to it.  (*See* Dkt. 6-38.)  Although FFG asked, in the same letter to NYCCRC, to preserve at least "$12,280,000" for future use (*see id.*), the NYCCRC denied that request the next day and proceeded to terminate all of the bond allocations it had previously made to FFG (Dkt. 6-39).  Thus, by the time the Eastern Mirage offering memoranda issued, the NYCCRC had already withdrawn all bond allocations to the Mirage Project, but Defendants included representations about them nonetheless.[11]

---

[11] At the Hearing, Xia testified that he included the representation in the memoranda because he understood the NYCCRC's rejection to apply only to triple tax-bonds, stating that he still "had a Double Tax Exempt Bond[]," and that he had sent a renewed "application at the end of 2011 [to receive Triple Tax Bonds]."  (Tr. 60:1–6, 59:21–25.)  However, Xia referred the Court to no credible evidence that any double tax-exempt bonds existed, let alone that he obtained them. The Court therefore does not credit Xia's explanation for why the withdrawn $17,000,000 of double-tax-exempt-bond financing was referenced in the two Eastern Mirage offering memoranda. Likewise, the record is devoid of any credible evidence of a renewed 2011 application for the triple tax-exempt bonds, and the NYCCRC stated in its letter that the program was "due to expire on December 31, 2010."  (Dkt. 6-39.)  In sum, the Court concludes that Xia's claim about the bonds

The EMMCO TOWER, L.P., memoranda, which financed the construction of Phase Three of the Mirage Project, stated that it "will encompass the development of the Westin Elemnet [sic] Hotel & Condo Apartment building." (Dkt. 6-3, at ECF 5–6.) When questioned at the Hearing about whether he ever signed any agreement with Westin Hotels & Resorts, Xia was evasive and repeatedly stated that when he issued the memorandum, negotiations to sign such an agreement were underway.[12] (Tr. 89–91.)

## 2. The Eastern Emerald Memoranda

The Eastern Emerald is a planned building to be constructed at 112-21 Northern Boulevard, Flushing, New York. (*See generally* Dkt. 3, ECF 29.) From 2014 to 2017, Xia and his affiliates sold ownership stakes in two partnerships—EEGH, L.P. and EEGH, II, L.P.—each financing a distinct phase of the Emerald Project. (*See generally* Dkts. 6-4, 6-5, 6-6; *see also* Dkt. 2-1, ECF 11; *see* Dkt. 6-48, at ECF 18–23, 29–31.) Following the issuance of the Eastern Emerald offering memoranda, 346 prospective immigrants invested $500,000 each—$173,000,000 in total—along with $3,416,007.19 in fees in the Emerald. (*See* Dkt. 6-48, at ECF 18–23, 29–31.) Defendant Fleet acted as the general partner for each of the limited partnerships, and LaGuardia and Eastern Emerald Group ("EEG")—both Xia-controlled entities—acted as developers for each of the partnerships. (*See* Dkts. 6-4, 6-5, 6-6; *see also* Dkts. 6-62, 6-78, 6-79.) The EEGH, L.P., offering memorandum described the Emerald Project as follows:

---

is not credible. Indeed, as the Court noted at the conclusion of the Hearing, it finds Xia, and much of his testimony at the Hearing, lacking in candor and credibility. (Tr. 663–66.)

[12] Between 2017 and 2019, Xia corresponded on WeChat regarding the Projects with various prospective and present investors, who repeatedly referred to the "Westin hotel project" without Xia ever correcting them. (*See generally* Dkt. 6-73.)

11

> The Eastern Emerald Project is expected to consist [of] a 498-room 5-star luxury hotel, retail stores (97,180 square feet), an IACC certified international convention[] center (105,964 square feet), a restaurant (11,300 square feet), and a parking garage with 400 parking spaces covering 82,490 square feet.

(Dkt. 6-4, at ECF 10; *see also* Dkt. 6-6, at ECF 11 (similar).)  The EEGH, II, L.P., offering memorandum promised investors all of the above, and further promised that the Emerald Project would include 294 additional 5-star hotel rooms, a five-story performing art center, retail stores, multiple restaurants, and additional parking spaces.  (Dkt. 6-6, at ECF 11.)  Like the Eastern Mirage offering memoranda, the Eastern Emerald offering memoranda did not disclose to investors that Xia's only independent project prior to the Emerald and Mirage Projects was the 65-unit Shangri-La Tower, and the Eastern Emerald memoranda contained a description of a "Racanelli Construction Group" that Xia had copied from Racanelli-1's website.  (*See* Dkt. 6-4 at ECF 12, Dkt. 6-6, at ECF 12–13.)

The Eastern Emerald memoranda made multiple statements regarding financing.  First, the EEGH, L.P. and EEGH, II, L.P. memoranda stated that the Emerald was expected to be financed with loans from Hapoalim Securities, in the amount of $40 million and $72 million, respectively. (Dkt. 6-4 at ECF 11–12, Dkt. 6-6, at ECF 11–12.)  In fact, although Xia had obtained a letter of intent from Hapoalim Securities as to these loans, he never actually received, and does not even remember applying for, the loans themselves.  (Tr. 60:16–18,61:12–18.)  Second, the EEGH, L.P. supplemental offering memoranda stated that the $190-million cost of the Emerald Project "shall b[e] financed as follows[,]" and listed, among other things, the $18 million NMTC.  (Dkt. 6-5, at ECF 3.)  As with the Hapoalim Securities loan, Xia never obtained anything more than a

preliminary letter of intent as to the NMTC. (Tr. 69:9–14.)[13] Third, the EEGH, L.P. supplemental offering memoranda also promised that the Emerald Project "shall b[e] financed" by $21 million in Brownfield Tax Credits (Dkt. 6-5, at 3), which Xia, years later, used to buy his wife a mansion.

### D.    The Loans

In accordance with provisions in the memoranda and various agreements styled as loans, Xia treated the funds paid by the EB-5 investors as general "loans" from the respective Partnerships to three developer entities that Xia controlled:  EEG, LaGuardia, and FFG. (*See* Tr. 230–31, 253–54.)  At the Hearing, Xia testified that these loans were earmarked, such that "the developer is supposed to use those loan proceeds only for that particular project" for which a loan was made. (Tr. 98:15–20.)  Thus, the Mirage Project loans included an exclusive use provision. (*See* Dkt. 6-77, at 1 ("Using the loan proceeds, [FFG] . . . will develop [the] []Eastern Mirage Project[]"); Dkt. 6-61, at 1 (same); Dkt. 6-60, at 1 (same); Dkt. 6-59, at 8 ("Lender shall use the Loan proceeds only for the payment of hard costs in connection with the Construction Work.").)

At the Hearing, Xia confirmed the accuracy of a flow chart prepared by the SEC showing that a total of $17,059,850 of the EB-5 investor funds raised for the Mirage Project,[14] and loaned

---

[13] The record includes materials about each of the Projects that third parties had circulated to potential investors that contained false representations about both projects. (Dkts. 6-8, 6-9, 6-10.)  At the Hearing, Xia admitted that he had provided some information about the Projects to these third parties, but denied having ultimate control over the statements within them. (Tr. 91–93.)  Considering the totality of the evidence, including the many texts that Xia exchanged with investors who used terminology mirroring the contents of the materials, the Court finds the third-party materials at least probative, albeit not determinative, as to the character of the scheme at issue.

[14] This figure is arrived to by adding the total amount of funds, $1.7 million, transferred during the "June 2013" transfers (Dkt. 7-7, at 1), to the total amount of funds, $15,359,850, transferred during the "December 2013" transfers. (*Id.* at 2.)

to FFG, ended up financing the purchase of land for the Emerald Project—contrary to the purported exclusive-use provision of the Mirage Project loans.  (Tr. 104:9–21; *see also* Dkt. 7-7, at 1–2.)[15] Xia's explanations for these transfers shifted throughout the hearing.  Initially, Xia reasoned that after he had performed the work on the Mirage Project at a lower cost than expected, he was entitled to use any remaining funds for the Emerald Project.  (Tr. 108:1–109:3.)[16] Xia's reasoning then shifted, and he later explained that in his view, once the money was loaned to the developers it lost its character as "investor money" and turned into "loan proceeds." (Tr. 164:4–19.)[17] Finally, Xia maintained that money that had originated in the Mirage Project was used in the Emerald Project, not after it was loaned, but after it was paid to subcontractors who built the Eastern Mirage.

---

[15] The flow chart shows that on June 27, 2013, Xia and Yue transferred $1.7 million in Mirage Project funds from FFG to Racanelli-2—the entity that coordinates and pays for services that subcontractors provide to the Mirage Project—and then to EEG, without EEG having billed for any services performed for the Mirage Project.  (*See* Dkt. 7-7, at 1.)  Similarly, in December 2013, Xia and Yue engaged in an identical pattern of transfers, culminating in Racanelli-2 paying $15,359,850 to EEG for no apparent reason.  (*Id.* at 2.)  Xia admitted that all these payments were used to purchase the Emerald land.  (Tr. 326:8–328:7.)

[16] Xia later testified that all final transfers were made from the Racanelli accounts ending in 1555 and 5028 over which he had no control.  (*See* Tr. 112:17–113:25.)  Earlier in the Hearing, the SEC produced the bank records of all the Racanelli accounts, including those ending with 1555 and 5028, which showed that Yue and Xia were the only authorized signers for all of the accounts.  (*See* Dkt. 6-19, lines 129, 137.)  While Xia denied the accuracy of these listings, the SEC produced close to 100 transfer records, spanning roughly three-years, each noting that East-West Bank staff had conferred telephonically with Yue in conjunction with various transactions and withdrawals from the 5028 account.  (*See* Pl.'s Ex. 172 (physical exhibit).)  Given that the 1555 and the 5028 were in the same bank branch—38-05 Union Street, Flushing, New York, (*see* Dkts. 7-17, 7-21)— the Court does not credit Xia's testimony, and instead concludes that all transfers from both Racanelli accounts were made by Xia himself or by Yue, acting at Xia's direction.

[17] Such statements aligned with Xia's description of the loan structure as "almost like a bank[;] . . . [an] EB-5 investor . . . put[s] money into that bank . . . and the bank gave a loan to the developer[.]"  (Tr. 231:1–5; *see also* Tr. 277:23–24 ("It's almost like the bank gave me the loan and I guarantee to pay them back for the interest.").)

(*See* Tr. 165:3–23.)  Xia later attempted to explain why, if all payments were meant to pay his subcontractors for their work, the transfers were made to EEG—the developer of the Emerald Project—and not to the subcontractors themselves.  Xia maintained that two of his controlled entities—X&Y and JiQing Development—had billed Racanelli-2 for their work, but then had asked informally for payments to be made to EEG to finance the purchase of the Eastern Emerald land.  (Tr. 327:24–328:12.)[18]  When presented with evidence that all of the payments made to EEG were titled "loan," Xia was largely unresponsive and testified that that was done at the advice of his accountant.  (Tr. 369:11–372:15.)

In his 2019 investigative testimony,[19] Xia testified that JiQing Development ("JiQing")[20]— a Xia-owned entity that allegedly had billed Racanelli-2—was a shell entity, without employees, that did not conduct work or issue bills.  (Tr. 124–25; *see also* Dkt. 6-24, at 66–67.)  At the Hearing, however, Xia testified that after his deposition, he suddenly remembered that JiQing, in fact, had employees.  (Tr. 126–27.)  In fact, the SEC's investigation into Xia's affairs uncovered that, in 2012, Xia transferred about $819,000 of Mirage Project funds to JiQing to cover a mortgage relating to property located in 57-35 Lawrence Street—which had no direct connection to the

---

[18] Raymond Dookhie, an accounting expert with 25 years of experience in conducting forensic examinations of financial records, with specific focus on real-estate and construction projects (Dkt. 7, ¶¶ 1-3), testified for the SEC at the Hearing.  Among other things, Dookhie noted that such a payment structure where a subcontractor asks the general contractor to pay a third-party vendor was "very rare" and that he did not recall ever seeing any.  (Tr. 474:6–15.)  Finally, while the Hearing's Transcript refers to the witness's name as "Dhookie," the Court notes that this is merely a typographical error.

[19] On May 30, 2019, as part of the SEC's pre-suit investigative efforts, Xia appeared for a deposition at the SEC's Regional Office in New York and gave a sworn testimony.  (*See* Dkt. 6-24, at 1, 8.)

[20] The Court notes that JiQing is one of Yue's first names.  (*See* Tr. 129:5–8.)

15

development of the Mirage Project. (Tr. 118–20.) At the Hearing, Xia claimed that that payment was meant to pay JiQing's employees, but when asked how JiQing had billed such copious amounts in so little time, Xia responded, "I don't know how to answer that question." (Tr. 126:20–127:19.)[21]

### E.    The Developer-Contractor Transactions

At the Hearing, the SEC's accounting expert witness, Raymond Dookhie, testified that many of the payments purportedly made for legitimate reasons by and between Xia's various entities were, in fact, irregular.[22] First, while Defendants transferred approximately $22 million of investor funds to their various subcontractors, the record is entirely devoid of any invoice or other information explaining what business purpose, if any, these transfers of substantial sums served. (Tr. 402.)[23] Second, Dookhie noted that the pattern of transactions—where, for nine years, money circulated in all directions between 95 different bank accounts controlled by, or affiliated,

---

[21] The SEC's expert suggests that evidence in the record supports the inference that about $6.5 million in funds loaned to the Emerald Project might have been used to finance the Mirage Project. (*See* Dkt. 7, ¶¶ 36–41.) For instance, the SEC's expert argued that while the Eastern Emerald is merely a hole in the ground (Dkt. 3, at ECF 29–42.), between 2013 to 2017, Racanelli-2 used $2.3 million in Emerald Project funds to pay, among others, companies that specialize in air conditioners, window installation, and furniture. (*See* Dkt. 7, ¶ 39.) The SEC argues that because such services are inconsistent with the Eastern Emerald's primitive state, these monies had to have been diverted to the Mirage Project. The SEC did not question Xia about this evidence at the Hearing, and the SEC's argument is based solely on its expert's "review" of these companies' "names" and an "internet" search he had performed about them. (*See* Dkt. 7, ¶ 39.) While, standing alone, this evidence might appear equivocal, the Court considers the record holistically and finds that these transfers are indicative of a near-decade-long pattern of suspicious financial conduct by Defendants.

[22] The Court found Dookhie's entire testimony at the Hearing credible.

[23] Defendants' attempt to minimize this lacuna in the record—where tens of millions of Project funds are largely unaccounted for—as "lax business and accounting practices" (Def.'s Mem., Dkt. 124, at 17), borders on frivolous.

with Xia and Yue, from and to the contractors, with and without invoices—was irregular. (*See generally* Dkt. 7.)  For instance, when Xia's entities did submit invoices, the invoices were frequently for a series of vague and conclusory round figures. (Dkt. 7, ¶ 16; Tr. 408:15–25; Tr. 412:16–20 (noting that in the "good majority of" invoices reviewed, it was "very difficult to understand what was the value of the work that was being performed.").) At other times, the payments made to Xia-controlled entities did not match the invoices that the entities had submitted. (Tr. 511–12.)  Third, the invoices and payments that the general contractors submitted were inconsistent with industry standards and lacked specification, via a "Form 703," of the work the contractors had allegedly performed.  (Tr. 405–07.)  The irregularity of these payments was compounded by the fact that Xia controlled all the subcontractors that purportedly worked on the Projects and therefore their use of transferred funds.  (Tr. 231; *see also* Tr. 252.)[24]

\*     \*     \*

After learning of the possibility of SEC prosecution, Xia completed a series of transactions that dispersed EB-5 investor funds to Relief Defendants.  To these transactions, the Court now turns.

---

[24] At the conclusion of the Hearing, the Court made the following finding on the record:

I found so much of Mr. Xia's testimony unbelievable and incredible and proven demonstrably false by records and other testimony.  I am concerned, quite frankly, about his conduct in this case, not only what was reported by the monitor in terms of candor and cooperation, but even just in the hearing before me . . . . [E]verything that has been presented to me show[s] that there is only a loose familiarity with the truth when it comes to what Mr. Xia says to the public and to others and, quite frankly, to me in court here.  Perhaps he is guided by his own sense of what is right, I do not know, or what he believes is true, but much of what I heard, I reject as incredible.

(Tr. 663–64.)

## II.   Post-Investigation Transactions

In May 2018, Xia first learned of the SEC's investigation into his affairs.  (Tr. 355:1–6.)
By October 2021, at least 36 lawsuits had been filed against Xia and Verfenstein in connection
with the Projects.  (Dkt. 53-1.)[25]  On May 24, 2021, Xia's lawyer received a phone call, confirmed
by a letter, from the SEC advising "that the staff of the Securities and Exchange Commission has
made a preliminary determination to recommend that the Commission file an enforcement action
against [Xia]," Fleet, and Yue (the "SEC Letter").  (Dkt. 102-19, at ECF 1, 3, 11.)  After Xia
received that communication from the SEC, he and Verfenstein engaged in a series of transactions
involving about $26 million of assets—comprised of tax credits that Xia had promised investors
would be used on the Projects, property rights in the Eastern Emerald land, and EB-5 investor
funds—to buy, in quick succession, three mansions in Long Island and to transfer ownership of
them to Relief Defendants Yue, Verfenstein, and X. Yu.[26]  (*See* Pl.'s Mem., Dkt. 100, at 10–17.)

---

[25] Additional lawsuits have been filed since the initiation of this action.  (*See* Dkt. 183-6
(listing *Molina v. Xia*, No. 22-CV-864 (PKC) (RER) (E.D.N.Y. Feb. 16, 2022) (Dkt. 1) (alleging
that Defendants unlawfully overworked and underpaid their construction workers to work on the
Projects)); *see also Jin v. Fleet New York Metro. Reg'l Ctr., LLC*, No. 22-CV-740 (PKC) (RER)
(E.D.N.Y. Feb. 9, 2022) (Dkt. 1) (alleging that Defendants defrauded their investors).

[26] X. Yu is Verfenstein's mother.  The record suggests that X. Yu has little to do with the
underlying transactions in this matter, but currently resides in a 12-bedroom mansion purchased
by Defendants, together with her (X. Yu's) husband (Verfenstein's father) and mother.  (Dkt. 101-
36, at 42:14-18, 62–63.)

In January 2021, Xia took $10.97 million that he had received as part of the Brownfield Tax Credit, which the Eastern Emerald offering memorandum had promised investors would be used to finance the Emerald Project, deposited it into an empty certificate of deposit ("CD") bank account, and used the account to secure a loan for "business operations" allegedly for the Emerald Project. (Id. at 7–8.) Xia repeated the same process in June 2021, this time using $4.59 million of investor funds. (*Id.* at 8–9.) In August 2021, Xia caused one of his entities, X&Y, to mortgage the Eastern Emerald land for "business purposes" in return for a $15 million loan. (*Id.* at 9, 17.) A circuitous series of transactions followed, and about $26 million of the funds and other investor funds were funneled through multiple accounts to finance the purchase of the three Long Island mansions. (*See* Dkts. 102-31, 102-32, 102-33.) On May 25, 2021, X. Yu became the owner of a 12-bedroom mansion on Vanderbilt Drive in North Hempstead (Dkt. 101-23, at 3–4); on August 13, 2021, Yue became the owner of a 20-room mansion on Kings Point Road in North Hempstead, where Xia now resides:



(Dkt. 102-28 (exhibit cropped by the Court); *see also* Dkt. 101-10, at 2); and, on August 30, 2021, Verfenstein became the owner of a 29-room mansion on Middle Neck Road in North Hempstead,

which she subsequently transferred to an entity she owns—named Yume Sansai, LLC—and mortgaged:



(Dkts. 102-29 (exhibit cropped by the Court); 101-15, at 2; *see also* Dkt. 100, at 13, 18.)

In their depositions, Xia and Verfenstein denied any impropriety and stated, as Verfenstein repeats in her filings in this matter, that these residential purchases were made for legitimate business purposes only.  Among other reasons, they claim that the work on the Emerald Project generated a lot of dirt, making it necessary to buy X. Yu a mansion with a large tennis court that serves as a "perfect dumping site."  (Dkt. 101-35, at 59:19; 60:5–11 ("Q. Okay. You're going to dump dirt from the Eastern Emerald site at Vanderbilt Drive?,  A. That's right. Q. Where? A. Huh? Q. Like, where? Where the tennis court is? A. Yes."); 102:21–25 ("It is not a mansion. This is . . . the dumping site."); Dkt. 101-36, at 59–60 (same).)  In similar fashion, Xia claims that Yue's 20-room mansion, where Xia now resides with Yue and their family, was a necessary business expense because Xia needed a "home office."  (Dkt. 101-35, at 39–40.)

## LEGAL STANDARD

Under the Securities Act of 1933 and Exchange Act of 1934, the SEC may "bring an action in any district court of the United States" and ask to "enjoin [illegal] acts or practices, and upon a proper showing, a permanent or temporary injunction or restraining order shall be granted without

bond." 15 U.S.C. §§ 77t(b), 78u(d)(1).  Generally, to obtain a preliminary injunction, the SEC

need only show "a substantial showing of likelihood of success as to both a current violation and

the risk of repetition." *Smith v. S.E.C.*, 653 F.3d 121, 127–28 (2d Cir. 2011); *S.E.C. v. Cavanagh*,

155 F.3d 129, 132 (2d Cir. 1998) ("A preliminary injunction enjoining violations of the securities

laws is appropriate if the SEC makes a substantial showing of likelihood of success as to both a

current violation and the risk of repetition.").  However, "because an asset freeze is a provisional

remedy that [merely] serves to preserve the status quo," *S.E.C. v. Ahmed*, 123 F. Supp. 3d 301,

307–08 (D. Conn. 2015) (citations omitted), *aff'd sub nom. S.E.C. v. I-Cubed Domains, LLC*, 664

F. App'x 53 (2d Cir. 2016); *accord S.E.C. v. Infinity Grp. Co.*, 212 F.3d 180, 197 (3d Cir. 2000)

("A freeze of assets is designed to preserve the *status quo*[.]") (emphasis added), the SEC need

only "show either a likelihood of success on the merits, or that an inference can be drawn that the

party has violated the federal securities laws." *Smith*, 653 F.3d at 128 (citation omitted); *S.E.C. v.

Unifund SAL*, 910 F.2d 1028, 1041 (2d Cir. 1990) ("*Unifund-1*") (finding "evidence suffic[ient] to

warrant some form of freeze order [because] [t]here [was] a basis to infer" that a violation of

securities laws had occurred); *see also S.E.C. v. Montle*, 65 F. App'x 749, 753 (2d Cir. 2003) ("A

preliminary injunction the subject of which is an asset freeze requires a lesser showing[.]").[27]

---

[27] The Court rejects Defendants' and Relief Defendant Yue's arguments that the standard
governing freezes of a defendant's assets is unclear.  (*See* Dkt. 43, at 8–15.)  Despite reciting the
applicable standard without difficulty (Dkt. 124, at 6 (citing *Smith*, 653 F.3d at 128)), Defendants
and Yue argue that the standard is unclear because in some cases the Second Circuit asked the
SEC to show "likelihood of success on the merits," and not merely a "reasonable basis to infer"
illegality, for an asset freeze to issue.  (*See* Dkt. 43, at 8–9.)  However, the cases cited by
Defendants and Yue, without exception, all involve orders freezing the assets of relief defendants,
not defendants in the SEC action.  *See I-Cubed*, 664 F. App'x at 54 ("Relief Defendants . . . appeal
from a preliminary injunction freezing their assets"); *S.E.C. v. Miller*, 808 F.3d 623, 629–30 (2d
Cir. 2015) ("This appeal was [] taken by . . . Relief Defendants . . . [who] challenge the freeze of
their assets"); *Montle*, 65 F. App'x at 753–54 (2d Cir. 2003) (affirming an injunction freezing a

Furthermore, "[t]he plenary powers of a federal court to order an asset freeze are not limited to assets held solely by an alleged wrongdoer, who is sued as a defendant in an enforcement action." *I-Cubed*, 664 F. App'x at 55 (citing *Smith*, 653 F.3d at 128). The Court may freeze assets that a relief defendant owns, "where that person: (1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *Cavanagh*, 155 F.3d at 136. "The standard of review for an injunction freezing assets of a relief defendant is whether the SEC has shown that it is likely to succeed on the merits." *Id.*; *see also I-Cubed*, 664 F. App'x at 55 (noting that "[t]he receipt of property as a gift without payment of consideration does not create a legitimate claim under the *Cavanagh* test." (citation omitted)); *S.E.C. v. Rosenthal*, 426 F. App'x 1, 3 (2d Cir. 2011) (finding that disgorgement may be ordered "against a person who is not accused of wrongdoing in a securities enforcement action" if the *Cavanagh* standard is met).

## DISCUSSION

Defendants and Relief Defendants raise four principal arguments in opposition to the SEC's motion: (1) the Court lacks the power to issue an asset freeze; (2) the statute of limitations bars the SEC's action; (3) the SEC fails to meet the relevant standard for an asset freeze; and (4)

---

yacht which relief defendants owned (discussing *S.E.C. v. Martino*, 255 F. Supp. 2d 268, 271 (S.D.N.Y. 2003) ("[The] luxury yacht . . . [was] held in the name of [one relief defendant], an offshore company wholly owned and controlled by [another relief defendant].")))  As discussed next, it is well-established that the applicable standard for freezing a relief defendant's assets is, in fact, "whether the SEC has shown that it is likely to succeed on the merits." *Cavanagh*, 155 F.3d at 136. But this does not alter, or muddy the waters as to, the standard for freezing the assets of a defendant in an SEC action, which can be satisfied by "an inference . . . that the [defendant] has violated the federal securities laws." *Smith*, 653 F.3d at 128; *cf. Smith*, 653 F.3d at 128 (applying the basis-to-infer standard when reviewing an order freezing a vacation home which relief defendant *and* defendant owned jointly); *Unifund-1*, 910 F.2d at 1041 (same).

the asset freeze is overbroad and should be limited according to the expected recovery of the SEC. The Court addresses each of these arguments in turn.

## I.     The Court has the Power to Issue an Asset-Freezing Injunction

The Court rejects Defendants' and Yue's argument that it lacks the power to issue a statutory asset freeze because that remedy was unknown in 1789 England.  In support of their argument, Defendants and Yue cite *Grupo Mexicano de Desarrollo S.A. v. All.  Bond Fund, Inc*., 527 U.S. 308 (1999), in which "the Supreme Court held that a preliminary injunction issued under Fed. R. Civ. P. 65 had to be within the district court's equitable authority under the Judiciary Act of 1789[.]"  *Adelphia Bus. Sols., Inc. v. Abnos*, 482 F.3d 602, 606–07 (2d Cir. 2007); (*see also* Dkt. 43, at 2–4.)  *Grupo* is irrelevant to this matter.

First, "*Grupo* [only] addressed . . . an action for money damages," *S.E.C. v. ETS Payphones, Inc*., 408 F.3d 727, 734 (11th Cir. 2005), and did not disturb the well-established principle that an asset freeze may be issued "in an action for equitable remedies," *Tiffany (NJ) LLC v. China Merchs. Bank*, 589 F. App'x 550, 552 (2d Cir. 2014) (allowing an asset freeze to issue under the Lanham Act because the complaint asked for the equitable remedy of disgorgement); *see also S.E.C. v. Collector's Coffee Inc*., --- F. Supp. 3d ----, No. 19 Civ. 04355 (VM), 2022 WL 1448432, at *3 (S.D.N.Y. May 8, 2022) (explaining that *Grupo* "held that a court does not have authority to freeze assets to preserve them for potential money damages, but distinguished actions seeking money damages from actions seeking equitable relief"); *accord Johnson v. Couturier*, 572 F.3d 1067, 1084 (9th Cir. 2009).  Here, the SEC seeks the equitable remedy of disgorgement, thus making *Grupo* irrelevant.

 Second, "[u]nlike private actions, which are rooted wholly in the equity jurisdiction of the federal court, SEC suits for injunctions are creatures of statute." *S.E.C. v. Mgmt. Dynamics, Inc*.,

515 F.2d 801, 808 (2d Cir. 1975).  *Grupo*, which involved a private action, is therefore irrelevant for the additional reason that it addressed the issuance of a preliminary injunction pursuant to the Court's general equitable powers and not pursuant to a statute for the benefit of a public authority. *See Grupo*, 527 U.S. at 325–26 (discussing an asset freeze issued pursuant to the tax-code for a public authority's benefit, highlighting the distinction between the federal court's general equitable powers and statutory authority, and noting that "courts of equity will go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." (cleaned up)); *Mgmt. Dynamics, Inc*., 515 F.2d at 808 ("[T]he SEC appears in these proceedings not as an ordinary litigant, but as a statutory guardian charged with safeguarding the public interest in enforcing the securities laws.").  The Court, therefore, rejects the facial challenge to its authority to issue the statutory asset freeze requested by the SEC.

Defendants and Yue argue that notwithstanding the fact that the Second Circuit has repeatedly affirmed the Court's power to issue such asset freezes under the relevant statutes, the Supreme Court effectively prohibited courts from doing so in *Liu v. S.E.C.*, 140 S. Ct. 1936 (2020). However, the growing consensus is that *Liu* merely clarified the scope of disgorgement as a remedy, and said nothing about, let alone eliminated, asset-freezing injunctions.  *See S.E.C.* v. *Bronson*, No. 12-CV-6421 (KMK), 2022 WL 1287937, at *13 (S.D.N.Y. Apr. 29, 2022) ("*Liu* did not disturb courts' authority to impose § 5 injunctions under 15 U.S.C. § 78u(d)(1)[.]" (collecting cases)), *aff'd*, 2022 WL 5237474 (2d Cir. Oct. 6, 2022); *Collectors Coffee Inc*., 2022 WL 1448432, at *3 (freezing assets in a decision that was issued after *Liu*); *S.E.C. v. Voight*, No. H-15-2218, 2021 WL 5181062, at *4 (S.D. Tex. June 28, 2021) (noting that in *Liu* "[t]he Supreme Court did not address, much less prohibit, asset freezes[.]"); *S.E.C. v. Good*, No. 22-CV-60-D, 2022 WL 1485177, at *2 (E.D.N.C. Apr. 20, 2022) (freezing assets post *Liu* pursuant to 15 U.S.C. §§ 77t(b),

78u(d)); *S.E.C.* v. *Sripetch*, No. 20-CV-01864, 2020 WL 6396927, at *8 (S.D. Cal. Nov. 2, 2020) (same); *S.E.C.* v. *SiliconSage Builders*, *LLC*, No. 20-CV-09247, 2021 WL 1041618, at *2 (N.D. Cal. Feb. 10, 2021) (same); *S.E.C. v. MCC Int'l Corp.*, No. 22-CV-14129, 2022 WL 2760279, at *8 (S.D. Fla. May 18, 2022) (same), *report and recommendation adopted via docket entry* (June 17, 2022). Indeed, on remand in *Liu* itself, the Ninth Circuit affirmed the district court's grant of a pre-judgment asset-freezing injunction. *See S.E.C. v. Liu*, 851 F. App'x 665, 668 (9th Cir. 2021).

The Court therefore rejects Defendants' and Yue's argument that after *Liu*, the Court is prohibited from issuing the requested statutory asset freeze.[28]

## II.   Statute of Limitations

Defendants and Relief Defendants argue that most of the SEC's claims—for disgorgement, civil penalties, and pre-judgment interest based on violations of §10(b) of the Exchange Act, Rule 10b-5, and §17(a) of the Securities Act—relate to offerings made before 2016 and are therefore barred by the five-year statute of limitations under 28 U.S.C. § 2462. (*See* Dkt. 43, at 33–35; Dkt.

---

[28] Even if the Court were to entertain Defendants' and Yue's argument that bygone precedents somehow govern its powers, it would not find that Defendants' and Relief Defendants' cursory reference to a single English Court of Appeals decision from 1890—*Lister & Co. v. Stubbs* [1890] 45 Ch. D. 1 (EWCA)—shows that asset-freezing injunctions were unknown in English law at the time of the United States' founding. *See, e.g.*, John Mitford, *A Treatise on the Pleadings in Suits in the Court of Chancery by English Bill* 46 (2d ed. 1787) ("For the purpose of preserving property in dispute, pending a suit, or to prevent evasion of justice the [Court of Chancery] . . . issues a provisional writ [such] as . . . injunction to refrain the defendant . . . from committing waste, or doing any injurious act[.]"); *The Great Western Railway Co. v. Birmingham & Oxford Junction Railway Co.*, 41 Eng. Rep. 1074, 1076 (1848) (Cottenham, Lord Chancellor) ("It is certain that the Court [of Chancery] will in many cases interfere and preserve property in *statu quo* during the pendency of a suit, in which the rights to it are to be decided, and that without expressing, and often without having the means of forming, any opinion as to such rights." (collecting Court of Chancery cases)); *Echliff v. Baldwin*, 16 Ves. 267 (1809) (same) (Court of Chancery); *accord* 2 Joseph Story, *Commentaries on Equity Jurisprudence: As Administered in England and America* §§ 906–08, 955–58 (9th ed. 1866) (discussing cases where the courts of equity enjoined the transfer of property pending suit).

124, at 12–16; Dkt. 179, at 17–24.)  Because the offerings in themselves did not trigger the running of § 2462's statute of limitations and because the extended ten-year period of § 6501(a)(3) of the National Defense Authorization Act applies to this case, the Court finds that most of the SEC's claims for civil penalties, disgorgement, and pre-judgment interest are timely.[29]

**A.      SEC's Claims for Civil Penalty**

As an initial matter, it is true that the SEC may only pursue civil penalties relating to investor payments made within the five-year period before the SEC filed this action.  In relevant part, 28 U.S.C. § 2462 provides that "[e]xcept as otherwise provided by Act of Congress, an action, suit or proceeding for the enforcement of any civil fine, penalty, or forfeiture, pecuniary or otherwise, shall not be entertained unless commenced within five years from the date when the claim first accrued[.]"  *Id.*  The Second Circuit recently opined that, notwithstanding the recent amendment to § 2462, "civil penalties [claims] remain[] subject to § 2462's five-year statute of limitations."  *See S.E.C. v. Fowler*, 6 F.4th 255, 260 n.5 (2d Cir. 2021).

Because "a claim accrues [in an SEC action for civil penalties] when the plaintiff has a complete and present cause of action," *Gabelli v. S.E.C.*, 568 U.S. 442, 448 (2013) (citations and quotation marks omitted),[30] Defendants' and Relief Defendants' argument that the SEC's claims

---

[29] The Court notes that "the statute of limitations is ordinarily an affirmative defense that must be raised in the answer, . . . [and] may be decided on" a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6).  *See Connecticut Gen. Life Ins. Co. v. BioHealth Lab'ys, Inc.*, 988 F.3d 127, 132 (2d Cir. 2021); *see also Katz v. Goodyear Tire & Rubber Co*., 737 F.2d 238, 243 n.2 (2d Cir. 1984) ("[W]here the statute of limitations operates as an affirmative defense[,] . . . issues of fact as to the application of that defense must be submitted to the jury.").  Thus, Defendants' and Relief Defendants' attempt to litigate this defense at this juncture is likely premature, but because the Court finds it meritless, it resolves it at this stage.

[30] *See also Smith v. Campbell*, 782 F.3d 93, 100 (2d Cir. 2015) (noting that a claim accrues when a claimant has a "complete and present cause of action," even if "the full extent of the injury is not then known or predictable."); *accord William A. Graham Co. v. Haughey*, 646 F.3d 138,

26

accrued when the Eastern Emerald and Eastern Mirage offering memoranda were issued fails.  The SEC brings this action under Rule 10b-5 and § 17(a), which require a showing of "purchase or sale" or "offer or sale" of a security, respectively.  The Second Circuit has made clear that the time of "a purchase or sale" of a security is not the same as when the alleged misstatement is made.  *See Grondahl v. Merritt & Harris, Inc*., 964 F.2d 1290, 1294 (2d Cir. 1992) ("[t]he time of a 'purchase or sale' of securities within the meaning of Rule 10b–5 is to be determined as the time when the parties to the transaction are committed to one another."); *S.E.C. v. Leffers*, 289 F. App'x 449, 451 (2d Cir. 2008) ("[Under] [t]he language of Section 17(a) . . . [t]he operative act, triggering the limitations period, . . . occurs [at] the earliest on the effective date of the offer and arguably continues through the time of the actual sales."); *see also City of Pontiac Gen. Emps. Ret. Sys. v. MBIA, Inc*., 637 F.3d 169, 176 (2d Cir. 2011) ("A securities fraud claim does not accrue until after the plaintiff *actually purchases* (or sells) the relevant security" (emphasis added)).  This means that Section 2462's five-year statute of limitations did not begin to run on the SEC's civil penalty claim until the EB-5 investments were made in each of the Projects.[31]

    Furthermore, although the SEC does not make this argument, the Court notes the possibility that the SEC's civil penalty claims are still timely, because they were all part of an allegedly fraudulent scheme that began in 2010 and continued into 2017.  "Rule 10b-5 and Section 17(a) [] impose . . . 'scheme liability' for those who, with scienter, engage in deceitful conduct."  *S.E.C. v.*

---

150 (3d Cir. 2011) ("'[A]ccrual' of a cause of action occurs at the moment at which each of its component elements has come into being as a matter of objective reality[.]").

    [31] It is uncontested that the Parties signed a tolling agreement that extends the SEC's time limit, for all claims, by six months.  (*See* Dkt. 179 at 20–21; Dkt. 182, at 19 n.12.)  The Court discusses the asset freeze's scope *infra* on pages [62] to [69].

*CKB168 Holdings, Ltd*., 210 F. Supp. 3d 421, 445 (E.D.N.Y. 2016).  Whereas other parts of securities laws make it unlawful simply to utter or spread falsehoods, scheme liability "hinges on the performance of an inherently deceptive act that is *distinct from* an alleged misstatement." *S.E.C. v. Kelly*, 817 F.Supp.2d 340, 344 (S.D.N.Y. 2011) (emphasis added); *see also CKB168*, 210 F. Supp. 3d at 445 ("[T]he Second, Eighth, and Ninth Circuits require deceptive conduct in addition to misrepresentations that go beyond mere assistance with making the misrepresentation." (cleaned up)); *United States v. Stirling*, 571 F.2d 708, 725 (2d Cir. 1978) ("A scheme to defraud may consist of numerous elements . . . and the alleged false statements [are] merely means for carrying it into effect.").  Here, because the SEC made allegations of an integrated fraudulent scheme that included all of the EB-5 investments, whether made before or after September 27, 2016, the Court would have found, in the alternative, that § 2462's five-year statute of limitations did not begin to run after the scheme was completed—when the final sale of the EB-5 investments occurred, in December 2017—thereby making the SEC's entire civil penalty claim timely.

**B.     SEC's Disgorgement Claim**

**1.     National Defense Authorization Act for Fiscal Year 2021**

On January 1, 2021, Congress enacted the National Defense Authorization Act for Fiscal Year 2021 ("NDAA"), Pub. L. No. 116-283, § 6501, 134 Stat. 3388, 4625–26 (2021).  In relevant part, § 6501(a) of the NDAA, now codified at 15 U.S.C. § 78u(d)(8)(A)–(B), provides that:

> The [SEC] may bring a claim for disgorgement . . . (ii) not later than 10 years after the latest date of the violation that gives rise to the action or proceeding in which the Commission seeks the claim if the violation involves conduct that violates – (I)

section 78j(b) of this title; (II) section 77q(a)(1) of this title; . . . or (IV) any other provision of the securities laws for which scienter must be established.[32]

§ 6501(b) of the NDAA also provides that: "the amendments made by subsection (a) shall apply with respect to any action or proceeding that is pending on, or commenced on or after, the date of enactment of this Act."

Regarding Section 6501(b)'s retroactivity, the Court need not write on a blank slate.  "The retroactivity of the NDAA has been addressed by a number of courts, including in this [Circuit]." *See S.E.C. v. Stubos*, No. 22-CV-04674 (LJL), 2022 WL 6776741, at *11 (S.D.N.Y. Oct. 11, 2022) (collecting cases).  Relying on the plain text of the NDAA, courts have uniformly concluded that the NDAA is retroactive in its application and revives some previously time-barred claims filed after January 2021.  *See id.* at *12 (finding that NDAA applied retroactively, and that "[t]he words 'pending on' clearly envision—as other courts have held—that the statute of limitations contained in the NDAA has some retroactive effect and, in turn, revives some previously time-barred claims."); *Fowler*, 6 F.4th at 260 n.5 (2d Cir. 2021) ("A recent amendment to the Exchange Act took the SEC's claims for disgorgement and injunctive relief outside of the ambit of § 2462 and retroactively imposed a new, ten-year statute of limitations for those claims."); *S.E.C. v. Hallam*, 42 F.4th 316, 335 (5th Cir. 2022) (finding that the NDAA had a retroactive application, even to a case on appeal); *S.E.C. v. Gallison*, 588 F. Supp. 3d 509, 519 (S.D.N.Y. 2022) (finding that "changes are applicable to any action pending at the date of the NDAA's enactment.").

---

[32] It is clear that this provision of the NDAA extends the statute of limitations period for SEC enforcement actions that ordinarily would be governed by § 2462, which, as discussed, provides for a five-year limitations period "[e]xcept as otherwise provided by Act of Congress[.]"

The Court rejects Defendants' and Relief Defendants' argument that the Second Circuit's decision in *Enter. Mortg. Acceptance Co., LLC, Secs. Litig. v. Enter. Mortg. Acceptance Co.* ("*Enterprise Mortgage*"), 391 F.3d 401 (2d Cir. 2004), dealing with a different statute, makes such retroactivity impermissible.  Retroactivity of previously extinguished or lapsed claims is not unknown in the law.  *See id.* at 405 ("The Supreme Court has recognized that . . . Congress is empowered to enact retroactive legislation."); *Int'l Union of Elec., Radio & Mach. Workers, AFL-CIO, Loc. 790 v. Robbins & Myers, Inc.*, 429 U.S. 229, 243–44 (1976) ("[C]ertainly it cannot be said that lifting the bar of a statute of limitation so as to restore a remedy lost through mere lapse of time is per se an offense against the Fourteenth Amendment." (citation omitted)); *accord Lieberman v. Cambridge Partners, L.L.C.*, 432 F.3d 482, 490 (3d Cir. 2005) ("Congress undoubtedly possesses the powers to resurrect claims extinguished by a statute of repose, no less than claims barred by a statute of limitations, but it must manifest those powers in the clearest possible terms.").  Furthermore, the Supreme Court has long cautioned against adopting categorical rules of interpretation as to the meaning of statutes.  *See Crown Coat Front Co. v. United States*, 386 U.S. 503, 517 (1967) ("The Court has pointed out before [] the hazards inherent in attempting to define for all purposes when a cause of action first accrues." (cleaned up)).  In *Enterprise Mortgage*, the Second Circuit decided whether provisions of the Sarbanes-Oxley Act of 2002 ("SOX"), extended the statute of limitations for private civil actions retroactively, such that claims that previously lapsed were revived.  *See* 391 F.3d at 403.  In relevant part, that statute provided that it "shall apply to all proceedings addressed by this section that are commenced on or after the . . . date of enactment of this Act," and in a different portion, that "[n]othing in this section shall create a new, private right of action."  *Id.* at 406 (citation omitted).  The Second

Circuit concluded that this language was too ambiguous to create a retroactive right of action.  *See id.* at 407.

However, courts have not applied the reasoning of *Enterprise Mortgage* to the NDAA.  In *Stubos*, the district court distinguished the NDAA from SOX:

> The NDAA has none of the features that the court in *Enterprise Mortgage* relied on to conclude that the retroactive effect of SOX was ambiguous.  In passing the NDAA, Congress did not just provide that the extended statute of limitations would apply to proceedings "commenced on or after" the date of its enactment.  It stated that the limitations period would apply to proceedings "pending on, or commenced on or after," the date of its enactment.  NDAA § 6501(a)(3).  The law also does not contain the language that the court concluded in *Enterprise Mortgage* created ambiguity, specifically that the limitations period was not intended to create a new cause of action. . . . [Furthermore] in deciding *Enterprise Mortgage*, the Second Circuit itself referred to the "pending on, or commenced on or after" language that Congress used in the NDAA as an "unambiguous" grant of retroactivity.  *Enter. Mortg. Acceptance Co.*, 391 F.3d at 407. . . . It follows from *Enterprise Mortgage* that the NDAA—which uses the language that both [the Supreme Court] and the Second Circuit have stated conveys an explicit retroactivity command—should be given retroactive effect.

*Stubos*, 2022 WL 6776741, at *14.

Indeed, twelve years after the Second Circuit's decision in *Enterprise Mortgage*, the Supreme Court, in *Bank Markazi v. Peterson*, 578 U.S. 212 (2016), in effect, held that the NDAA applies retroactively to claims commenced after its passage and rendered them timely.  In so doing, the Supreme Court affirmed the principle that "Congress may indeed direct courts to apply newly enacted, outcome-altering legislation in pending civil cases," 578 U.S. at 230 (citation omitted); *see also S.E.C. v. Sharp*, ---F. Supp. 3d----, No. CV 21-11276 (WGY), 2022 WL 4085676, at *9 (D. Mass. Sept. 6, 2022) (same); *see also S.E.C. v. Kellen*, No. CV 20-3861(RSWL)(AGR), 2021 WL 4907238, at *4 (C.D. Cal. Sept. 14, 2021) ("While courts generally disfavor retroactive legislation, the Court cannot ignore plain congressional intent."); *see generally Landgraf v. USI Film Prod.*, 511 U.S. 244, 273 (1994) ("[A] court should apply the law in effect at the time it

renders its decision, even though that law was enacted after the events that gave rise to the suit." (cleaned up)).  Thus, Defendants and Relief Defendants' argument that *Enterprise Mortgage* precludes the retroactive application of the NDAA's extended ten-year statute of limitations to the SEC's disgorgement claim in this case is plainly meritless.

The Court also rejects Defendants' and Relief Defendants' argument that retroactive application of the NDAA's ten-year statute of limitations is barred by the *Ex Post Facto* Clause. This argument, too, is plainly meritless.  "The *ex post facto* clause forbids retroactive application of penal legislation, not civil legislation," *Domond v. I.N.S.*, 244 F.3d 81, 87 (2d Cir. 2001), and the "disgorgement remedy [] has not been considered a criminal sanction," *S.E.C. v. Palmisano*, 135 F.3d 860, 865–66 (2d Cir. 1998); *see Stubos*, 2022 WL 6776741, at \*14 (noting that "[t]he *ex post facto* clause forbids retroactive application of penal legislation, not civil legislation" and concluding that disgorgement was not a criminal penalty); *Kellen*, 2021 WL 4907238, at \*4 ("[D]isgorgement remains beyond the constraints of the *Ex Post Facto* Clause").

Thus, the Court finds that the NDAA's ten-year statute to limitations may be applied retroactively to the SEC's disgorgement claim, which was pending at the time of the NDAA's enactment on January 1, 2021.

## 2.    Application of the NDAA's Statute of Limitations to the SEC's Disgorgement and Prejudgment Interest Claims

Next, the Court determines when the ten-year limitations period begins to run under the NDAA and whether the SEC's disgorgement claim—and by extension, its prejudgment interest claim—are timely.  The NDAA provides that the SEC may bring its claim "10 years" from the "latest date of the violation."  *See* 15 U.S.C. § 78u(d).  Here, the parties dispute, assuming the statute does apply, at what point it begins to run.  As before, Defendants and Relief Defendants

argue that the limitations period begins to run when the Eastern Emerald and Eastern Mirage offering memoranda were issued. (Dkt. 124, at 12; Dkt. 179, at 18.)  By contrast, the SEC argues that statute of limitations begins to run: (1) on the date(s) when each investor purchased his or her security, and Defendant "received the ill-gotten gains," (2) when the last solicitation occurred in 2017, or (3) when Defendants stopped using any "ill-gotten gains" in 2021.  (Dkt. 132, at ECF 11–12.)

Several principles guide the Court in interpreting § 6501(a)(3).  In general, statutes of limitations "promote justice by preventing surprises through plaintiffs' revival of claims that have been allowed to slumber until evidence has been lost, memories have faded, and witnesses have disappeared." *CTS Corp. v. Waldburger*, 573 U.S. 1, 8 (2014).  Nonetheless, when "a statute of limitations is sought to be applied to bar rights of the Government, it must receive a strict construction in favor of the Government."  *See United States v. Domino Sugar Corp.*, 349 F.3d 84, 88 (2d Cir. 2003) (citing *E. I. Du Pont De Nemours & Co. v. Davis*, 264 U.S. 456, 462 (1924)) (cleaned up).  Furthermore, "amendment is presumed not to work a change in the underlying substantive law unless an intent to make such a change is clearly expressed." *See Fowler*, 6 F.4th at 261 (cleaned up).

The Court finds that the new law, 15 U.S.C. § 78u(d), worked a substantive change in the previously enacted § 2462 with respect to when the period of limitations starts to run.  As explained above, § 2462 measures the timeliness of a claim from the date it "accrues," and the "standard rule [is] that accrual occurs when the plaintiff has a complete and present cause of action[,] that is, when the plaintiff can file suit and obtain relief." *See Wallace v. Kato*, 549 U.S. 384, 388 (2007) (cleaned up); *Gabelli*, 568 U.S. at 448 (2013) (same); *California Pub. Employees' Ret. Sys. v. ANZ SEC., Inc.*, 137 S. Ct. 2042, 2049 (2017) (same).  By contrast, Section 78u(d) provides that the

33

ten-year limitations period begins to run at the "latest date of the violation," that is, when the illegal conduct comes to an end.  15 U.S.C. § 78u(d).

Section 78u(d) finds its origin in 28 U.S.C. § 2462, dating back to 19th century.  While, prior to 1839, that statute of limitations had undergone multiple amendments, in 1839, Congress first added the word "accrued" to the statute.  *3M Co. v. Browner*, 17 F.3d 1453, 1462 (D.C. Cir. 1994) (discussing the history of § 2462).  The word "accrued" was "carried over" to "the 1874 version," "the 1948 revision," and all other versions of this statute since.  *Id.*  With the word "accrued" in place, the circuits have reached a consensus that the statute of limitations for a 2462 claim begins to run when "a suit may be maintained thereon."  *See S.E.C. v. Mohn*, 465 F.3d 647, 654 (6th Cir. 2006); *United States v. Meyer*, 808 F.2d 912, 914 (1st Cir. 1987) (same); *see generally United States v. Worldwide Indus. Enter., Inc.*, 220 F. Supp. 3d 335, 342 (E.D.N.Y. 2016) (discussing authorities).  As the Second Circuit recently recognized, the "recent amendment to the Exchange Act [takes] the SEC's claims for disgorgement and injunctive relief *outside of the ambit* of § 2462."  *See Fowler*, 6 F.4th at 260 n.5 (emphasis added).

In the Section 78u(d), Congress omitted the word "accrued," and instead referred the Court to the "latest date" where the "violation . . . occur[s]" to measure the timeliness of each claim.  Violation, as opposed to a legal claim, is commonly defined as "[t]he act of breaking or dishonoring the law."  *See* Violation, Black's Law Dictionary (11th ed. 2019); *see also Conn. Nat'l Bank v. Germain*, 503 U.S. 249, 253–54 (1992) ("We have stated time and again that courts must presume that a legislature says in a statute what it means and means in a statute what it says there.").  The term is often used in "statute[s] of repose," where a "limit is measured not from the date on which the claim accrues but instead from the date of the last culpable act or omission of the defendant."  *CTS Corp.*, 573 U.S. at 8; *see also P. Stolz Fam. P'ship L.P. v. Daum*, 355 F.3d

34

92, 102 (2d Cir. 2004) ("[I]n general, a statute of repose acts to define temporally the right to initiate suit against a defendant after a legislatively determined time period.").[33]  The Court finds that the plain language of Section 78u(d) calls for the same construction, and finds that the limitation period begins to run at the latest point the underlying wrong occurs.

In its Complaint, the SEC alleges, *inter alia*, that there existed an integrated scheme to defraud that was perpetrated collectively by Defendants. (Dkt. 98, ¶¶ 13, 78–190.); *S.E.C. v. Kelly*, 663 F. Supp. 2d 276, 288 (S.D.N.Y. 2009) (discussing "a continuous, integrated scheme.")  While Defendants and Relief Defendants ask the Court to view the multiple EB-5 investment and other Project-related transactions as disparate infractions, the Court views them as interconnected attempts to propel their alleged scheme forward.  Here, the last culpable act—as opposed to the wrongful consequences of that act, including wrongfully obtaining funds and then misusing them—is the last misrepresentation, and payment, that occurred in late 2017 in connection with the Emerald Project.  (Dkt. 4-68, at ECF 31.)  Thus, the scheme ended then, making all the SEC's claims, in principle, timely.[34]

---

[33] While Section 78u(d) uses the violation itself as the touchstone for timeliness, the Court still considers it to be a statute of limitations and not one of repose.  In *P. Stolz*, the Second Circuit explained that the main difference is that a statute of repose "is not a limitation of a plaintiff's *remedy*, but rather defines the right involved in terms of the time allowed to bring suit."  355 F.3d at 102.  The statute in question here only limits the availability of remedies, namely disgorgement, and has no bearing on other modes of recovery the SEC may have for the same underlying wrong. *See S.E.C. v. Wyly*, 788 F. Supp. 2d 92, 112–13 (S.D.N.Y. 2011) (finding that filing statutes were not imposing a statutory repose limitation because they only applied to specific remedies).

[34] The Court notes that even if the accrual rule were applied, the result would be the same, given the ten-year statute of limitations under Section 78u(d).  Defendants and Relief Defendants hardly contest that all, but seven, EB-5 investor payments were made after March 27, 2011. (*See* Dkt. 6-48, at ECF 9, 12–13, 16, 18–23, 29–31.)  Thus, because each violation accrued at the first point the SEC could have brought its claim, that is, when payments were made as opposed to when the misstatements were uttered under the scheme liability, the Court finds that almost all of the

**III.     The SEC Has Met Its Burden to Obtain an Asset-Freezing Preliminary Injunction**

Contrary to Defendants' and Relief Defendants' arguments, the Court finds that the SEC has met its burden to obtain the asset-freezing preliminary injunction.  As discussed, to obtain such an injunction as to Defendants' assets, the SEC need only "show either a likelihood of success on the merits, or that an inference can be drawn that the party has violated the federal securities laws." *Smith*, 653 F.3d at 128 (cleaned up).  Here, the Court finds that the SEC has shown a substantial likelihood of success on the merits.

**A.     SEC's Causes of Action**

The SEC brings claims against Defendants under Section 10(b) of the Exchange Act, Rule 10b-5, and Section 17(a) of the Securities Act.  Courts have long recognized that Congress passed the securities law to serve an extensive remedial purpose, and therefore have construed them broadly.  *See S.E.C. v. Edwards*, 540 U.S. 389, 393 (2004) ("Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called." (citations omitted)); *Lorenzo v. S.E.C.*, 139 S. Ct. 1094, 1103 (2019) (noting that securities laws' purpose was to "meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." (citations omitted)); *S.E.C. v. Zanford*, 535 U.S. 813, 819 (2002) ("[W]e have explained that the [securities] statute should be construed . . . flexibly to effectuate its remedial purposes." (cleaned up)).

Section 10(b) provides, in relevant part:

---

SEC's disgorgement claims (broken down by individual investor) are timely, and the scope of the injunction would remain the same.

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange . . . To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, or any securities-based swap agreement any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. 78j(b).  Rule 10b-5 similarly provides:

> It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange . . . [t]o employ any device, scheme, or artifice to defraud . . . [or to] make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, [or to] engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b-5.  The SEC has alleged both misrepresentation liability and scheme liability under Section 10(b), Rule 10b-5, and Section 17(a).  (Dkt. 98, ¶¶ 191–99.)  To prevail on Section 10(b) and Rule 10b-5 misrepresentation claims, the SEC must show that each defendant: "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities."

*S.E.C. v. Monarch Funding Corp.*, 192 F.3d 295, 308 (2d Cir. 1999).

Section 17(a) provides, in relevant part:

> It shall be unlawful for any person in the offer or sale of any securities . . . by the use of any means or instruments of transportation or communication in interstate commerce or by use of the mails, directly or indirectly . . . to employ any device, scheme, or artifice to defraud[.]

15 U.S.C. § 77q(a).  To prevail on a Section 17(a) claim, the SEC must set forth "[e]ssentially the same elements [as a Section 10(b) claim]. . . though no showing of scienter is required for the SEC

to obtain an injunction under subsections [17](a)(2) or (a)(3)." *CKB168*, 210 F. Supp. 3d at 441 (citing *Monarch*, 192 F.3d at 308)).

To prevail on a scheme liability claim under Section 10(b), Rule 10b-5, and Section 17(a), the SEC must show that the defendants "(1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter." *Id.* at 445. "To prove [scheme] liability under Securities Act Section 17(a)(3), however, the SEC only has to prove negligence rather than scienter." *Id.* (citation omitted).

Finally, the SEC contends that Defendants' alleged fraud unjustly enriched Relief Defendant. To obtain disgorgement from relief defendants, SEC must show that each relief defendant "(1) has received ill-gotten funds; and (2) does not have a legitimate claim to those funds." *S.E.C. v. Bronson*, 14 F. Supp. 3d 402, 417 (S.D.N.Y. 2014) (ultimately citing *Cavanagh*, 155 F.3d at 136).

### B. The Transactions Between Defendants and EB-5 Investors Involved a Security

For securities laws to apply, a "security" within the meaning of Section 2(a)(1) of the Securities Act of 1933 must be present. In line with securities laws' overarching remedial purpose, courts interpret the statutory "definition of [a] security" to be "quite broad." *Marine Bank v. Weaver*, 455 U.S. 551, 555 (1982); *see also Caiola v. Citibank, N.A., New York*, 295 F.3d 312, 325 (2d Cir. 2002) ("The definition of security is construed in a flexible manner[.]" (cleaned up)); *accord S.E.C. v. Shields*, 744 F.3d 633, 641 (10th Cir. 2014) ("Congress painted with a broad brush in defining a 'security' in recognition of the virtually limitless scope of human ingenuity[.]" (citations and quotation marks omitted)).

The statutory definition of a "security" includes an "investment contract."  15 U.S.C. § 77b(a)(1).  Although the securities laws liberally define a security, none explicitly define an "investment contract."  The Supreme Court has done so in *S.E.C. v. W.J. Howey Co.*, 328 U.S. 293 (1946), and the Second Circuit found the *Howey* test applicable when interests in limited liability companies are at issue.  *See Mayer v. Oil Field Sys. Corp.*, 721 F.2d 59, 65 (2d Cir. 1983) (applying the *Howey* test and finding that a "limited partnership interest generally is a security[.]").  An investment contract is a "scheme whereby a person [1] invests his money [2] in a common enterprise and [3] is led to expect profits [4] solely from the efforts of the promoter or a third party."  *Howey*, 328 U.S. at 298–99.  Importantly, in applying the *Howey* test, "form should be disregarded for substance and the emphasis should be on economic reality."  *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967).  The Court examines the *Howey* prongs with respect to this case in turn.

### 1.    Investment of Money

The first *Howey* prong examines whether "an investor chose to give up a specific consideration in return for a separable financial interest with the characteristics of a security."  *Int'l Bhd. of Teamsters. v. Daniel*, 439 U.S. 551, 559 (1979).  With respect to this prong, courts merely ask whether such investment "was part of the relevant transaction."  *S.E.C. v. Telegram Grp. Inc.*, 448 F. Supp. 3d 352, 368 (S.D.N.Y. 2020); *see also Top of Iowa Co-op. v. Schewe*, 6 F. Supp. 2d 843, 851 (N.D. Iowa 1998) ("Courts rarely tarry over the 'investment of money' prong of the *Howey* test[.]" (citation omitted)).  Because it is undisputed that the EB-5 investors paid at least $229 million to Defendants for interests in Defendants' limited liability companies and in fees (*see generally* Dkt. 6-48), the first prong of the *Howey* test is satisfied.

### 2.    Common Enterprise

The second *Howey* prong requires proof of a common enterprise. "A common enterprise within the meaning of *Howey* can be established by a showing of 'horizontal commonality'[.]" *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994). In such an enterprise, "'the fortunes of each investor in a pool of investors' are tied to one another and to the 'success of the overall venture.'" *Balestra v. ATBCOIN LLC*, 380 F. Supp. 3d 340, 353 (S.D.N.Y. 2019) (citing *Revak*, 18 F.3d at 87)). Thus, in effect, a "finding of horizontal commonality requires a sharing or pooling of funds." *In re Energy Sys. Equip. Leasing Sec. Litig.*, 642 F. Supp. 718, 735 (E.D.N.Y. 1986) (collecting cases). Here, the offering memoranda and records of transactions show that EB-5 investor funds were pooled and that the enterprise—consisting of Fleet, additional LLPs, and Xia-controlled entities—offered investors the opportunity to share profits *pro-rata*. (*See* Dkt. 6-1, at ECF 7 ("Distributions will be made. . . pro rata[.]"); Dkt. 6-2, at ECF 7 (similar); Dkt. 6-3, at ECF 7 (similar); 6-4, at ECF 47–48 (similar); Dkt. 6-6, at ECF 47–48 (similar); *see also* Dkt. 6-48 (evidencing pooling).) Thus, the second prong of *Howey* is easily satisfied.

### 3. Expectation of Profit

Third, the Court finds that investors in the Emerald and Mirage Projects had a reasonable expectation of profit. All of the offering memoranda promised investors the opportunity to share in the profits of the Projects. (Dkt. 6-1, at ECF 7 ("100% [of the profits from investments will be distributed] to the Limited Partners until each Limited Partner has received US$500,000 in distributions. Thereafter, such amounts will be allocated and distributed 99% to the Limited Partners and 1% to the General Partner."); Dkt. 6-2, at ECF 7 (similar); Dkt. 6-3, at ECF 7 (similar); Dkt. 6-4, at ECF 7 ("90% [of investment profits] to the Limited Partners and 10% to the General Partner."); Dkt. 6-5, at ECF 6 (same); Dkt. 6-6, at ECF 7 (same).) The Eastern Emerald

offering memoranda also promised investors interest on their loans.  (Dkt. 6-5, at ECF 24 ("The interest rate is 2% per annum[.]"); Dkt. 6-6, at ECF 14 (similar).)

Defendants and Relief Defendants make two arguments in response.  First, they argue that investors had no expectation of profit because, in fact, the investors' subjective aspirations were only to obtain an EB-5 visa and immigrate to the United States.  Second, they argue that, at least in the context of the Mirage Project, even if investors expected profit, such expectation was unreasonable because profit was not guaranteed.  The Court addresses these arguments in turn.

### a) Defendants' Offering Materials Created an Objective Expectation of Profit

The Court rejects the argument that the interests in the partnerships sold to EB-5 investors were not securities because the investors' primary, subjective motivation was not to profit, but to obtain green cards and immigrate to the United States.  The inquiry under *Howey* is objective, and the investors' subjective motivations are categorically immaterial.  *See S.E.C. v. Aqua-Sonic Prods. Corp.*, 687 F.2d 577, 584 (2d Cir. 1982) ("[I]n determining whether the offering is an investment contract courts are to examine the offering from an objective perspective[.]"); *S.E.C. v. Kik Interactive Inc.*, 492 F. Supp. 3d 169, 183 (S.D.N.Y. 2020) ("*Howey* is an objective test that provides the flexibility necessary for the assessment of a wide range of investment vehicles."); *accord Warfield v. Alaniz,* 569 F.3d 1015, 1021 (9th Cir. 2009) ("Under *Howey*, courts conduct an objective inquiry into the character of the instrument or transaction offered based on *what the purchasers were led to expect*." (cleaned up) (emphasis added)).  For instance, in *United Hous. Found., Inc. v. Forman*, the Supreme Court concluded that investors lacked the required expectation of profit based, not on the individual statements of investors, but on promotional materials that "emphasize[d] the 'nonprofit' nature of the endeavor."  421 U.S. 837, 854 (1975).  Accordingly, courts focus on the objective circumstances of transactions and not on the

idiosyncratic motivations of purchasers.  *See Teague v. Bakker*, 35 F.3d 978, 988 (4th Cir. 1994)

(finding a security, despite investor testimony that "they [had] purchased [the products] with

personal use, not profit, as the central motivation," based on "evidence that the promoter of the

scheme in question marketed the scheme by emphasizing the potential for profit"); *Warfield*, 569

F.3d at 1021 (rejecting the argument that a security cannot be present when purchasers were

allegedly "motivated solely to make a charitable donation").

     Here, as explained above, the offering memoranda circulated to prospective EB-5 investors

included explicit representations that emphasized the possibility of financial return on the

investment. (*See supra* at [40].)  These materials, therefore, created an objective expectation that

purchasers would profit by investing in the Projects.  Thus, the "expectation" of profits test—

which endorses a "commonsense understanding of profits" that "simply [means] financial returns

on [] investments," *Edwards*, 540 U.S. at 396 (citations omitted)—is easily met in this case.

     Defendants, unwilling to relent, further argue that even when taking an objective look at

the scheme, because profit was expected to be small—perhaps less than 0.5% on the investments—

no investor would have chosen to purchase them solely and exclusively for profit.  (Dkt. 43, at

ECF 26 ("Here, the EB-5 investors' overriding expectation of a green card trumps any residual

possibility of profit."); Dkt. 124, at ECF 11–13 (similar).)  The Court declines to accept such a

quixotic and narrow interpretation of the case law.  Nothing in *Howey* stands for the impractical

proposition that the expectation of profit must be an investor's only or overriding motivation, but

only that such expectation in the form of "financial returns on [the] investment" must be present

as part of the scheme.  *See Edwards*, 540 U.S. at 396; *see also S.E.C. v. Hui Feng*, 935 F.3d 721,

727 (9th Cir. 2019) (finding that USCIS-approved regional centers that "promised investors a

fixed, annual return on investment, which ranged across projects from 0.5 to 5 percent of the capital

42

contribution" sold securities to EB-5 investors).  In short, courts need not attempt to resolve the kind of sorites paradox that Defendants posit and decide at what point investors' expectations, or expected returns, form a substantial heap.  *See* Fredrick Schauser, *Slippery Slopes*, 99 Harv. L. Rev. 361, 378 (1985) ("If the removal of one grain of salt from a heap still leaves a heap, the paradox goes, and so too with the removal of the next grain, and the next, and the one after that, and so on, then it must follow that the removal of all the grains still leaves a heap.").

Defendants' reliance on *Forman* on this issue is misplaced.  421 U.S. 837 (1975); (*see also* Dkt. 124, at ECF 14–16.)  In *Forman*, the Supreme Court held that shares in a subsidized, low-income housing co-operative sold to its tenants were not securities because the promotional materials never mentioned the possibility of profit.  *See id*. at 856.  Specifically, the Court found that the possibility that business leases, which the co-operative granted to several entities on the premises, would have generated profit did not meet the third prong of the *Howey* test because, among other things, the promotional materials were entirely devoid of any mention of profit.  *Id*. at 857.[35]  Instead, the Court held that "there [could] be no doubt that investors were attracted solely by [other reasons], and not by financial returns[.]"  *Id*. at 853 (emphasis added).

Here, the opposite is true: there is considerable doubt that the EB-5 investors, each of whom paid Defendants $500,000 plus substantial fees for an interest in the partnerships, were "attracted solely by" the prospect of a green card.  First, as explained above, in stark contrast to *Forman*, all of the offerings made to the EB-5 investors included representations concerning the possibility of profit.  Second, Defendants apparently sought to make their investment offers appear more

---

[35] In fact, the *Forman* Court left open the question of where promotional materials do include a profit inducement, whether that inducement must be a primary, or even an important, motive.  *Id*. at 853 n.17 ("[Such] questions that are not present in this case.").

lucrative to investors over time, and elevated interest rates and shares of profits in their later Eastern Emerald offerings, seemingly in lockstep with their attempts to reach a wider audience of investors. (*Compare* Dkt. 6-1, at ECF 15 (offering a loan "accruing at a rate of 0% per annum") (2010 memoranda) *with* Dkt. 6-6, at ECF 14 (offering a loan "accruing at a rate of 2% per annum") (2015 memoranda); *see also* Dkt. 6-48 at ECF 9, 29–31 (showing that 16 individuals invested in the 2010 offering and 126 individuals invested in the 2015 offering.).) Such marketing efforts prevent this Court from concluding that the investors' profit motive was non-existent. Third, as other courts have observed, the success of any investor's visa application hinged on the ability of the EB-5-funded Projects to turn a profit, be sustainable, and create jobs. *See, e.g.*, *Hui Feng*, 935 F.3d at 731 ("An EB-5 investor's interest in a visa is inextricably tied to the financial success of the regional center's project."). A reasonable EB-5 investor, therefore, would have placed great weight on the representation that the Projects would be profitable because absent profitability, and the enterprise's ability to generate new jobs, the EB-5 investor's visa application would be doomed. *Id.*

Thus, because the *Howey* inquiry is objective, the Court finds that the Projects' offering memoranda created an expectation of profit.

### b) The Investors' Expectation of Profit Was Reasonable.

The Court rejects Defendants' and Yue's companion argument that the EB-5 investors' expectation of profit was unreasonable because any actual profit was uncertain and, in any event, not guaranteed. (Dkt. 124, at ECF 13–16.) Profits were not guaranteed in *Howey* either. There, investors bought stakes in citrus groves based on a representation that "a 10% annual return was to be *expected* over a 10-year period." *See Howey*, 328 U.S. at 296 (emphasis added). Nothing guaranteed that market conditions, or forces of nature, would not have ruined the crops and

deprived investors of any profit.  Thus, the Supreme Court merely required an "expectation" of profit, and further emphasized that when the *Howey* "test [is] satisfied, it is immaterial whether the enterprise is speculative or non-speculative[.]"  *Id.*  Accordingly, other courts have rejected the argument that an absolute entitlement to, or guarantee of, profit is required.  *See, e.g.*, *S.E.C. v. Int'l Loan Network, Inc.*, 968 F.2d 1304, 1308 (D.C. Cir. 1992) ("Very few investments 'guarantee' a return—all that *Howey* requires is a 'reasonable expectation of profits.'"); *S.E.C. v. Scoville*, 913 F.3d 1204, 1222 (10th Cir. 2019) (rejecting an argument that a security requires a guarantee of profits).  Indeed, as the Eleventh Circuit noted in the related context of commodities, such requirement would "thrust the door of deception wide open" and effectively immunize from liability those who target vulnerable victims who lack the knowledge to appreciate the risks inherent in the transactions in which they engage.  *See C.F.T.C. v. R.J. Fitzgerald & Co.*, 310 F.3d 1321, 1330 (11th Cir. 2002) (rejecting a "bright-line requirement" of "a clear guarantee of profits before liability is triggered") (internal quotation marks omitted); *see also Howey*, 328 U.S. at 301 ("The statutory policy of affording broad protection to investors is not to be thwarted by unrealistic and irrelevant formulae.").

Defendants also place undue emphasis on individual disclaimers in the offering memoranda that stated that their enterprise might not be profitable.  (Dkt. 43, at ECF 24–26.)  The Court considers Defendants' representations in context, objectively, and from the perspective of a reasonable potential investor.  As explained above, Defendants' offering memoranda included multiple misstatements that bolstered Defendants' credentials and experience, as well as untruths about financial sources that Defendants did not, in truth, obtain or had a reasonable expectation to obtain.  (*See supra* at [7]–[13].)  These materials also touted collaboration with a well-known construction company with which Defendants had no working relationship.  (*See, e.g.*, Dkt. 6-1,

at ECF 14 (discussing the "Racanelli Construction Group.").)   The Court concludes that these misstatements, taken as a whole, were meant to portray Defendants as well-equipped and well-positioned to build the Projects, and to create and bolster an unrealistic image that the (outsized) Projects would succeed and earn a profit.   Thus, by the time a reasonable investor read any disclaimer, she would have already been tricked into believing that—given Defendants' experience, connections, and the abundance of financing—the possibility that the enterprise might never be profitable was so remote as to be negligible.   In line with their overall scheme, Defendants also affirmatively stated, or strongly implied, that their Projects would be profitable.   (*See, e.g.*, Dkt. 6-9, at ECF 20 ("Project [sic] operating income will see 50% returns at a minimum"); Dkt. 6-8, at ECF 3 ("After five years, each investor will receive $500,000 in returns."); Dkt. 6-1, at ECF 12 ("The Partnership anticipates that the [Project] will be . . . generating income[.]").)   In the face of these representations and the "economic reality" of the transactions between Defendants and the EB-5 investors, Defendants cannot rely on boilerplate disclaimers as a contractual escape hatch or to avoid liability under the securities laws.   *See, e.g.*, *Telegram Grp. Inc.*, 448 F. Supp. 3d at 365 (noting that "[d]isclaimers, if contrary to the apparent economic reality of a transaction, may be considered by the Court but are not dispositive").

Defendants also argue that because they had the discretion to withhold distributions to the investors, the EB-5 investors could not reasonably have expected to make a profit.   (Dkt. 43, at ECF 24–26.)   The Court rejects the notion that simply because Defendants had the authority to withhold distributions, they arbitrarily could issue none.   As Defendant Xia admitted at the Hearing (Tr. 8), all of Defendants' offerings explained that they were "fiduciar[ies]" who were required to "exercise good-faith and integrity" in their dealings with the investors.   (*See generally* Dkts. 6-1, 6-2, 6-3, 6-4, 6-5, 6-6.)   Under New York law, therefore, Defendants' discretion to withhold profits

is bounded and circumscribed.  *See Riviera Cong. Assocs. v. Yassky*, 223 N.E.2d 876, 879 (N.Y.

1966) ("There can be no question that a managing or general partner of a limited partnership is

bound in a fiduciary relationship with the limited partners[.]" (cleaned up)); *AFBT-II, LLC. v.

Country Vill. on Mooney Pond, Inc.*, 759 N.Y.S.2d 149, 151 (N.Y. App. Div. 2003) ("Where the

contract contemplates the exercise of discretion, this pledge includes a promise not to act arbitrarily

or irrationally in exercising that discretion." (citation omitted)).

In sum, the Court finds that Defendants led the EB-5 investors to expect profits from their

Projects and that, therefore, the third *Howey* prong is satisfied.

### 4.     Profits Determined Solely by Efforts of Promoter or Third Party

The fourth *Howey* prong is that the profits the investors expected to receive were "solely

from the efforts of the promoter or a third party."  *Howey*, 328 U.S. at 298–99.  The fourth prong

of *Howey* narrows the universe of transactions that securities laws reach and ensures that the

allegedly defrauded "purchasers were mere passive investors[,] and the sale of the investment

contracts gave rise to 'all the evils inherent in the securities transactions which it was the aim of

the Securities Acts to end.'"  *Wieboldt v. Metz*, 355 F. Supp. 255, 257 (S.D.N.Y. 1973) (quoting

*S.E.C. v. C.M. Joiner Leasing Co.*, 320 U.S. 344, 349 (1943)).  Thus, the Circuit held that this

prong is satisfied when "as a result of the investment agreement itself or the factual circumstances

that surround it, [the investor] is left unable to exercise meaningful control over his investment."

*See United States v. Leonard*, 529 F.3d 83, 91 (2d Cir. 2008) (cleaned up); *accord Hocking v.

Dubois*, 885 F.2d 1449, 1460 (9th Cir. 1989) (en banc) ("[T]he question of an investor's control

over his investment is decided in terms of practical as well as legal ability to control.").  It is

undisputed that the EB-5 investors—limited partners residing abroad—had no right to control the

partnerships and lacked any legal or practical ability to influence their operation.  *See Leonard*,

529 F.3d at 90 (finding that the "number and geographic dispersion left investors particularly dependent on centralized management[.]"); *see also S.E.C. v. Arcturus Corp.*, 928 F.3d 400, 409 (5th Cir. 2019) ("[L]imited partners . . . cannot ordinarily dissolve the partnership or bind other partners, and [] have little or no authority to take an active part in the management of the partnership." (cleaned up)).  The fourth *Howey* prong is therefore met.

*   *   *

Because all of the *Howey* prongs are satisfied, the Court finds that the SEC has shown that the transactions in this case involved securities.

### C.      The SEC has Proven a Likelihood of Success on the Merits Section 10(b), Section 17(a), and Rule 10b-5 Claims

As discussed, to prevail on Section 10(b) and Rule 10b-5 misrepresentation claims, the SEC must show that each defendant: "(1) made a material misrepresentation or a material omission as to which he had a duty to speak, or used a fraudulent device; (2) with scienter; (3) in connection with the purchase or sale of securities." *Monarch Funding Corp.*, 192 F.3d at 308.  The Court finds that the SEC has made a strong showing of likelihood of success on the merits as to these claims.

First, the Court agrees with the SEC that all of the misrepresentations and omissions made by Defendants in the Projects' offering memoranda were material.  An affirmative falsehood is material where there "is a substantial likelihood that a reasonable investor would find the . . . misrepresentation important in making an investment decision." *United States v. Litvak*, 808 F.3d 160, 175 (2d Cir. 2015) (citation omitted).  An omission is material when there is a "substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Matrixx*

48

*Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 38 (2011) (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988)); *see also S.E.C.* v. *Nutra Pharma Corp.*, 450 F. Supp. 3d 278, 286 (E.D.N.Y. 2020) ("The touchstone of the materiality inquiry is . . . whether the defendants' representations or omissions, considered together and in context, would affect the total mix of information[.]" (cleaned up)).  Here, as explained above, the SEC has presented sufficient evidence that, in the offering memoranda sent to potential EB-5 investors, Defendants omitted and misrepresented, on numerous instances, information about the availability of funding sources, their experience in the construction and project development industry, and their association with the Westin Hotel chain. (*See, e.g.*, Dkt. 6-1, at ECF 14 (discussing Xia's purported experience and collaboration with the "Racanelli Construction Group."); Dkt. 6-3, at ECF 5–6 (touting a purported collaboration with the "Westin Elemnet [sic] Hotel" group); Dkt. 6-5, at ECF 3 (stating that the Emerald "shall b[e] financed" with $18 million, from the NMTC, that Xia never obtained.).)

The SEC also adduced evidence indicating that Defendants flatly falsified information about Racanelli-2.  (*See, e.g.*, Tr. 31:6–25 ("I didn't have any relationship with [Racanelli-1] at all.").)  Independently and combined, these misleading or false representations and omissions about the Projects created the illusion that Defendants were well-qualified to execute their scheme. Defendant Xia, who controlled Fleet, oversaw the preparation of the information in the memoranda and admitted that he knew that investors would find various pieces of the allegedly misleading information material.  (*See, e.g.*, Tr. 56:10–13 ("Q: [Y]ou knew that an investor would find it important that there was [] government backing behind the project, right? A: That's right.").)

Second, the Court finds that the SEC has adduced sufficient evidence to show a substantial likelihood of success in proving scienter.[36]  Under Rule 10b-5, scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 319 (2007).  "Circumstantial evidence can support an inference of scienter in a variety of ways, including where defendants '(1) benefitted in a concrete and personal way from the purported fraud; (2) engaged in deliberately illegal behavior; (3) knew facts or had access to information suggesting that their public statements were not accurate; or (4) failed to check information they had a duty to monitor." *S.E.C. v. Fiore*, 416 F. Supp. 3d 306, 323–24 (S.D.N.Y. 2019) (citation omitted).  Here, there is ample evidence of scienter.  The evidence shows that Defendant Xia directly benefited from the alleged fraud by singlehandedly controlling millions of dollars of investor funds, which Xia transferred, without oversight or documentation, between the more than 90 bank accounts he and/or Yue controlled.  (*See supra* at [16]–[17].)  As explained before, there remains a void in the record as to where $22 million in investor funds went or how they were spent.  (*See, e.g.*, Tr. 402.)  The Court finds that this record shows a stunning lack of accounting as to how investor funds were spent or used.  (*See, e.g.*, Tr. 412:16–20 (SEC's expert noting that it was "very difficult to understand what was the value of the work that was being performed" in the "good majority of [the] invoices [of the Projects]" he had reviewed); Tr. 412:24–25, 413:1–3 ("I thought it was highly unusual to see that . . . in some cases, there were four invoices that were being submitted in a given month by one of [the entities] in very large round dollar sums . . .with very little backup.").)  Further, as described above, after learning about the SEC investigation against him, Xia used investor funds to purchase three mansions for his wife Yue

---

[36] As stated *supra*, the SEC need not show scienter to prove § 17(a) liability.

and the other two Relief Defendants.   Evidence likewise suggests that Defendants had access to information the public did not.   Specifically, it appears that Xia repeatedly failed to disclose to investors information about his experience in the project development and construction industry, his funding sources, and his companies.   Xia also failed to disclose to investors that he was misusing and misdirecting their funds on a daily, *ad-hoc* basis.   The Court finds that all of the evidence, viewed as a whole, makes it abundantly clear that Defendants acted with scienter.

Defendants and Yue argue that some of their alleged misstatements were not material, because cautionary language in the memoranda "bespoke caution."  (Dkt. 43, at ECF 27–30.)  The Court disagrees.  The "bespeaks caution" doctrine makes "[c]ertain alleged misrepresentations in a stock offering . . . immaterial as a matter of law because it cannot be said that any reasonable investor could consider them important in light of adequate cautionary language set out in the same offering."  *Halperin v. eBanker USA.com, Inc.*, 295 F.3d 352, 357 (2d Cir. 2002).  The doctrine does not apply when "the cautionary language [does] not expressly warn of or did not directly relate to the risk that brought about [the] loss."  *Id.* at 359; *see also Hunt v. All. N. Am. Gov't Income Tr., Inc.*, 159 F.3d 723, 729 (2d Cir. 1998) ("The cautionary language . . . must relate directly to that by which plaintiffs claim to have been misled.").  Furthermore, the "doctrine applies only to statements [and omissions] that are forward-looking," not to "omission[s] of present fact[s]."  *See Iowa Pub. Emps.' Ret. Sys. v. MF Glob., Ltd.*, 620 F.3d 137, 142 (2d Cir. 2010) (finding that the doctrine did not apply to the omission of information about the then-existing failure to enforce security protocols to a company's employees); *Hunt*, 159 F.3d at 729 (finding the doctrine inapplicable when a fund stated that it "intended to use hedging techniques to reduce currency risk," but failed to disclose that the "defendants knew (or recklessly disregarded) that, as a practical matter" such devices were unavailable.).

51

Here, Defendants rely on the following language in their offering memoranda in support

of their "bespoke caution" argument:

> This memorandum contains certain "forward-looking statements" (as such term is
> defined in the Private Securities Litigation Reform Act of 1995), which can be
> identified by the use of forward-looking terminology such as "believes," "expects,"
> "may," "will," "should," or "anticipates" or the negative thereof, or other variations
> thereon or comparable terminology, or by discussions of strategy that involve risk
> and uncertainties.  Such forward-looking statements involve known and unknown
> risks, uncertainties, and other factors that may cause the actual results, performance,
> or achievements of the partnership to be materially different from any future results,
> performance, or achievements expressed or implied by such forward-looking
> statements.  Such factors include the timing, costs, and scope of any investment by
> the partnership, the revenue and profitability levels of the partnership, real estate
> valuations in the geographic areas in which the partnership invests and numerous
> other factors.  Certain of these factors are discussed in more detail elsewhere in this
> memorandum.  Given these uncertainties, prospective investors are cautioned not
> to place undue reliance on such forward-looking statements. These forward-looking
> statements are based on current expectations, and the partnership assumes no
> obligations to update this information.  Future results are impossible to predict, and
> no representation of any kind is made respecting the future accuracy or the
> completeness of any forward-looking statements herein.

(*See, e.g.*, Dkt. 6-1, at 2–3.)[37]

This boilerplate disclaimer, however, is insufficient to support Defendants' and

Yue's "bespeaks caution" argument.  First, this language neither neutralizes nor negates

the knowing and calculated misrepresentations, and omissions as to then-existing facts,

that Defendants made in the Projects' offering memoranda.  *See In re Prudential SEC. Inc.*

---

[37] Prior to the Hearing, and in the Amended Complaint, the SEC alleged that other future-
looking statements were allegedly misleading or erroneous, specifically as to the anticipated square
footage of the buildings.  (*See* Dkt. 98, ¶¶ 149–50.)  Xia testified at the Hearing that he did not
misrepresent the anticipated size of his buildings, because the New York City Building
Department's authorizations contemplate that the actual, built square footage of the buildings
would exceed their land size and orally calculated the relevant square footage. (Tr. 129–32.) Post-
hearing, the SEC has not argued that the evidence is sufficient to show that these statements were
misleading.  The Court therefore does not consider them in its analysis.

*Ltd. Partnerships Litig.*, 930 F. Supp. 68, 72 (S.D.N.Y. 1996) ("[C]autionary language does not protect material misrepresentations or omissions when defendants knew they were false when made."). For example, as argued by the SEC and established by the evidence, Xia and Fleet "had no factual basis for the statements in the Offering Memoranda regarding third-party funding" or for failing to disclose as much. (Dkt. 132, at ECF 9–10.) While the offering memoranda stated that Defendants "intended" or "anticipated" obtaining tens of millions in funding, these materials failed to disclose the then-existing reality that Defendants had already been denied funding by these sources and that Defendants' expectations for funding rested on non-binding exchanges of intent letters. (*See, e.g.*, Dkts. 6-1, 6-2, 6-3 all at ECF 12 (stating, in 2010 and 2011 and thereafter, that the Mirage Project is "expected to be financed" by $17,000,000 in NYCCRC bonds, when, in fact, the agency had terminated the bonds in 2010); Dkt. 6-4, at ECF 11 (stating that the Emerald Project was "expected to be financed" by a $72 million loan from Hapoalim Securities, when, in fact, no loan application to Hapoalim Securities had ever been filed); Dkt. 6-6, at ECF 12 (same, with respect to a $40 million loan from Hapoalim Securities); Dkt. 6-5, at ECF 3 (stating that the Emerald Project "shall [be] financed" with $18 million in NMTC tax credits and $21.2 million in Brownfield tax credits, without disclosing that the sole basis for Xia's expectation was the exchange of preliminary intent letters); Dkt. 6-3, at ECF 5–6 (stating that the Mirage "will encompass the development of the Westin Elemnet [sic] Hotel & Condo Apartment building," without disclosing that the basis for Xia's expectation was the exchange of preliminary intent letters.).)

Second, the "bespoke caution" doctrine does not apply because the above cautionary language in the offering memoranda was not tailored to the risk. In substance, Defendants warned investors that the future could not be predicted, but did not tell them that the then-existing reality

53

rendered their expectations dubious.  (*See, e.g.*, Dkt. 6-1, at ECF 1–2 ("[Our] forward-looking statements are based on current expectations . . . . *Future* results are impossible to predict, and no representation of any kind is made respecting the *future* accuracy or the completeness of any forward-looking statements herein (emphasis added)); *In re Prudential*, 930 F. Supp. at 72 ("Cautionary language cited to justify application of the doctrine must precisely address the substance of the specific statement or omission that is challenged." (citation omitted)).

The SEC has also made a sufficient showing as to its scheme liability claims.  As discussed, to prevail on a scheme liability claim under Section 10(b), Rule 10b-5, or Section 17(a), the SEC must show that the defendants "(1) committed a deceptive or manipulative act; (2) in furtherance of the alleged scheme to defraud; (3) with scienter." *CKB168*, 210 F. Supp. 3d at 445.[38]  For the reasons previously discussed, the Court finds that the evidence is sufficient to show that Defendants acted with scienter.  The Court further finds that the rampant, undisclosed diversions of EB-5 investor funds by Defendants for uses unrelated to the Projects constituted deceptive acts, that furthered the scheme, when combined with the alleged misstatements and omissions made by Defendants in the offering memoranda.  Xia admitted, as all the offering memoranda stated, that he was a fiduciary of the limited partners that received the EB-5 investor funds.  (Tr. 8:1–11.)  The Supreme Court long held that when a fiduciary "has exercised his power of disposition for his own benefit," that this is fraud "without more." *See S.E.C. v. Zandford*, 535 U.S. 813, 821 (2002) (citing *United States v. Dunn*, 268 U.S. 121, 131 (1925)).  Thus, because the record strongly

---

[38] As stated *supra*, "[t]o prove [scheme] liability under Securities Act Section 17(a)(3), however, the SEC only has to prove negligence rather than scienter." *Id.* (citation omitted).

suggests that Xia exercised his disposition power for his own benefit, the SEC has exceeded its burden to show that scheme liability is likely.

The rest of Defendants' arguments are meritless and warrant only a short discussion.  First, Second Circuit precedent belies Defendants' argument that fraud is actionable only if it is perpetrated on an investor.  *See A. T. Brod & Co. v. Perlow*, 375 F.2d 393, 396–97 (2d Cir. 1967) ("Neither § 10(b) nor Rule 10b-5, it appears, speaks in terms of limiting the nature of the violation to one involving fraud of 'investors'; nor is there any justification for reading such an additional requirement into the Act.").  Second, Supreme Court precedent forecloses the argument that misappropriations of funds that follow the sale of a security are not actionable because they, themselves, are not made "in connection" with the purchase or sale of securities.  *See S.E.C. v. Zandford*, 535 U.S. at 820–21 (finding that a scheme involving sales of securities and "subsequent misappropriation of the proceeds" had the "requisite connection with the sales" of securities because the complaint alleged a "scheme to defraud" and the "the securities sales and [the] fraudulent practices were not independent events"); *see also Romano v. Kazacos*, 609 F.3d 512, 522–23 (2d Cir. 2010) (finding that the "in connection" requirement "does not pivot on temporal limitations" and merely involves claims that "necessarily allege, necessarily involve, or rest on the purchase or sale of securities" (cleaned up)).  The district court cases that Defendants cite as authority for their arguments are distinguishable because they did not include any allegations of a cohesive scheme to defraud of the kind at issue in this case.  Third, the Court rejects the argument that Defendants held all of their opinions reasonably and in good faith because, at a minimum, the SEC adduced sufficient evidence that Defendants acted negligently.  (Dkt. 43, at ECF 29–32.); *see also S.E.C. v. Manor Nursing Centers, Inc*., 458 F.2d 1082, 1096 (2d Cir. 1972) (rejecting a "good

faith" defense because in "enforcement proceeding[s]. . .we have held that mere negligence is a sufficient basis for liability[.]").

> **D.     The SEC Has Made a Strong Showing that Relief Defendants Have No Legitimate Claim to The Assets**

The SEC has exceeded its burden to show a likelihood of success on its unjust enrichment claim that Relief Defendants X. Yu and Verfenstein received ill-gotten gains for which they had no legitimate claim.[39]   As an initial matter, the Court rejects Relief Defendants' bare assertion, without any reference to case-law and only a cursory discussion of the record, that the SEC has not shown a likelihood of success in showing that the funds they received were "ill-gotten."  *See, e.g.*, *Rosenthal*, 426 F. App'x at 3 (finding that funds that were the gains from insider trading were ill-gotten); *S.E.C. v. Boock*, No. 09 Civ. 8261 (DLC), 2013 WL 4828571, at *1–2 (S.D.N.Y. Sept. 9, 2013) (finding that funds that originated in the receipt of unlawfully issued, unregistered shares were ill-gotten funds).   To start, Verfenstein appears to accept, at least in principle, that "funds used to purchase the home came from Perini or the [P]roject[s]" (Dkt. 120, at ECF 5), and, as the Court already has concluded, the evidence shows that Defendants likely obtained the EB-5 investor

---

[39] Defendant Yue did not respond to the SEC's argument that she received ill-gotten monies for which she lacks any legitimate claim.  (*See generally* Dkt. 127.)  The Court accordingly deems her as having waived her defenses on this argument.  *See Jackson v. Fed. Express*, 766 F.3d 189, 198 (2d Cir. 2014) ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned.");  *Williams v. Romarm*, 751 F. App'x 20, 23 (2d Cir. 2018) ("[The] argument was not raised by the plaintiffs below in their opposition to [defendant's] motion to dismiss and therefore was waived." (citation omitted)).  The Court rejects Yue's argument that the injunction reaches too broadly and fails to calculate her reasonable business expenses *infra*.  Regardless, the Court finds that SEC has met its burden to show that the investor funds were ill-gotten—as potential proceeds of investor fraud—and the record is devoid of any evidence that Yue had any legitimate claim for them.  *See Cavanagh*, 155 F.3d at 137 (finding that spouse had no legitimate claim to shares for which he "gave no consideration").

funds for both Projects through fraud. (*See supra* at [48]–[55].)  Next, while Relief Defendant X. Yu's residence was purchased through more circuitous means than the other two mansions, namely, using the Brownfield clean-up tax funds as collateral, the Court still finds that these funds have sufficient connection to the alleged fraud to be "ill-gotten."  In relevant part, the Eastern Emerald offering memorandum says that the "Eastern Emerald . . . shall b[e] finance[d] . . . [with] $ 21,200,000" of Brownfield Tax Credit.  (Dkt. 6-5, at ECF 3.)  The SEC argues that this representation in the memorandum effectively earmarked the $21.2 million to the Emerald Project, as no reasonable investor would have understood the memorandum to mean that the money could have been arbitrarily diverted for Xia's and his associates' "personal use[s]," such as purchasing mansions for Xia, Yue, and X. Yu to live in.  (*See* Dkt. 128, at ECF 11; *see also* Dkt. 6-5, at ECF 3.)  Relief Defendants respond that the Eastern Emerald offering memorandum merely promised that some amount of funds would be used in the Emerald Project, without earmarking any specific portion of the funds for that purpose.  (Dkt. 120, at ECF 11–12.)

The Court agrees with the SEC.  "When analyzing offering materials for compliance with the securities laws," courts must "review the documents holistically and in their entirety."  *In re Morgan Stanley Info. Fund Secs. Litig.*, 592 F.3d 347, 365–66 (2d Cir. 2010).  Specifically, the falsity inquiry "requires an examination of defendants' representations, taken together and in context," and focuses on the "objective" perspective "of a reasonable investor."  *Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d 85, 140 (2d Cir. 2017).  First, at other points in the Eastern Emerald offering memorandum, Defendants indicated their discretion with respect to financial matters.  (*Compare* Dkt. 6-5, at ECF 6, *with* Dkt. 6-5, at ECF 3.)  A reasonable investor may well have concluded that the absence of such language in connection with the Brownfield Tax Credit, combined with non-discretionary phrasing that the

Project "*shall* b[e] finance[d]" (Dkt. 6-5, at ECF 3 (emphasis added)), with the $21.2 million Brownfield Tax Credit, meant that Defendants were required by law and/or fiduciary duty to use the Brownfield Tax Credit for the Emerald Project.  It was reasonable for investors to assume that Defendants lacked any discretion to use the money for other purposes and certainly not to finance X. Yu's personal home purchase.  Relief Defendants resist that conclusion by asserting that they may have received, and in fact anticipated receiving, a larger amount of the Brownfield Tax Credit than their investors had been promised.  (Dkt. 120, at ECF 11–13.)  But such possibility has little to do with what Defendants represented and investors reasonably understood, not least because the memorandum did not mention any additional purported credit.  In fact, the Eastern Emerald offering memorandum contained an itemized list of costs and a corresponding itemized list of financing sources.  In the first list, Defendants detailed the "budget" for the Emerald Project, including "hard costs," "soft costs," and "operating costs" of the Project, which totaled $190 million.  (Dkt. 6-5, at ECF 9.)  The second list, which Defendants placed on the first page of the offering memorandum, began with the phrase "shall [be] financed as follows," detailed the Project's financing sources (including the Brownfield Tax Credit), and ended with the representation that the project's financing sources covered the entire cost of $190 million.  (*Id.* at ECF 3.)  It is clear to the Court that a reasonable investor reading the memorandum likely would have concluded that every dollar of purported financing, including the Brownfield Tax Credit, would be used to pay the costs of the Emerald Project, and not be diverted for Defendants' and Relief Defendants' personal use.  Therefore, the Court concludes that the SEC has exceeded its relatively low burden of showing a likelihood of success in showing that the deliberate diversion of the Brownfield Tax Credit was impermissible.

The SEC has shown a significant likelihood of success on the merits that Relief Defendants have no legitimate claim to the mansions Defendants purchased, in whole or part, using Project funds, and then transferred to Relief Defendants. First, the SEC has overwhelmingly demonstrated that X. Yu has no legitimate claim to the mansion that Defendants and Verfenstein, X. Yu's daughter, gave her. In her sworn deposition, Verfenstein tried to portray the purchase of her mother's mansion as a legitimate business expense. Verfenstein testified that, at the start of 2021, she formed a company named Impact Environmental Soil Management ("IESM") to clean up excess soil from the Emerald Project. (Dkt. 101-36, at 50:7–51:25.) Verfenstein further testified that because IESM needed "a property for dumping purposes," she purchased the luxurious 12-bedroom mansion (with a tennis court), where her mother, father, and grandmother now reside. (*Id.* at 55:1–16.) Aside from being patently incredible, Verfenstein's explanation lacks any documentary support. (*Id.* at 59:16–60:1 ("Q. And are there any invoices for the work done by Impact Environmental Soil Management? A. Right now it's -- no, I don't keep any official invoices? Q. Do you keep unofficial invoices? . . . A. Notes sometimes. Depends.").) Verfenstein also failed to articulate at her deposition how IESM, which was allegedly formed in 2021, accumulated millions of dollars in bills in less than a year of (undocumented) work. (*See id.* at 54:13–19 ("Q. And has Impact Environmental -- between the beginning of 2021 and September 2021, did [IESM] remove any soil from the Eastern Emerald site, project site? . . . A. No. We -- we couldn't.").).[40] Verfenstein further explained that, although bank accounts stated that X. Yu

---

[40] In the Amended Complaint, the SEC argues that IESM was, in effect, a non-existent entity that was never incorporated. (Dkt. 98, ¶ 38.) Such allegation is not repeated in the motion papers and was not fully explored in Verfenstein's deposition. Nonetheless, the lack of any documentation regarding IESM's existence, incorporation, or work, coupled with Verfenstein's non-credible deposition testimony, leads the Court to conclude that IESM never existed and did

was IESM's president, X. Yu played no role in IESM.  (*Id.* at 115:6–9.)  In fact, she admitted

during the deposition that she purchased the mansion so her mother would "be able to enjoy it."

(*Id.* at 62:12–22.)  Based on this record, it is clear that Verfenstein's testimony—that she "came

up with this idea" of using the Vanderbilt Drive mansion "to dispose [of] the soil [from the Emerald

Project]" and "meanwhile" keeping X. Yu's "house"—is a *post-hoc* fabrication, and that X. Yu's

mansion falls squarely within the asset freeze's scope.  (*Id.*)[41]

Next, Verfenstein argues that her own mansion—one of the three purchased using Project

funds—was legitimate compensation for her work on the Projects.  (Dkt. 120, at 5.)  Verfenstein

produced invoices to support this "compensation" argument.  (*See generally* Dkt. 102-8.)

However, the invoices (also known as "requisitions") are a 10-page collection of blurry, only partly

legible, seemingly pictures-of-pictures that appear to be dated from 2018 and 2019.  (*See generally

id.*)  In substance, the invoices purportedly show that the "current payment" owed to a company

named Perini that Verfenstein allegedly owns, was $4,649,462.56, and that some $2.7 million in

monies were being held in "retainage."  (*Id.* at 10.)  None of this purported evidence shows

Verfenstein's entitlement to the mansion purchases using Project funds.  First, it is undisputed that

the $11 million payment Verfenstein received from Defendants to purchase her mansion (*see* Dkt.

101-36, at 73–74), far exceeded the sum that appeared on the invoices.  Second, none of the

--------

not perform any work on the Projects.  This finding, however, is not necessary to the Court's
findings regarding the Relief Defendants' lack of entitlement to the assets at issue.

[41] Verfenstein refers the Court to irrelevant portions of her depositions, where she says that
before 2021 soil was removed to a "different facility" because it was heavily contaminated.  (*See*
Dkt. 120, at ECF 13–14 (citing Dkt. 101-36, at 63:10–11.).)  Such side testimony had little to do
with Verfenstein's repeated references to her decision, which occurred *after* 2021, to give her
mother a mansion that would also be utilized for dumping purposes.

invoices, or any document in the record, prove that Defendants either received the invoices or made payments pursuant to them.  Third, in light of Verfenstein's testimony and the form of this evidence (*i.e.*, blurry, partially illegible pictures-of-pictures), the authenticity of these invoices is dubious, at best.  Casting further doubt on their authenticity, these purported invoices lack cost-breakdowns for the work allegedly performed, which, as expert testimony during the Hearing detailed, is typically required in the construction industry.  (*See* Tr. 405–08 (noting, *inter alia,* the use of Form 703 in the construction industry to itemize contractors' work).)

The Court rejects Verfenstein's argument—based on these purported invoices, her deposition testimony, and certain non-binding (and largely inapposite) case-law—that the SEC has failed to meet its burden of proof.  In this Circuit, the SEC need not disprove every theoretical possibility that a relief defendant is blameless in order to prevail.  Rather, the SEC need only to show that the "probability of [it] prevailing is better than fifty percent.  There may remain considerable room for doubt." *S.E.C. v. Byers*, No. 08 Civ. 7104 (DC), 2009 WL 33434, at *3 n.5 (S.D.N.Y. Jan. 7, 2009) (citing *Abdul Wali v. Coughlin*, 754 F.2d 1015, 1025 (2d Cir. 1985), *overruled on other grounds*, *O'Lone v. Estate of Shabazz*, 482 U.S. 342 (1987)).  Here, the SEC has more than met that burden.  The SEC has sufficiently proved, as previously described, that Defendants and Verfenstein engaged in a circuitous series of transactions in the months after lawsuits relating to the Projects against her and Defendants began to mount, culminating in the purchase of the three mansions, one of which Verfenstein owns (through her entity which mortgaged the property) and one of which Verfenstein's mother now owns.  The SEC has also submitted substantial evidence demonstrating Verfenstein's longstanding and deep involvement in the extensive fraud scheme alleged in this action.  (*See, e.g.*, Tr. 228:7–16 (explaining that Xia met Verfenstein in the early 2000s); Tr. 229:11–14 ("[Q:] And you[] [are] working closely with

61

Xi Verfenstein on all of the projects we[] [have] been talking about, the Mirage and Emerald, is that right?, [Xia:] That's correct, yes.").)  Such evidence more than suffices to show a strong likelihood that Verfenstein has received ill-gotten gains to which she has no legitimate claim. Considering the SEC's relatively minimal burden at this stage of the proceedings, Verfenstein's misdirected submissions do not move the needle.

*    *    *

## IV.    The Scope of the Injunction

Once the SEC has met its initial burden for an asset freeze to issue, the Court has "ample discretion to assess all the relevant circumstances" to determine the appropriate "coverage, terms, and duration of that order." *S.E.C. v. Unifund Sal*, 917 F.2d 98, 99 (2d Cir. 1990) ("*Unifund-2*"). Because an asset freeze "simply assures that any funds that *may* become due can be collected," *Unifund-1*, 910 F.2d at 1041 (emphasis added), courts do not require the SEC to prove the extent of the defendants' potential liabilities with exactitude. *See ETS Payphones*, *Inc*., 408 F.3d at 735 ("The SEC's burden for showing the amount of assets subject to disgorgement (and, therefore, available for freeze) is light: a reasonable approximation of a defendant's ill-gotten gains is required[.]" (cleaned up)); *S.E.C. v. First Jersey Secs., Inc*., 101 F.3d 1450, 1474 (2d Cir. 1996) (noting that "any risk of uncertainty in calculating disgorgement should fall on the wrongdoer whose illegal conduct created that uncertainty" (cleaned up)).  Thus, given its provisional nature, an asset freeze may encompass assets not derived from the fraud to preserve the full amount of recovery that may ultimately become due.  *See Unifund-1*, 910 F.2d at 1042 (holding that the SEC should not be denied "the opportunity to collect funds that Congress has expressly determined are appropriate for forfeiture."); *cf. S.E.C. v. Banner Fund Int'l*, 211 F.3d 602, 617 (D.C. Cir. 2000)

("[D]isgorgement is an equitable obligation to return a sum equal to the amount wrongfully obtained, rather than a requirement to replevy a specific asset[.]").

The Court rejects Defendants' and Relief Defendants' argument, based on the Supreme Court's decision in *Liu*, that their "legitimate business expenses" have any bearing on the scope of the asset freeze.  In *Liu*, the Supreme Court held that, after judgment, any disgorgement amount must be discounted to accommodate "legitimate business expenses."  *See* 140 S. Ct. at 1949–50. The Supreme Court's discussion, however, did not take place in the context of preliminary relief such as an asset freeze.  As the Ninth Circuit noted on remand in *Liu*, the argument that the Court should, before final judgment—and here, before discovery—calculate all of Defendants' prospective liabilities and legitimate business expenses would effectively require the Court to resolve the merits.  *See S.E.C. v. Liu*, 851 F. App'x at 669 ("[That] position would require the district court to calculate an amount of disgorgement now, prior to any final judgment.  Without that finding, it would be impossible to tailor this injunction solely to those assets that are net profits from the use of investor funds[.]").  This conclusion is especially apt here, because, although the Supreme Court in *Liu* found that a carve-out for business expenses from the disgorgement *judgment* was appropriate, the Court did so only for "business expenses" that were proved to be "*legitimate*."  140 S. Ct. at 1950 (noting that those recoverable expenses must be "legitimate" and not "merely wrongful gains under another name." (citing *Providence Rubber Co. v. Goodyear*, 76 U.S. 788, 803 (1869) ("extraordinary salaries which [were] paid  .  .  .  were dividends of profit under another name."))).  Here, in effect, the SEC alleges that some of the business expenses Defendants seek to exempt from the asset freeze are not legitimate, but merely incidental means to fuel the ongoing fraudulent scheme.  This issue raises complex questions of law and fact, including questions of credibility, which are ill-suited for resolution on the pleadings, before any

discovery.  Because *Liu* does not require otherwise, the Court declines to account for any purported business expenses in determining the scope of the injunction.[42]

The Court likewise rejects Defendants' and Relief Defendants' argument that rental properties that pre-dated the fraud should be released from the asset freeze because the SEC is over-secured.  (*See, e.g.*, Dkt. 179, at ECF 14.)  Once the SEC has offered a fair assessment of a defendant's liabilities, courts generally hold that the defendant and any relief defendant must present evidence—and may not rely on conclusory denials—to defeat the SEC's claim that their net worth falls below the scope of their potential liabilities.  *See, e.g.*, *S.E.C. v. Am. Bd. of Trade, Inc.*, 830 F.2d 431, 438–39 (2d Cir. 1987) (freezing $500,000 in funds was proper because defendant failed to rebut the SEC's assessment of his liabilities); *S.E.C. v. Lauer*, 478 F. App'x 550, 554 (11th Cir. 2012) (finding a complete asset freeze proper because defendant offered "only estimates as to his net worth," and "did not meaningfully rebut the SEC's showing that his potential disgorgement exceeded his net worth"); *S.E.C. v. Quinn*, 997 F.2d 287, 289 (7th Cir. 1993) (finding that a complete asset freeze was proper when defendant "did not offer an alternative calculation or demonstrate that some of the assets have legitimate sources").

As part of this process, the Court may properly consider what "documentary evidence," if any, Defendants have produced to rebut the SEC's assessments of their liabilities, the risk that Defendants would "waste their assets prior to refunding public investors' money," as well as the "doubt cast on the credibility" of Defendants "by these proceedings."  *Am. Bd. of Trade, Inc.*, 830 F.2d at 439 (affirming the freezing of personal assets that did not directly relate to the fraud).  Here,

---

[42] The Court expresses no view as to whether any expense, including those which are currently at issue, falls under the category of legitimate business expenses.  When the factual record is fully developed, the parties may renew their arguments on the issue.

the SEC's assessment is convincing only in part. First, the Court finds convincing the SEC's assessment of disgorgement based on the total amount that Defendants raised from investors as $229 million (Dkt. 183, ¶ 4), and prejudgment interest of approximately $68 million. (*See* Dkt. 183-1.) However, the SEC errs in its calculation of civil penalties. As to these penalties, the SEC recognized Defendants' argument that the limitations period began running in March 2016, five years before the Complaint was filed, but then inexplicably refers to the statutory time period as starting on March 27, *2015*, *i.e.*, one year earlier. (*Compare* Dkt. 179, at 21 ("The SEC commenced this action on September 27, 2021. After adding the six-month tolling period to its claims, any claims that accrued before March 27, 2016, were time barred.") *with* Dkt. 182, at 19 n.12 ("Given that the Complaint was filed on September 27, 2021, five years prior to that date, minus the six-month tolling agreement, results in a penalty period commencing on March 27, 2015.")). Thus, the SEC erroneously expanded the scope and amount of recovery being sought by approximately one year. (*See* Dkt. 182, at 19 (asking "$34,519,932" for 30 months of allegedly illegal conduct); *see id.* at 20 n.13 (similarly expanding the recovery period)). The difference is significant. Using the correct time frame, the SEC may only seek penalties for a 15-month period during which Defendants received investor payments, which amounts to $15,538,635 for Fleet, $3,107,745 for Xia, and $18,646,380 in total (*see* Dkt. 6-48, at ECF 29–31)—compared to the $34,519,932 calculated by the SEC for a 30-month period (Dkt. 182 at 19).[43]

---

[43] The Court reached these figures by multiplying the number of months—after March 27, 2016—where Defendants received payments from investors (*see* Dkt. 6-48, at ECF 29–31), by the "maximum penalty" available "for third-tier violations occurring after November 2, 2015," namely, "$207,183 per violation [for a person] and $1,035,909 per violation for entities." (Dkt. 182, at 19.)

The Second Circuit addressed a comparable situation in *Unifund-1*, where the SEC sought an asset-freezing preliminary injunction, in a case involving alleged insider-trading for which, the Circuit found, the SEC had presented insufficient evidence of a violation. 910 F.2d at 1040 (finding that the SEC had failed to "identif[y] the person or entity alleged to have conveyed inside information to either appellant"). The Circuit further found that the SEC had attempted to bridge the gap in "evidence with speculation," and therefore held that a preliminary injunction was insufficiently supported. *Id.* at 1040–41. However, the Circuit found that the same evidence provided a "basis to infer that the appellants [had] traded on inside information," and accordingly affirmed a time-limited asset freeze. *Id.* Here, unlike in *Unifund-1*, the SEC has produced overwhelming evidence to justify its asset freeze, far exceeding its evidentiary burden. (*See supra* at [3]–[20].) While the SEC's assessment of liabilities is temporally over-inclusive and creates a modicum of doubt as to the proper magnitude of a preliminary asset freeze, the Court finds that it is still necessary, in order to ensure full recovery in this matter and to prevent the dissipation of Defendants' assets that can be applied toward satisfying any judgment, not to release the rental properties from the freeze at this time. *See* 910 F.2d at 1041 (noting the broad policy requiring giving "[the SEC an] opportunity to collect funds that may yet be ordered disgorged"). Thus, in keeping with *Unifund-1*, the Court issues a complete, but time-limited, asset freeze that includes Xia's rental properties and all income from those properties to last for two years. This period of time will permit a more precise calculation of the SEC's potential recovery in this case.[44]

---

[44] The Court notes the possibility that a complete asset freeze would be justified as the SEC might be able to recover a disgorgement amount far exceeding the $229 million that EB-5 investors paid and encompassing income earned on the proceeds of the fraud. In *S.E.C. v. Manor Nursing Centers, Inc.*, 458 F.2d 1082, 1105 (2d Cir. 1972), the Second Circuit reversed an asset-freeze order reaching such income derived from fraudulent gains. While some courts in this Circuit have

Several factors convince the Court that it would be ill-advised to release the rental properties from the scope of the asset freeze at this stage.  First, as previously discussed, the SEC has met its evidentiary burden, put into evidence a list of the lawsuits currently pending against Defendants, each of which seeks to obtain the same assets as here, and further argues that the two main assets, the Eastern Emerald and the Eastern Mirage, are highly illiquid and might never be sold.  (*See* Dkt. 53-1.)  Such evidence, even when considered only with respect to the disgorgement and prejudgment interest claims, supports a complete asset freeze.   Second, the Court has considered the evidence adduced by Defendants in response to the SEC's assessment of their liabilities.  This evidence, in the main, consists of two "expert" reports that assess the value of their

---

interpreted *Manor* to mean that such asset freezes were *per-se* impermissible, the Court does not read *Manor* nearly as restrictively.  *See Unifund-1*, 910 F.2d at 1042 ("[W]e concluded [in Manor] that this incremental remedy would be arbitrary in the *circumstances presented*." (emphasis added)).  Specifically, in *Manor*, the Second Circuit found "significant" the fact that the defendants in that "private litigation" would not have been able to recover the income derived from the fraud and were limited to recovering the value of their initial investment, *i.e.*, actual damages.  *See* 458 F.2d at 1104.  A year after *Manor*, the Second Circuit issued a decision allowing private investors precisely the recovery disallowed in *Manor* because the private plaintiffs could prove that the defendants would not have made any profit absent the fraud.  *See Zeller v. Bogue Elec. Mfg. Corp.*, 476 F.2d 795, 801–02 (2d Cir. 1973).  Here, the SEC alleges, in effect, that EB-5 investor funds were virtually the sole source of funding Defendants used to finance the Projects, and thus, per *Zeller*, any profits Defendants made from those funds might be recoverable by the private plaintiffs in the various investor lawsuits that have been filed against Defendants.  Because the Second Circuit in *Manor* did not consider a case where a private party may have been able to recover the fraudulent income, the Court is unable to conclude that *Manor* controls here as to the SEC.  Furthermore, in the decades following *Manor* and in the context of securities fraud, the Second Circuit has developed a more expansive view of disgorgement, one not tied to the underlying loss investors suffered.  *See Ahmed*, 123 F. Supp. 3d at 309 ("Relief Defendants are incorrect that a remedy of disgorgement is appropriate only where the victim has sustained a loss.  Rather, disgorgement serves to remedy securities law violations by depriving violators of the fruits of their illegal conduct." (citing *S.E.C. v. Contorinis*, 743 F.3d 296, 301 (2d Cir. 2014)).  Thus, while the Court will faithfully apply, as it must, all relevant precedent, it notes that the rationale underlying *Manor* might now be an outlier in the law of this Circuit.  *See generally Hallam*, 42 F.4th at 327–29 (discussing *Manor*'s rationale, *inter alia*, in light of Fifth Circuit precedent).

real estate holdings and contributions to the Projects to be in the order of $400 million.  (*See, e.g.*, Dkts. 180, 181.)    However, these reports rely heavily on Xia-provided documents and representations.   Because Xia has consistently demonstrated a troubling lack of candor and credibility throughout this lawsuit (*see* Tr. 663 (noting that the Court "found so much of Mr. Xia's testimony unbelievable and incredible and proven demonstrably false by records and other testimony")), the Court finds the value of these expert reports to be almost nil.   The SEC's assessment of Defendants' liabilities thus stands largely unrebutted.   Third, as in *Am. Bd. of Trade*, the record strongly suggest that Xia will dissipate, transfer, hide, or otherwise seek to shield from recovery any assets left unfrozen and unmonitored.   *See* 830 F.2d at 439

In addition to Defendants' blatant misuse of investor funds to facilitate the purchases of Relief Defendants' mansions, there are clear indications that Xia has not been complying with the TRO currently in place and that not all of Xia's assets have been disclosed, such that the TRO did not freeze all of Xia's assets, as intended.   First, Xia has made virtually no application for any carve-out from the current TRO and yet has apparently managed to pay hundreds of thousands of dollars in legal fees, as well as continue his daily affairs seemingly with minimal interruption. Second, the Court's concern about undisclosed assets is reinforced by Defendants' and Relief Defendants' ongoing lack of cooperation and participation in the Monitor's efforts to verify the magnitude of their assets and liabilities, as noted in each of the Monitor's quarterly status reports. (*See generally* Dkts. 55, 115, 170; *see also* Dkt. 196 (Monitor's Fourth Quarterly Report noting that Defendant Xia has placed his rental properties that, as Xia claims, are currently subject to the asset freeze on sale).)   In light of Xia's apparent disregard for the existing TRO, it is clear to the Court that releasing the rental properties and the resulting income from the asset freeze would almost certainly lead to their permanent dissipation, thereby depriving investors of relief and the

68

SEC of a fair opportunity to recover, which must be protected under this Circuit's precedent. Considering these factors, the Court determines that a two-year complete asset freeze is appropriate in this case.

The Court will, however, consider making a substantial carve-out from the asset freeze for the benefit of Defendants and Relief Defendants, for reasonable payments of legal fees, living expenses, and other good reasons, including support of children and other dependents. *See S.E.C. v. I-Cubed*, 664 F. App'x at 57 (finding that the district court did not abuse its discretion, *inter alia*, because substantial carve-outs were permitted upon request).[45]

Furthermore, the SEC may apply to extend the asset freeze after the two-year period, based on a showing that an extension is needed to preserve the full amount of assets necessary to satisfy a judgment in this matter, that Defendants and/or Relief Defendants have delayed, or attempted to delay, this action, and/or other just cause.

---

[45] Any such carve-out is subject to the conditions stated in Part V of the, contemporaneously filed, Order Freezing Assets.

**CONCLUSION**

For the reasons stated herein, the SEC's motion is granted in part, and Defendants' and Relief Defendants' cross-motion is denied in its entirety.  The Court issues an asset-freezing preliminary injunction, for the duration of two years, that covers all of Defendants' assets and Relief Defendants' residential properties.[46]

SO ORDERED.

*/s/ Pamela K. Chen*
Pamela K. Chen
United States District Judge

Dated: December 8, 2022.
      Brooklyn, New York

---

[46] The Court has carefully reviewed and considered all the arguments, evidence, and other filings—including, but not limited to, any declarations, depositions, charts, summaries, expert reports, and letters—that any party, interested party, and/or third party submitted in this action to date.  To the extent any such materials or arguments bore on the issues presented in this Memorandum and Order, but were not explicitly addressed herein, the Court has found them without merit or relevance.  *See Clemons v. Mississippi*, 494 U.S. 738, 747 n.3 (1990) (noting that federal courts implicitly reject arguments they refuse to address).

70

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------x
SECURITIES AND EXCHANGE
COMMISSION,

                    Plaintiff,

        - against -

RICHARD XIA, a/k/a YI XIA; and FLEET
NEW YORK METROPOLITAN
REGIONAL CENTER, LLC, f/k/a
FEDERAL NEW YORK
METROPOLITAN REGIONAL CENTER,
LLC,

                  Defendants,
          -and-

JULIA YUE, a/k/a JIQING YUE; XI
VERFENSTEIN; and XINMING YU,

              Relief Defendants.
-------------------------------------------------------x

**PRELIMINARY INJUNCTION
FREEZING ASSETS**
21-CV-5350 (PKC) (RER)

## ORDER FREEZING ASSETS

      **WHEREAS** the Court has jurisdiction over the subject matter of this action and over the

Defendants and Relief Defendants, and venue properly lies in this District;

      **WHEREAS** the Court has appointed M. Scott Peeler to serve as a Monitor, according to

the terms of the Order Appointing Monitor, Docket Entry No. 11-1, whose terms remain in full

force;

      **WHEREAS** based upon due consideration of the entire record, the Court finds that Plaintiff

Securities and Exchange Commission (the "SEC") has made a sufficient and proper showing in

support of the relief granted herein, as required by Section 20(b) of the Securities Act of 1933

("Securities Act"), 15 U.S.C. § 77t(b), and Section 21(d) of the Securities Exchange Act of 1934

("Exchange Act"), 15 U.S.C. § 78u(d), by establishing a strong likelihood that the SEC will prevail at trial on the merits and an inference that Defendants have engaged in acts, practices, and courses of business constituting violations of Section 17(a) of the Securities Act, 15 U.S.C. § 77q(a), Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b–5, 17 C.F.R. § 240.10b-5 thereunder;

**WHEREAS** there is good cause to believe that the Defendants and Relief Defendants have received ill-gotten gains derived from the Defendants' unlawful conduct, and that at least some of these funds have been deposited into accounts controlled by one or more of the Defendants and/or Relief Defendants, as set forth in Schedule A to this ORDER;

**WHEREAS** the SEC has made a sufficient and proper showing to freeze the Defendants' assets, including, but not limited to, the accounts set forth in Schedule A to this ORDER, for an amount of at least $297,000,000;

**WHEREAS** the SEC has made a sufficient and proper showing to freeze the Relief Defendants' assets, including, but not limited to, the accounts set forth in Schedule A to this ORDER, for an amount of up to $30,180,000;

**WHEREAS** there is good cause to believe that, unless restrained and enjoined by order of this Court, the Defendants and Relief Defendants will attempt to dissipate, deplete, or transfer from the jurisdiction of this Court assets that could be subject to an order directing disgorgement or the payment of civil monetary penalties in this action, such that an order freezing the Defendants' and Relief Defendants' assets is necessary to preserve the *status quo* and to protect this Court's ability to award equitable relief in the form of disgorgement of illegal profits from fraud and civil penalties,

SPA-73

**I.**

**NOW, THEREFORE, IT IS HEREBY ORDERED** that, from the date of this ORDER and until two years thereafter, the assets, funds, or other property held by or under the direct or indirect control of the Defendants whether held in any of their names or for their direct or indirect beneficial interests, wherever located, are frozen.  The Defendants and each of their financial and brokerage institutions, officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this ORDER by personal service, facsimile service, telephonic notice, notice by email, or otherwise, and each of them, shall hold and retain within their control, and otherwise prevent, any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal (including money, real or personal property, securities, commodities, choses in action or other property of any kind whatsoever) of, held by, or under the direct or indirect control of the Defendants, whether held in any of their names or for any of their direct or indirect beneficial interest wherever situated, in whatever form such assets may presently exist, and shall direct each of the financial or brokerage institutions, debtors and bailees, or any other person or entity holding such assets, funds or other property of the Defendants to hold or retain within its or his or her control and prohibit the withdrawal, removal, transfer or other disposal of any such assets, funds or other properties, including, but not limited to, the accounts set forth in Schedule A to this ORDER.

**II.**

**IT IS HEREBY FURTHER ORDERED**, that, from this date of this ORDER and until two years thereafter, the assets, funds, or other property held by or under the direct or indirect control of the Relief Defendants whether held in any of their names or for their direct or indirect beneficial interests, wherever located, up to the amount of $30,180,000 are frozen.  The Relief Defendants and each of their financial and brokerage institutions, officers, agents, servants,

3

SPA-74

employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this ORDER by personal service, facsimile service, telephonic notice, notice by email, or otherwise, and each of them, shall hold and retain within their control, and otherwise prevent, any withdrawal, transfer, pledge, encumbrance, assignment, dissipation, concealment, or other disposal (including money, real or personal property, securities, commodities, choses in action or other property of any kind whatsoever) of, held by, or under the direct or indirect control of the Relief Defendants, whether held in any of their names or for any of their direct or indirect beneficial interest wherever situated, in whatever form such assets may presently exist, and direct each of the financial or brokerage institutions, debtors and bailees, or any other person or entity holding such assets, funds or other property of the Relief Defendants to hold or retain within its or his or her control and prohibit the withdrawal, removal, transfer or other disposal of any such assets, funds or other properties, including, but not limited to, the accounts set forth in Schedule A to this ORDER, up to the amount of $30,180,000.

### III.

**IT IS FURTHER ORDERED** that, while Parts I and II of this ORDER remain in force, this ORDER applies, without limitation, to the following properties:

A. Real property located at Kings Point Road, Kings Point, NY 11024; referred to in Docket Entry No. 101-10, and is held in the name of Julia Yue,

B. Real property located at Middle Neck Road, Sands Point, NY 11050; referred to in Docket Entry No. 101-11, and is held in the name of Xi Verfenstein and/or any entity which Xi Verfenstein controls, including Yume Sansui, LLC.

C. Real Property located at Vanderbilt Drive, Sands Point, NY 11050; referred to in Docket Entry No. 101-19, and is held in the name of Xinming Yu.

As to these or any other pieces of real property in which the Defendant or

Relief Defendants have an interest, the Defendant and Relief Defendants and their officers, directors, successor corporations, subsidiaries, affiliates, agents, servants, employees, attorneys-in-fact, and those persons in active concert or participation with them are prohibited from encumbering their interests by means of selling, transferring, assigning, or otherwise disposing of the property, pledging the property as collateral for any purpose, or allowing the property to secure any obligation.

## IV.

**IT IS FURTHER ORDERED** that, while Parts I and II of this ORDER remain in force, no person or entity, including the Defendants, the Relief Defendants, or any creditor or claimant against the Defendants or any of the Relief Defendants, or any person acting on behalf of such creditor or claimant, shall take any action to interfere with the asset freeze, including, but not limited to, the filing of any lawsuits, liens, or encumbrances, or bankruptcy cases to impact the property and assets subject to this ORDER; provided, however, that any party or non-party may seek leave from this ORDER upon a proper showing, and that any appeal to or from the Second Circuit regarding this ORDER would be permissible.

## V.

**IT IS FURTHER ORDERED** that the Defendants and Relief Defendants may apply to the Court to use assets, funds, or other property currently subject to this ORDER provided that:

A.  The Defendants and Relief Defendants seek to use assets, funds, or other property (subject to this ORDER but not derived from or associated with any alleged fraud) for reasonable payments of legal fees or living expenses, or other good reasons, including support of children and other dependents;

B.  The Defendants and Relief Defendants have given a full accounting of their assets and liabilities to the Monitor, as requested by the Monitor, and detailed in Part V of the Court's

September 27, 2021, Order granting a temporary restraining order and asset freeze, Docket Entry No. 11; and

      C.  The Defendants and Relief Defendants have provided appropriate documentation of these expenses to the Court, and the Court finds them legitimate, proper, and not excessive.


      **IT IS FURTHER ORDERED** that this ORDER shall be, and is, binding upon each of the Defendants and Relief Defendants, and each of their respective officers, agents, servants, employees, and attorneys, and those persons in active concert or participation with them who receive actual notice of this ORDER by email, personal service, facsimile, overnight courier, or otherwise.


      SO ORDERED.

      */s/ Pamela K. Chen*
      Pamela K. Chen
      United States District Judge

Dated:  December 8, 2022
        Brooklyn, New York